UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, L.L.C. d/b/a UNIVERSITY HEALTH SHREVEPORT AND VANTAGE HEALTH PLAN, INC.<br><br>          Plaintiffs,<br><br>v.<br><br>WILLIS-KNIGHTON MEDICAL CENTER, d/b/a WILLIS-KNIGHTON HEALTH SYSTEM<br><br>          Defendant. | NO.  5:15-cv-2057<br><br>JUDGE<br><br>MAG. JUDGE<br><br>JURY TRIAL REQUESTED |

**COMPLAINT FOR INJUNCTION
AND DAMAGES AND DEMAND FOR TRIAL BY JURY**

NOW IN COURT, through undersigned counsel, come Plaintiffs, BRFHH Shreveport, L.L.C. d/b/a University Health Shreveport ("UH-Shreveport" or "UHS"), and Vantage Health Plan, Inc. ("Vantage") for their Complaint for Injunction and Damages, aver as follows.

**INTRODUCTION**

1.

This case is being filed to enjoin Willis-Knighton Medical Center from unlawfully stripping plaintiff UH-Shreveport of its commercially insured business, and then taking over UH-Shreveport.  The actions of Willis-Knighton described below would give it a virtually complete monopoly position in the relevant market.  They would substantially increase health care costs, reduce health care quality, and seriously harm insurers, employers, and consumers, including plaintiff Vantage, with whom Willis-Knighton has effectively refused to deal.

2.

This is a scheme that, according to Willis-Knighton's own analysis, it could not lawfully pursue, because "**costly anti-trust [sic] challenges would certainly be brought** against WKHS if we added the LSU Medical Center market share to that we already have."  Nevertheless, Willis-Knighton is now trying to accomplish indirectly what it has admitted it could not lawfully achieve directly.

3.

Willis-Knighton already has a monopoly level market share in the relevant metropolitan Shreveport-Bossier City hospital market, and has exploited that position to harm the public.  In Willis-Knighton's own words, "Willis-Knighton **is unlike any health care provider in Louisiana by virtue of our share of the health care services market**."  Willis-Knighton has exploited its monopoly power to obtain reimbursement rates from payors such as Blue Cross that are as much as **2 and 3 times** the rates of other providers such as UH-Shreveport.  Willis-Knighton has also effectively refused to deal with other health plans such as Vantage in order to limit their market acceptance and maintain Willis-Knighton's monopoly power.

4.

Willis-Knighton is now seeking to acquire the commercially insured practice of Louisiana State University Health Sciences Center - Shreveport ("LSU Shreveport") through a series of agreements under which LSU Shreveport-employed faculty members would work in clinics on the Willis-Knighton hospital campuses, with their services billed (and prices set) by Willis-Knighton.  Willis-Knighton intends under this plan to ultimately have all of the LSU Shreveport faculty physicians' commercially insured patients treated at Willis-Knighton facilities instead of at UH-Shreveport.  Willis-Knighton has also pressured Louisiana State University

17525393.36

("LSU") into unjustifiably seeking to terminate UH-Shreveport's operation of its hospital so that Willis-Knighton can take it over.

5.

Willis-Knighton's scheme involves each of the following elements:

a.     Threats of the withdrawal of research funding to LSU Shreveport if it does not agree with Willis-Knighton's scheme and the offer of greater research funds if it does cooperate, paid for out of the greater monopoly profits that Willis-Knighton will earn as a result of its greater market power.  Such actions serve to coerce LSU Shreveport and to cause it to agree to shift its commercially insured business to Willis-Knighton.

b.     The decision to contract for, bill for and collect on such commercially insured business at Willis-Knighton's commercially insured rates and according to its anticompetitive contracting practices.

c.     Utilizing Willis-Knighton's control over the business aspects of LSU Shreveport's commercially insured business to assure that LSU Shreveport's commercially insured patients will be referred for hospital and ancillary services to Willis-Knighton facilities.

d.     Undertaking these actions to cause significant financial harm to UH-Shreveport, forcing a change in the Shreveport hospital's operations.

e.     Willis-Knighton has now caused LSU to issue a notice of breach with regard to its cooperative endeavor agreement providing for operation of what was previously LSU Medical Center by UH-Shreveport.  Willis-Knighton plans a takeover of management of UH-Shreveport's hospital

and its medical residency slots after an unjustified termination of the Shreveport hospital by LSU.

    f.    Enhancement of Willis-Knighton's monopoly power in the relevant hospital and physician markets, leaving CHRISTUS Health Shreveport-Bossier as its only remaining competitor.

6.

As a result of Willis-Knighton's plan, the public, UH-Shreveport, Vantage and health care competition in metropolitan Shreveport/Bossier City will be seriously and irreparably injured, in at least the following ways:

    a.    Willis-Knighton will gain a dominant share or enhance its already dominant share in relevant physician services markets, including (initially) ENT, hematology oncology, neurology, Ob/Gyn, and general pediatrics.

    b.    Willis-Knighton's 75% share in the relevant hospital market will increase to even higher levels, near 90%. This will occur because the LSU physicians who treat their commercially insured patients at LSU clinics will refer those patients for hospitalization and other hospital services to Willis-Knighton, rather than UH-Shreveport.

    c.    Willis-Knighton will thereby possess an irreplaceable network of physicians and hospitals that will allow it to exclude competition from its rivals, including UH-Shreveport, and raise prices even farther above competitive levels than they already are. Additionally, if this transaction is permitted, more patients will be referred to the already higher priced Willis-Knighton hospitals, causing significant harm to consumers and employers.

4

d.  Willis-Knighton's takeover of the LSU Shreveport faculty physicians' commercially insured practice will have a devastating impact on UH-Shreveport, which depends critically on the commercially insured admissions from the LSU Shreveport faculty physicians.  The shift of commercially insured business to Willis-Knighton would cause UH-Shreveport to lose more than $15 million annually in incremental profits, and could endanger the Shreveport hospital's survival and its care for the poor and underserved citizens of Shreveport and Bossier City.

e.  Willis-Knighton has seriously harmed Vantage's ability to operate effectively in the Shreveport area by effectively refusing to participate in Vantage's provider networks on any reasonable basis, and its threatened actions with regard to the commercially insured patients of LSU Shreveport facility physicians will further seriously damage Vantage's provider network and harm Vantage's ability to offer its innovative care in the Shreveport area.

7.

In fact, Willis-Knighton has engaged in essentially the same practices at issue here at multiple times in the past.  In three cases – with regard to Bossier Medical Center, Doctors' Hospital, and (most recently) CHRISTUS Schumpert – Willis-Knighton has (a) acquired physicians practicing at the competing hospital, (b) thereby caused a substantial shift in referrals away from the competing hospital, (c) the competing hospital failed, in substantial part due to Willis-Knighton's actions, and (d) (in two cases) Willis-Knighton ultimately bought the formerly competing hospital's building.  In at least one of these cases, the referrals that were shifted were predominantly commercially insured patients.  These events, including the closure of

5

17525393.36

CHRISTUS Schumpert's acute care services in 2013, have caused serious damage to Vantage. There is no doubt that Willis-Knighton seeks the very same result with regard to UH-Shreveport.

## THE PARTIES AND LSU SHREVEPORT

8.

Plaintiff UH-Shreveport is a not-for-profit corporation organized under and by virtue of the laws of Louisiana, headquartered in Shreveport. UH-Shreveport is a subsidiary of BRF Hospital Holdings, L.L.C., d/b/a University Health System, which in turn is owned by Biomedical Research Foundation of Northwest Louisiana. UH-Shreveport is a critical "safety net" hospital, which plays a predominant role in treating the poor and underserved in the Shreveport-Bossier City area. UH-Shreveport is also a sophisticated academic medical center, with centers of excellence in cancer, arthritis and rheumatology. The Shreveport hospital is a Level 1 trauma center serving communities across north Louisiana, east Texas and southwest Arkansas and one of only two burn centers in Louisiana.

9.

Plaintiff Vantage is a for-profit corporation organized under and by virtue of the laws of Louisiana, headquartered in Monroe. Vantage is a subsidiary of Vantage Holdings, Inc. As a state-licensed HMO, Vantage provides healthcare coverage to individuals, employer groups and to Medicare recipients under the Medicare Advantage Program administered by the Centers for Medicare and Medicaid Services ("CMS"). Vantage, which was started by a group of Monroe area physicians and other citizens in 1994 to improve healthcare in northeast Louisiana, currently insures over 35,000 lives.

10.

Defendant Willis-Knighton Medical Center is a not-for profit corporation organized under and by virtue of the laws of Louisiana. Willis-Knighton Medical Center is headquartered

in Shreveport.  Willis-Knighton Medical Center is the corporate name of both the Willis-Knighton hospital located in Shreveport and of the entity that manages and operates all of the Willis-Knighton facilities in the Willis-Knighton health system.  Willis-Knighton Medical Center operates the health system under the name Willis-Knighton Health System. Willis-Knighton Medical Center and Willis-Knighton Health System are referred to collectively herein as "Willis-Knighton."

11.

The metropolitan Shreveport-Bossier City area is located about 30 miles south of the Arkansas/Louisiana border.  There are three health systems that operate hospitals in metropolitan Shreveport-Bossier City: Willis-Knighton, UH-Shreveport and CHRISTUS Health Northern Louisiana, d/b/a CHRISTUS Health Shreveport-Bossier ("CHRISTUS").  Willis-Knighton's share of hospital admissions in metropolitan Shreveport/Bossier City is approximately 60% overall and approximately 75% among commercially insured patients.  UH-Shreveport and CHRISTUS each have approximately a 12% share of commercially insured patients.

**LSU-SHREVEPORT**

12.

LSU Shreveport is a medical school located in Shreveport, Louisiana, which is part of Louisiana State University.  LSU Shreveport employs hundreds of faculty physicians and hundreds of residents and fellows in 39 residency programs.  LSU Shreveport is establishing a private faculty practice plan, the LSU Health Sciences Center – Shreveport Faculty Group Practice (the "Faculty Practice Plan").  It is planned that all commercially insured patients will be treated by the Faculty Practice Plan.  According to LSU, the Faculty Practice Plan will operate "separately with its own tax ID."

7

13.

Louisiana State University ("LSU") is a university, which includes a medical school that employs physician faculty at various locations around Louisiana who teach students, train residents and fellows, and treat patients.  LSU Shreveport's and LSU's actions as described herein are not as regulators (and therefore not as state sovereigns), but as market participants, through their operation of physician practices and ownership of hospital facilities in various locations in Louisiana, including Shreveport.

14.

UH-Shreveport is the clinical partner and hospital for LSU Shreveport, and depends exclusively on admissions from LSU Shreveport faculty physicians.   By contract, UH-Shreveport has a closed medical staff, limited to LSU Shreveport physicians.  LSU Shreveport faculty physicians' commercially insured patients are critical to the financial viability of UH-Shreveport, both because of their volume and because commercially insured patients are more lucrative than the Shreveport hospital's overall patient base.  UH-Shreveport is only able to afford to treat the poor, uninsured and Medicaid population because of the more profitable commercially insured admissions it receives primarily through referrals from the LSU Shreveport physicians.

## JURISDICTION AND VENUE

15.

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

17525393.36

16.

Willis-Knighton transacts business in the Western District of Louisiana and is subject to personal jurisdiction therein.  The actions complained of herein took place in this district.  Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.

## TRADE AND COMMERCE

17.

Willis-Knighton is engaged in interstate commerce and its activities substantially affect interstate commerce.  Hundreds of millions of dollars of Willis-Knighton's and UH-Shreveport's revenues come from sources located outside of Louisiana, including payments from the federal government through such programs as Medicare and payments from out of state commercial payors such as Aetna, Cigna and United.  Vantage receives millions of dollars of payments in interstate commerce from Medicare and from the federal government to subsidize payments for Vantage members on the health care exchanges.  Vantage also receives millions of dollars in payments of premiums from employers outside of Louisiana who have Vantage members inside Louisiana.  Willis-Knighton owns and operates a medical facility in Arkansas.  Both UH-Shreveport and Willis-Knighton Medical Center treat a substantial number of patients from other states, including, in particular, Arkansas and Texas.  The parties expend millions of dollars on the purchase of supplies in interstate commerce.

18.

For these reasons, the increase in volume and market power of Willis-Knighton and the weakening of UH-Shreveport and Vantage described herein will substantially affect the parties' revenues in interstate commerce.  Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing

9

Willis-Knighton's volume of patients and interstate purchases and decreasing the volumes of UH-Shreveport's.  Willis-Knighton's past acquisitions have already had this effect.

## FACTUAL ALLEGATIONS

### Willis-Knighton's Monopoly Power and Anticompetitive Actions

19.

Willis-Knighton is the dominant hospital in the Shreveport-Bossier City area, with a share of 65% overall and approximately 75% or more among commercially insured patients and Medicare patients according to state data.  Willis-Knighton's most recent published financial statements, for the year ended September 30, 2014, state that it has a 65.9% market share with respect to all patients.

20.

Willis-Knighton has achieved this share in significant part by a series of anticompetitive acquisitions of physician practices across virtually all physician specialties, continuing from approximately 2000 to the present.  This includes its purchase of numerous physician practices, which have resulted in the 350 physician Willis-Knighton Physician Network, as well as the acquisition of other competing facilities, such as the Northwest Louisiana Surgery Hospital. Willis-Knighton's CEO James Elrod admits in his 2013 book, "Breadcrumbs to Cheesecake," that Willis-Knighton's market share was obtained in significant part by its "ever enlarging network of employed physicians."   The gross revenues of the Willis-Knighton Physician Network have more than quintupled, and the number of physicians in the network has increased from about 50 to more than 350.

21.

Willis-Knighton has by its anticompetitive acquisitions gained a dominant share of the commercially insured business in many physician specialties, including, among others:

17525393.36

      a.      Adult primary care:  80%.

      b.      Pediatric primary care:  44%.

      c.      Ob/gyn:  at least 60%.

      d.      Neurology:  47%.

      e.      Hematology oncology:  36%.

22.

In his book, Mr. Elrod confirmed these conclusions.   Mr. Elrod stated that Willis-Knighton has a "78% share of local, private hospital markets."   He also stated that Willis-Knighton's primary care physicians possess an "80%" share "of the primary care physicians in Shreveport-Bossier City." According to Mr. Elrod, 85% of the births in the Shreveport area occur at Willis-Knighton hospitals.   Mr. Elrod referred to Willis-Knighton as "dominant" or referred to its "dominance" in his book on multiple occasions.

23.

Other indicia of Willis-Knighton's monopoly power include:

      a.      Its status as a "must have" hospital in virtually all payor networks;

      b.      Its ability to impose burdensome terms on payors such as most favored nations clauses;

      c.      Its substantial profitability ($83.2 million profit, $136 million EBITDA, and over $300 million unrestricted cash, per the most recent published financial statement for the year ended September 30, 2014);

      d.      Its ability to maintain the Shreveport hospital's dominance despite its failure to keep current with the key trends in health care; and

      e.      Its success despite unusual inefficiencies (such as the employment of three relatives of the CEO in important management positions).

24.

Willis-Knighton has gained monopoly power through a variety of anticompetitive tactics. It has been able to induce many physicians to join its Willis-Knighton Physician Network by offering to purchase their medical offices and move them to the Willis-Knighton campus.  Many physicians who refused to move to the Willis-Knighton campus and join the Willis-Knighton Physician Network suffered huge declines in referrals from Willis-Knighton's primary care physicians.

25.

Willis-Knighton has used other anticompetitive tactics to retain the allegiance of physicians with whom it has contracted.  The contracts between the Willis-Knighton Physician Network and its physicians include two year non-competes, prohibiting the physician from practicing anywhere in Caddo or Bossier Parishes for two years after termination of the agreement.  Many contracts also contain financial disincentives against ending the relationship between the physician and Willis-Knighton Physician Network.   Under the terms of the contracts, if the physician sees fewer patients than is required to justify advance payments of incentive funds, the resulting deficit is "rolled over" into future years and not assessed against the physician, as long as the physician continues to work for Willis-Knighton.  Upon termination of the relationship, a physician may therefore be liable to Willis-Knighton for very substantial sums reflecting years of such deficits.  Physicians will likely not wish to incur what may be substantial deficits.  As a result of these disincentives, Willis-Knighton is able to retain its high market share in various physician markets, whether or not the physicians are happy practicing at Willis-Knighton, and whether or not they might prefer to practice elsewhere in response to competitive offers.

12

26.

Willis-Knighton has also ruthlessly controlled the referrals of its physicians, demanding that physicians within its network or in its office buildings admit virtually all their patients at Willis-Knighton facilities.  It has succeeded in this effort by the use of several sanctions imposed on physicians who do not accede to its demands.  These sanctions include the termination or non-renewal of leases for physician office space, and the direction of its network primary care physicians' referrals away from those specialty physicians who compete with Willis-Knighton or do not refer the bulk of their patients to Willis-Knighton facilities.  Willis-Knighton also controls specialty referrals through its referral center, which sends patients directly to Willis-Knighton network physicians.

27.

Statements in Mr. Elrod's book establish beyond any doubt that Willis-Knighton's physicians refer only to other Willis-Knighton physicians and facilities.  Mr. Elrod stated in his book that the possession of physicians in Willis-Knighton's network "drive" referrals to the Shreveport hospital, and that the employment of such physicians "ensures" high hospital volumes.  Indeed, Mr. Elrod wrote that Willis-Knighton's primary care physicians in its network provide its specialists with effective "monopolies" because of Willis-Knighton's control of the referrals to those specialists.  Thus, Mr. Elrod concedes that Willis-Knighton's control of referrals enhances the monopoly power of the Willis-Knighton Physician Network and hospital system.  He also stated that Willis-Knighton's control of referrals effectively "prohibits" Willis-Knighton's physicians from supporting competitors.

28.

Willis-Knighton has exploited this monopoly power to set extremely high charges and reimbursement rates, thereby creating much higher costs for payors, area employers, and

consumers.  The most recent comparison on the Federal Center for Medicare and Medicaid Studies site shows that Willis-Knighton's average charges are approximately twice that of UH-Shreveport.  An analysis of Blue Cross reimbursement rates for UH-Shreveport employees utilizing Willis-Knighton or UH-Shreveport indicates that Willis-Knighton's reimbursement rates are from 50% to several hundred percent higher than those at UH-Shreveport.  For example:

a.      Willis-Knighton obtained $727.63 per outpatient claim/service, whereas UH-Shreveport received only $442.00.

b.      Willis-Knighton received on average $18,456.05 per inpatient stay for all medical services, more than twice the amount ($5,784.00) obtained by UH-Shreveport.

c.      Willis-Knighton received on average $14,779.00 per inpatient stay for surgical care, more than twice the amount received by UH-Shreveport ($6,192.95).

d.      Willis-Knighton received on average $16,310.17 per inpatient stay for maternity care, more than twice the amount received by UH-Shreveport ($6,275.07).

e.      Willis-Knighton has set rates for ancillary services such as imaging at rates more than double those charged by competitors.

Willis-Knighton has threatened to cancel its contracts with Blue Cross of Louisiana and United Health Care unless it obtained the higher than competitive rates it demanded.

29.

Willis-Knighton's CEO confirmed these facts in his book.  Mr. Elrod admitted that the "critical mass of providers" in the Willis-Knighton network results in a "higher reimbursement

14

on average .. . . from managed care companies."  He also stated that "WK hospitals receive higher reimbursements from HMOs than hospitals without employed physicians."  ("As our network grew, so would our marketing power with other health insurers.  This [is an] advantage of market dominance through our multiple hospital locations and critical mass of providers . . .").

## Vantage and Willis-Knighton

30.

Vantage has been providing health care coverage in Louisiana for more than 20 years. Vantage heavily emphasizes efforts to improve the quality of care and cut the total cost of care for its members, especially its sicker members.  The goal is to improve these patients' care and reduce their often chronic illnesses and, as a result, keep them out of the hospital whenever possible.

31.

Vantage accomplishes these results by a variety of disease management programs for chronic illnesses such as congestive heart failure and diabetes.  Vantage operates case management programs, involving nurse practitioners, pharmacists, diabetes educators, and others, in order to help patients improve their health and comply with medical guidelines.

32.

Vantage's model has been very successful, and has resulted in the steady growth of the health plan.  The one major exception to this success has been in Shreveport.  Vantage has been unsuccessful in gaining membership in the Shreveport area, because of Willis-Knighton's effective refusal to contract with it.   Willis-Knighton's continuing acquisitions, the further impact of those acquisitions on Willis-Knighton's dominance and the unavailability of market alternatives, including during the last four years, have seriously impeded Vantage's success.

33.

Vantage has attempted repeatedly during the last 15 years to contract with Willis-Knighton, including a number of efforts within the last four years.  On each occasion, Willis-Knighton has refused.  The refusals have taken two forms.  In some cases (as most recently), the responsible Willis-Knighton officials have not even been willing to talk to Vantage.  On other occasions, Willis-Knighton has indicated that if Vantage would agree to pay 90% of Willis-Knighton's charges, Willis-Knighton would then be willing to talk about the *possibility* of a contract.  When asked by Vantage to provide Vantage with its charges, so Vantage could assess the prices that this proposal would entail, Willis-Knighton refused.

34.

Willis-Knighton's demand that Vantage pay 90% of charges is itself effectively a refusal to deal.  Very few hospitals are paid on a percent of charges basis, because this methodology allows the hospital to raise the rates that a plan pays simply by unilaterally raising its charges.  Virtually no acute care community hospitals today (except for a few small rural hospitals with old contracts and low levels of charges) are paid at a rate remotely near 90% of charges.  Hospitals are typically paid under other methodologies (typically methodologies based on Medicare's Diagnostic Related Groups or "DRG" system), at rates that are the equivalent of 50% of charges or less.  Payment to all or most of the hospitals in a network of 90% of charges would be completely uneconomic for any health plan, and would not allow it to compete effectively in virtually any market.

35.

Willis-Knighton does participate in Vantage's commercial provider network as a "Tier 2" provider.  In the Vantage network, Tier 2 providers are alternative providers, who, as a result, may be used by health plan subscribers, but only at a substantially greater cost-share rate (in

16

Vantage's case an additional 20% co-insurance). Willis-Knighton did not affirmatively agree to participate as a Vantage Tier 2 provider, but Willis-Knighton is a member of the national PHCS network, and PHCS agreed to provide a "Tier 2" network to Vantage.

36.

Willis-Knighton's participation in the Vantage network only as a Tier 2 provider has seriously impeded Vantage's ability to gain employer groups in the Shreveport area. Because of Willis-Knighton's dominant position in the relevant hospital and physician markets, many Shreveport-Bossier City area employees demand that they have Willis-Knighton hospitals and doctors available to them without the need to pay higher cost-share. As a result, without Willis-Knighton's full participation as a Tier 1 provider in a health plan's network, virtually all employers are unwilling to utilize that health plan.

37.

Willis-Knighton's refusals to deal have been effective because of Willis-Knighton's acquisition of new physicians and their inclusion in the Willis-Knighton Physician Network, and the resulting closure of competing hospitals and growth in Willis-Knighton's market share, in both hospital services and the full range of physician specialties. These acquisitions and their effects have continued through the last four years and into the immediate present, with the recent addition to the Willis-Knighton network of a previously independent cardiology group. These acquisitions have continued to harm Vantage, because the more physicians added to the Willis-Knighton Physician Network, the fewer physicians there are that are available to participate in Vantage's network in the Shreveport Area. The more competing hospitals which are eliminated by Willis-Knighton due to its acquisitions of physicians means that there are fewer hospitals available to Vantage for inclusion in its network.

38.

For example, the growth in the Willis-Knighton Physician Network and the resulting shifting in referrals has substantially contributed to the closing of CHRISTUS Schumpert Hospital's acute care business in 2013.  This significantly reduced the size and attractiveness of the provider network that Vantage was able to offer to employers and subscribers.  It has been especially damaging to Vantage's efforts to offer Medicare Advantage health plans and health plans on the new health care exchanges created in the last two years under the Affordable Care Act.  CHRISTUS Schumpert's location had made it especially attractive to much of the older and lower income population in the Shreveport area who utilize Medicare Advantage and exchange plans.

39.

As a result, Vantage's managed care products have achieved virtually no success in the Shreveport-Bossier City area.  Its provider network, consisting of the remaining CHRISTUS hospitals and doctors, UH-Shreveport and LSU Shreveport physicians, has been insufficient to attract many employers or subscribers.  In fact, Vantage has signed up only two employer groups in the Shreveport-Bossier City area with more than 100 members – and both have been physician groups which practice primarily at CHRISTUS.   In fact, even though Caddo and Bossier Parishes, where Shreveport and Bossier City are located, have a population of about two and a half times that of Ouachita Parish, containing Monroe, Vantage has a far smaller number of members in Caddo and Bossier Parishes than it has in the Monroe area.

40.

Willis-Knighton is committed to using its ever-increasing market dominance achieved through its series of acquisitions to suppress Vantage's success in the Shreveport-Bossier City area, because Vantage's entire model is based on physician-guided efforts to improve patients'

health and thereby reduce the total cost of care, including hospital care.  Willis-Knighton is opposed to efforts to move from a more wasteful (but revenue-producing) "fee for service" model, to a model that would create incentives to reduce the overall cost of care.  Such a transition would decrease Willis-Knighton's revenues and profits.  If Vantage were successful in the Shreveport area, that would put pressure on Willis-Knighton hospitals and physicians to compete with other hospitals and physicians to reduce the total cost of care, and thereby increase competition among physicians and hospitals.  Willis-Knighton's refusals to deal with Vantage have the effect of, and are intended to, prevent that outcome.

41.

In Monroe, where Vantage has been very successful, Vantage has taken its efforts to improve the quality of care and control costs to an even greater level.  In Monroe, Vantage enters into shared savings programs with physicians and hospitals, whereby the hospitals and physicians share an incentive with Vantage to reduce the cost of care and increase quality.  These kinds of programs are being adopted by innovative health plans and providers across the United States in order to create incentives for providers and health plans to work together to cut the costs of health care.  Additionally, Vantage has established a health management center, which provides its members with physical, occupational and speech therapy, diabetic education, athletic trainers, and a number of other services (many without charge).  These services are intended to improve the health of the patient, and also reduce the cost of health care that results from the need to treat unhealthy patients.  Vantage's subsidiary, Affinity Health Group, LLC ("Affinity"), operates a 24 hour walk-in clinic, to allow patients to receive immediate care without the need to wait in long emergency room lines, and without the increased cost involved in emergency room use.

17525393.36

42.

If Vantage had been able to achieve a greater membership level in the Shreveport-Bossier City area, Affinity would have undertaken a similar program in that area, including the placement of employed primary care physicians in Shreveport to manage patients in these innovative ways, improve their care, and reduce the cost of that care.  This would put further competitive pressure on hospitals and physicians in the area to engage in efforts that reduce the overall cost of care, and would have resulted in more effective, innovative health care competition in the Shreveport-Bossier City area.  Willis-Knighton's actions in refusing to deal with Vantage have eliminated this greater competition, and allowed Willis-Knighton to maintain its current level of monopoly power.

43.

Willis-Knighton has taken other steps to inhibit Vantage's growth and its access to providers.  DeSoto Regional Health System ("Desoto"), located in Mansfield, Louisiana, is an independent hospital that has a CEO who is a Willis-Knighton employee.  During 2015, Vantage has sought to enlist Desoto in its shared savings programs.  Desoto's CEO initially was enthusiastic about participating in the program, and even signed a preliminary agreement relating to the program.  However, the CEO then communicated to one of Vantage's staff that he understood that Willis-Knighton did not participate in Vantage's network, and that could be a problem.  After that communication, the Desoto CEO has not responded to any telephone calls or emails from Vantage.

44.

Vantage has over time significantly expanded its capabilities, and as a result has grown its membership substantially.  But for Willis-Knighton's unlawful expansion, Vantage would have achieved substantial growth in the last four years in the Shreveport area.

20

## LSU Medical Center

45.

UH-Shreveport began its operations in October 2013, taking over the operation of what was then referred to as LSU Medical Center, including the lease of the Shreveport hospital facilities from LSU.  LSU Medical Center was an academic medical center that primarily treated poor and indigent patients, and was originally part of the Louisiana state charity hospital system. The Shreveport hospital was very inefficient, with extraordinarily high overtime use, an absence of productivity standards and management dashboards, and lengthy wait times at clinics.  Many patients were instructed to arrive at 7:00 a.m. to wait and see a physician at an unspecified time that day.  In 2012, the Shreveport hospital lost its Level 1 Trauma Center certification.  As a result, the Shreveport hospital was not an effective competitor for commercially insured patients or for Willis-Knighton.  Those problems and problems at other hospitals led to Governor Jindal's privatization initiative.

## University Health Shreveport's Transformation

46.

In October 2013, University Health System took over control of the LSU Medical Center and renamed the Shreveport hospital, University Health Shreveport.  In less than two years-time, UH-Shreveport has made an incredible turnaround and has become a much more effective, efficient and patient-friendly hospital.

47.

Among the many dramatic successes achieved by UH-Shreveport are the following:

    a.     Reduced clinic patient referral queues from 12,000 to 1,200;

    b.     Achieved record surgical volumes;

    c.     Reduced overtime and the use of agency nurses to almost zero;

21

    d.        Developed an ICU step down unit and new stroke center;

    e.        Enhanced Bone Marrow Transplant program;

    f.        Restored Level 1 Trauma Center certification;

    g.        Established new Baby Friendly Program;

    h.        Established Minority and Women's Owned Business Program;

    i.        Reduced labor and benefit costs by 30% despite increasing volume;

    j.        Experienced a 43% reduction in patient complaints;

    k.        Reduced wait times for MRI (from 60 days to two) and CT Scans (from 21 days to one); and

    l.        Reduced average length of stay by 7%.

48.

These efforts were successful in dramatically improving UH-Shreveport's attractiveness to patients, and, as a result, its success in the marketplace.  In 2014 (as compared to 2012, before UHS's acquisition of the Shreveport hospital), UH-Shreveport accomplished the following:

    a.        Increased admissions by 15%;

    b.        Increased clinic visits by 6%;

    c.        Increased emergency department visits by 15%;

    d.        Improved EBITDA (earnings before interest, taxes, depreciation and amortization) since transition of approximately $80,000,000; and

    e.        Reduced expenses to the State of Louisiana of $49,000,000 as reported by the State of Louisiana's Department of Health & Hospitals.

49.

These improvements to the Shreveport hospital have made it a better alternative to Willis-Knighton for managed care plans and (for the first time) a significant competitive challenger to Willis-Knighton.

**Willis-Knighton's Anticompetitive Scheme**

50.

Threatened by the competition from the improved UH-Shreveport, Willis-Knighton has commenced a scheme to take over the Shreveport hospital and eliminate it as a competitor.

51.

In January of 2015, Willis-Knighton advocated in a letter to Louisiana State Treasurer John Kennedy and in a presentation to Louisiana Governor Jindal that Willis-Knighton should take over management of UH-Shreveport.  In its proposal to Governor Jindal, Willis-Knighton recommended, "changing the management of the teaching hospital (University Health) to the Willis-Knighton Health System."  Willis-Knighton further proposed "consolidating programs and further transitioning medical education into the community (Willis-Knighton Health System's four urban hospitals)."

52.

In order to achieve this aim, Willis-Knighton has obtained a contractual arrangement whereby numerous LSU Shreveport employed faculty members would work in clinics on the Willis-Knighton campuses.  Under these agreements, Willis-Knighton would be "solely responsible for billing and collecting" from patients and third party payors.  This provision means that Willis-Knighton will charge managed care plans its substantially higher rates for these physicians' services.

17525393.36

53.

Willis-Knighton will control all business aspects of these arrangements, so that the LSU Shreveport employed faculty members working at Willis-Knighton clinics would effectively be working for Willis-Knighton.  Willis-Knighton would be responsible for facilities, equipment, nursing staff, receptionists and managerial and clerical staff who would operate the practice. Pursuant to these agreements, physicians would submit time records to Willis-Knighton and Willis-Knighton would determine if a physician's "performance is unsatisfactory" or "has failed to act consistent with his/her level of advancement and competence."  LSU will not have any say regarding these business issues, and will not in any way supervise Willis-Knighton's decisions with regard to these business issues.

54.

While not all the care provided by LSU Shreveport physicians at Willis-Knighton clinics will involve commercial patients, the plan is that ultimately all LSU Shreveport faculty physicians' commercially insured patients would be treated at Willis-Knighton facilities, and not at UH-Shreveport.  This conclusion is confirmed by statements directly made by LSU Shreveport physicians to executives at UH-Shreveport.  One physician executive confirmed that the long term plan is that all LSU Shreveport commercially insured patients would be treated at Willis-Knighton clinics.  Dr. John Marymont, the Dean of LSU Shreveport, and Dr. Robert Barish, the Chancellor of LSU Shreveport, have both stated to UH-Shreveport executives that the Shreveport hospital should accept the role of only treating the poor and indigent and revert back to its days as the "Confederate Hospital."  The LSU Medical Center was once called "Confederate Memorial Hospital," when it was part of the LSU state charity hospital system. This is a clear indication that the Willis-Knighton plan is to return UH-Shreveport to this charity hospital status, without commercially insured patients.

55.

This conclusion is also confirmed by emails obtained by UH-Shreveport pursuant to a public records request.  Prior to the agreements with Willis-Knighton, Dr. Levine of LSU Shreveport acknowledged that the ability to treat commercially insured patients in a "faculty clinic" will "greatly impact where certain faculty would like to see 'faculty' patients, UH or WK."  The arrangement with Willis-Knighton provides a setting for such separate treatment of commercially insured patients.  In an e-mail, Dr. Levine stated that an arrangement where "faculty preferentially see patients with insurance is the type of arrangement we can readily negotiate with Willis-Knighton."  Another LSU Shreveport document referred to an "offsite location for private patients."

56.

These statements, and Willis-Knighton's proposal to Governor Jindal, constitute direct evidence of Willis-Knighton's unlawful plan and LSU Shreveport's agreement to that plan.

57.

This is highly significant, because commercially insured patients are the most lucrative patients for providers, with other payors (Medicare, Medicaid and indigent patients) either paying for services on a break even basis or at a loss to the Shreveport hospital.  All hospitals, including UH-Shreveport, critically depend upon a volume of commercially insured patients to maintain their financial position.

58.

In a meeting with LSU physicians, Rod Huebers, then (since dismissed) CEO of UH-Shreveport, indicated that the existing LSU faculty clinics could not easily be separated as between commercial and other patients.  However, commencing at that same meeting, UH-

17525393.36

Shreveport executives have made clear that they would provide separate sites for LSU faculty clinics, either at the Shreveport hospital or off campus.

59.

Willis-Knighton has made both threats and promises in order to force LSU Shreveport to agree to the transaction.  LSU Shreveport physicians were told that Willis-Knighton had threatened to pull its research funding from LSU Shreveport physicians if they did not agree to the arrangement and has indicated that it would provide greater funding if LSU Shreveport acquiesced in Willis-Knighton's plans.  They then approved it.  An earlier memo from Dr. John Marymont of LSU Shreveport referred to "expenses that may be assumed by" Willis-Knighton as part of the arrangement.  Willis-Knighton has also made clear that LSU Shreveport physicians' access to primary care referrals from Willis-Knighton's large primary care physician network is dependent on its agreement to practice and treat commercially insured patients in the Willis-Knighton clinics.  That has helped secure LSU Shreveport's agreement.  In one memorandum, one of the LSU Shreveport department chairs stated that "[w]e see our practices expanding with the help of WK marketing to us their network doctors."

60.

If LSU Shreveport had not been forced to agree to Willis-Knighton's scheme, it would not have shifted its commercially insured business to Willis-Knighton, because such a shift would undermine the efficient provision of patient care.  LSU Shreveport's own documents indicate that the LSU Shreveport physicians believed that their practice was most effective and efficient when continued at UH-Shreveport.  Dr. Steven Levine, the Chair of LSU's Department of Medicine, stated in August of 2014, "I think it is fair to say that we feel that it would be preferable, and mutually beneficial to our faculty and University Health to centralize our clinical activities at the present UH clinic facilities."  The Chair of the Department of Surgery at LSU

stated that "[t]he majority [of the surgery faculty] see off campus clinics as an inconvenience and potentially as an added cost."

61.

As part of the initial phase of this plan, 17 separate specialty contracts have been negotiated with LSU Shreveport, and Willis-Knighton is already proceeding to complete facilities to house many of the LSU Shreveport physicians.  These clinics are anticipated to be completed beginning in July, and the practices will be transferred at that time or shortly thereafter.  While the initial plan is for only certain physicians in the affected specialties to practice at Willis-Knighton, the number of physician full time equivalents who will practice at the Willis-Knighton clinics will be sufficient to treat all or virtually all of the commercially insured LSU faculty patients in the affected specialties.

62.

In fact, Willis-Knighton has already begun its takeover.  Five oral surgeons on the LSU physician faculty are now described on the Willis-Knighton website as practicing in the "WK/University Oral & Maxillofacial Surgery" group.  The physicians are being billed under and by Willis-Knighton.  This makes clear that Willis-Knighton's plan is to make the LSU faculty its employees and part of its physician network.

63.

Willis-Knighton has also attempted to prevent UH-Shreveport from exploring potential affiliations with other health systems.  Ochsner Health System is a large health system in New Orleans that was discussing an affiliation with UH-Shreveport.  A meeting was requested involving Ochsner Clinic and the LSU Shreveport clinical chairs.  Willis-Knighton's CEO, James Elrod, told LSU Shreveport officials that its physicians should not attend this meeting, and those officials then told LSU Shreveport physicians not to attend the meeting.  These actions

27

were taken to attempt to prevent the contribution of additional resources to UH-Shreveport, which would help it to continue to compete effectively.

64.

There is no doubt about Willis-Knighton's anticompetitive goals.  Willis-Knighton stated in a memorandum to LSU Shreveport that one of the purposes of the orthopedic agreement with LSU Shreveport is to "decrease the competitive threat to the current [Willis-Knighton] orthopedic staff."  The same document stated that LSU Shreveport physicians would "refer elective procedures to Willis-Knighton specialists as appropriate," and that Willis-Knighton and LSU Shreveport would "coordinate the continuum of care through WK departments (radiology, rehab, lab, etc.)."  The agreement thus calls for referral to Willis-Knighton specialists and hospital based departments, including ancillary services.

65.

Willis-Knighton is undertaking this transaction in order to damage UH-Shreveport as a competitor and eliminate its competitive threat to Willis-Knighton's monopoly power.  Willis-Knighton's plan is to damage UH-Shreveport financially so that its parent, BRF, is forced to relinquish control of the Shreveport hospital back to LSU.  When that occurs, Willis-Knighton plans to take over management of the Shreveport hospital and further cement its monopolistic, high priced control over health care in Shreveport and Bossier City.

66.

LSU has now issued a notice of breach to UH-Shreveport, beginning a process that could result in an attempt to terminate the agreement permitting UH-Shreveport to operate the Shreveport hospital.  This notice of breach was a sham, completely unjustified by UH – Shreveport's performance, which has been outstanding.  For example:

17525393.36

- Most of the breaches of contract alleged by LSU were raised in a letter dated August, 2014.  No notice of breach was alleged at that time.  UH-Shreveport explained why LSU was in error and the issues were dropped.

- The claims regarding information technology were resolved with the execution of additional agreements on June 30, 2014.  These issues were never raised again.

- Amounts alleged by LSU to be owed by UH-Shreveport were paid in the fall of 2014, despite the fact that most of the items were not provided for by contract and LSU had not properly invoiced UH-Shreveport for those sums.

- LSU claims that UH-Shreveport has failed to support the academic mission and reputation of LSU Shreveport, but LSU Shreveport has just had the largest Resident class in its history.

- LSU claims that UH-Shreveport has failed to establish a sustainable and competitive business model, but, as described above, the hospital has shown significant growth in volume and is profitable for the current fiscal year to date.

67.

The sham nature of LSU's notice of breach is further established by the fact that LSU refused to discuss the issue with UH-Shreveport, and gave it 24 hours to agree to resign before the notice of breach was issued.  LSU informed UH-Shreveport in a July 9th meeting that it would not consider any compromise or alternative resolution of its alleged concerns other than termination of operations by UH-Shreveport.  LSU took this unreasonable position even though the provisions of the Cooperative Endeavor Agreement between the parties call for an opportunity for any claimed breach to be cured and to be negotiated.

68.

Additionally, LSU has rejected the proposal that UH-Shreveport could address LSU's alleged concerns through a joint venture with Ochsner Clinic, one of the largest health care providers in Louisiana.  This makes no sense, since one of the claims of breach alleges that UH-Shreveport is inadequately capitalized, and a joint venture with Ochsner could provide a vehicle by which substantial additional capital would be available to the hospital.  LSU Shreveport's

actions are only understandable as efforts to carry out its agreement with Willis-Knighton and replace UH-Shreveport with Willis-Knighton as the operator of the hospital.

69.

LSU is taking these actions in order to acquiesce in Willis-Knighton's plan to take over the Shreveport hospital.  LSU officials have told UH-Shreveport's Chair and its CEO that it is their intention to replace UH-Shreveport with a "local partner," obviously a veiled reference to Willis-Knighton.

70.

Willis-Knighton's actions are being undertaken on its own initiative.  They are not compelled by LSU Shreveport.  Nor are they necessary to LSU Shreveport's conduct of its business.  LSU Shreveport has acquiesced in Willis-Knighton's conduct because of Willis-Knighton's pressure and market dominance.

71.

Willis-Knighton's actions alleged herein were not in any way supervised, and will not be supervised, by LSU Shreveport.

**Competition Among Health Care Providers**

72.

Competition among health care providers depends on the relationship between these providers and employers, subscribers and managed care plans.  Employers select managed care plans on behalf of their employees.  When managed care plans create networks, their goal is to offer convenient networks for their enrollees.  Employees and subscribers prefer to have a choice from a variety of providers in convenient locations, close to home.

17525393.36

73.

Employers generally have two alternative funding mechanisms for purchasing health insurance for their employees.  Fully insured employers and their employees pay premiums, co-pays and deductibles in exchange for access to a managed care plan's provider network and for insurance against the cost of future care.  Self-insured employers must pay the entirety of their employees' healthcare claims (aside from member cost-sharing, such as deductibles and co-payments), and, as a result, they immediately incur any provider rate increases.

74.

Managed care plans negotiate contracts with hospitals and physicians to create provider networks.  Employees pay higher out-of-pocket costs when they see a non-contracted or out-of-network provider.  Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers in order to minimize or avoid out-of-pocket expenses, and providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

75.

Competition among health care providers (both physicians and hospitals) occurs in two stages.  In the first stage, providers compete to be selected as in-network providers by managed care plans.  Managed care plans seek to create provider networks with geographic coverage and a scope of services sufficient to attract and satisfy individual subscribers as well as employers and their employees.

76.

Providers benefit from in-network status by gaining access to the managed care plan's members as patients.  Accordingly, providers compete in "Stage 1 competition" to be selected as "in-network" by healthcare payers.

31

77.

In the second stage of competition, providers compete with other in-network providers to attract patients.  When enrollees sign up to a plan, they almost always choose in-network providers.  Managed care plans typically offer multiple in-network providers with similar out-of-pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer.  Patients are insulated against prices paid to providers, do not have a lot of transparency about those prices, and do not shop around on the basis of price.

78.

Some managed care plans offer "tiered networks", with different financial incentives for patients who choose different providers, or "narrow" networks offering limited numbers of providers.  In such tiered networks, providers in the preferred tier may be used with fewer (or no) co-pays or deductibles payable by the member as compared to their payment obligations when they utilize "tier 2" providers.  Under these circumstances, providers may compete to be in the preferred tier or in the narrow network.  However, tiered networks are not popular if sought after providers are not included in the preferred tier, and therefore can only be used if the member is subject to higher co-pays or deductibles.  Employers need to offer a health plan that appeals to all their employees.

79.

Therefore, most individual employees and patients have no incentive to shift to other providers even if their providers raise prices.  The financial impact of such price increases is borne by the employer, not by the individual employee.

32

80.

As a result, pricing discipline does not take place based on decisions by insured patients choosing providers.  Rather, bargaining dynamics between providers and managed care plans determine health care prices.  Consumers of health care are typically not direct purchasers of health care, and it is health insurers that are negotiating with providers.

81.

When managed care plans negotiate with providers, the leverage in those negotiations depends on the plan's outside options.   A buyer has leverage if it has acceptable alternatives to a seller driving a hard bargain.  Therefore, if a managed care plan could drop a provider and still have an attractive network that it could sell to its customers, the managed care plan would have a stronger bargaining position.  For these reasons, the fewer alternative providers available to a managed care plan, the more bargaining leverage each of those providers has.  Similarly, the larger the market share of a given provider, the more important its presence in a network is to a managed care plan, and the more leverage it has in bargaining for higher reimbursement rates.

**The Relevant Product Markets**

**General Acute-Care Hospital Services Market**

82.

One relevant market in this case is the market for general acute-care inpatient and outpatient hospital services sold to commercially-insured patients ("general acute-care services").  This market encompasses a broad cluster of medical and surgical diagnostic and treatment services, including, but not limited to, many emergency services, internal medicine services, and surgical procedures.  It is not appropriate to evaluate each acute-care service independently, because the group of general acute-care services is offered to patients by the same set of competitors and under similar competitive conditions.  All commercial health insurance

33

products (including products offered on the exchanges created by the Affordable Care Act) cover inpatient and outpatient general acute-care hospital services.

83.

This relevant market does not include general acute-care hospital services reimbursed by the government under the Medicare or Medicaid programs.  A provider offering general acute-care hospital services (or physician services) could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them for hospitals or physicians.

84.

Additionally, Willis-Knighton's actions implicate additional relevant markets, involving the provision of services by hospitals, and by each physician specialty described herein, to Medicare Advantage subscribers.

85.

Medicare Advantage plans, unlike traditional Medicare, are offered by private insurance companies. Medicare Advantage plans provide all of the medical insurance coverage that seniors receive under traditional Medicare and also usually limit out-of-pocket costs and include drug coverage. These plans also generally provide benefits beyond what traditional Medicare provides, often including coverage for vision, hearing, dental, and wellness programs.

86.

Most successful Medicare Advantage plans, including those in the relevant geographic markets, offer substantially richer benefits at lower costs to enrollees than traditional Medicare does, including lower copayments, lower coinsurance, caps on total yearly out-of-pocket costs,

prescription drug coverage, and supplemental benefits that traditional Medicare does not cover, such as dental and vision coverage, and health club memberships. Seniors enrolled in Medicare Advantage plans also often value that they can receive all of these benefits through a single plan and that Medicare Advantage plans manage care in ways that traditional Medicare does not.

### Adult Primary Care Physician Services

87.

One relevant product market in this case is the market for adult primary care physician services sold to commercial third party payers ("primary care physician services").  This market encompasses services offered by physicians practicing internal medicine, family practice, and general practice.  Primary care physicians provide both the first contact for a person with an undiagnosed health concern as well as continuing care of varied medical conditions, not limited by cause, organ system, or diagnosis.

88.

Other physicians cannot and will not provide adult primary care services to most adult patients, because they are not trained to provide these services.  Some OB/GYN specialists provide primary care to adult female patients, but they do not do so for adult males.  Health plans would not be able to sell an insurance product without a broad selection of adult primary care physicians within that product's physician panel.  Likewise, patients generally would not, and do not, seek primary care services from physicians who are not primary care physicians.  If faced with a price increase by a hypothetical monopolist for adult primary care services, health plans would be forced to agree to the price increase because access to adult primary care physicians is essential to successfully market a health insurance product.  As a result, other types of physicians are not reasonably interchangeable or substitutes for adult primary care physicians.

89.

As a result of the nature of the practice, many patients establish strong loyalties to their primary care physicians.  One recent survey found that 87% of commercially-insured patients have a regular employed primary care physician, and 74% of these said that they are satisfied with their care.  The survey also found that fewer than 15% switch primary care physicians in a year.

90.

As the first point of entry into the health care system and the physician that is likely to have the most contact and most long-lasting relationship with a patient, primary care physicians can hold great influence over which hospital or specialist a patient will seek additional care with if necessary.  In a study published by the Center for Studying Health System Change, it was reported that almost 70 percent of patients chose a specialist because of their primary care physician's referral.

**General Pediatric Physician Services**

91.

Another relevant market is the market for general pediatric physician services sold to commercially insured patients ("general pediatric physician services").  The medical specialty of general pediatrics focuses on the medical care of infants, children, and adolescents.  The services provided by pediatricians require specific expertise about infants and children.  Most adult primary care physicians lack this expertise.

92.

Many patients would not, and do not, seek general pediatric services from physicians who are not general pediatricians.  As a result, health plans in metropolitan Shreveport-Bossier City would not be able to sell an insurance product without a broad selection of general

36

pediatricians within that product's physician panel.  Vantage, and each significant health plan operating in metropolitan Shreveport-Bossier City, has general pediatricians on its panel of providers.  If faced with even a small but significant price increase by a hypothetical monopolist for general pediatric services, health plans would be forced to agree to the price increase, because access to general pediatricians is essential to successfully market a health insurance product.  For these reasons, other types of physicians are not reasonably interchangeable or substitutes for general pediatricians.

93.

Given this dynamic – that health plans must offer general pediatricians' services to effectively compete – general pediatricians could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans.  Thus, general pediatricians have the leverage with health plan networks to profitably impose a small but significant price increase.

94.

The relevant market does not include the services of pediatric subspecialists, who treat specialty conditions such as pediatric cardiology, pediatric oncology or pediatric surgery.  Subspecialists do not provide the day to day routine care of children that is provided by general pediatricians, and are therefore not substitutes for general pediatricians.

95.

For these reasons, other physicians are not substitutes for general pediatric physicians for patients with significant ailments of the ear, nose and throat.  Because of the significant number of such patients, health plans could not offer a successful provider network without including significant numbers of general pediatric physicians in the network.  Every significant health plan

offering a network in metropolitan Shreveport/Bossier City includes general pediatric physicians in its network.

### Adult Ear Nose and Throat Services

96.

Another relevant market in this case involves professional adult Ear Nose and Throat ("ENT") services offered to commercially insured patients. These services include diagnostic or treatment services by otolaryngologists of patients with head and neck diseases including: general otolaryngology (common ear, nose and throat complaints); acoustic neuromas (tumors of the balance nerve that affect hearing); cochlear implants; diseases of the ear; hearing loss; balance disorders (vertigo, dizziness and unsteadiness); facial paralysis (facial movement disorders); cosmetic and reconstructive surgery; nose and sinus disorders; vocal health and voice disorders; cranial Base (tumors and disorders of the base of the skull); thyroid and parathyroid disorders; and sleep disorders.

97.

Significant ailments of the head and neck require treatment by an otolaryngologist (also called ENT physician). Otolaryngologists receive an extended education that includes medical school, and at least five years of surgical residency training. This is composed of one year in general surgical training and four years in otolaryngology–head and neck surgery. Following residency training, some otolaryngologists complete an advanced sub-specialty fellowship, where training can be one to two years in duration. Otolaryngologists receive board certification in otolaryngology from the American Board of Otolaryngology. Board certification requires satisfaction of these educational requirements as well as completion of a comprehensive examination on the diagnosis and treatment of ear, nose and throat ailments. No other specialists

38

provide comprehensive ear, nose and throat treatment as do ENT physicians, and many patients require and use the services of an ENT physician.

98.

For these reasons, other physicians are not substitutes for ENT physicians for patients with significant ailments of the ear, nose and throat.  Because of the significant number of such patients, health plans could not offer a successful provider network without including significant numbers of ENT physicians in the network.  Vantage, and every significant health plan offering a network in metropolitan Shreveport-Bossier City, includes ENT physicians in its network.

99.

Given this dynamic – that health plans must offer ENT physicians' services to effectively compete – ENT physicians could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans.  Thus, ENT physicians have the leverage with health plan networks to profitably impose a small but significant price increase.

**Hematology Oncology Services**

100.

An additional relevant market in this case is the market for hematology oncology services offered to commercially insured patients.  Hematology oncology is a subspecialty of internal medicine that focuses on diagnosis, treatment and/or prevention of blood diseases and cancers such as iron-deficiency anemia, hemophilia, sickle-cell disease, leukemia and lymphoma using chemotherapy, hormonal therapy, biological therapy, and targeted therapy. Hematologists/oncologists generally complete seven or more years of medical and postgraduate training and become certified in internal medicine prior to an additional two years of training in oncology and one year training in hematology.

39

17525393.36

101.

Patients suffering from blood diseases and cancer of the blood cells use the services of hematologists/oncologists, and no other specialists provide such medical care for patients with blood diseases cancer of the blood cells.

102.

For these reasons, other physicians are not substitutes for hematologists/oncologists. Because there are a substantial number of patients requiring the use of hematologists/oncologists, health plans could not offer a successful provider network without including significant number of hematologists/oncologists in the network.  Vantage, and every significant health plan offering a network in metropolitan Shreveport-Bossier City includes hematologists/oncologists in its network.

103.

Given this dynamic – that health plans must offer hematology/oncology services to effectively compete – hematologists/oncologists could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans.   Thus, hematologists/oncologists have the leverage with health plan networks to profitably impose a small but significant price increase.

**Neurology Services**

104.

Another relevant market in this case is the market for neurology physician services offered to commercially insured patients.  Neurologists specialize in the evaluation and treatment of all types of disease or impaired function of the brain, spinal cord, peripheral nerves, muscles, and autonomic nervous system, as well as the blood vessels that relate to these structures. Disorders addressed by neurologists include: stroke, brain and spinal tumors, muscular

dystrophy, headache and other pain, meningitis, encephalitis, epilepsy, Parkinson's disease, Alzheimer's disease and other memory disorders, multiple sclerosis, and effects of systemic diseases, like high blood pressure and diabetes, on the nervous system.

105.

Such diseases and impairments require treatment by a neurologist.  Neurology training typically consists of a three to four year neurology residency following completion of medical school.  In order to be board certified, a neurologist must undergo four years of neurology training.

106.

Many patients require and use the services of neurologists, and no other specialists provide such comprehensive medical care for neurological conditions.

107.

For these reasons, other physicians are not substitutes for neurologists.  Because there are a substantial number of patients requiring the use of neurologists, health plans could not offer a successful provider network without including a significant number of neurologists in the network.   Vantage, and every significant health plan offering a network in metropolitan Shreveport-Bossier City, includes neurologists in its network.

108.

Given this dynamic – that health plans must offer neurologists' services to effectively compete – neurologists could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans.  Thus, neurologists have the leverage with health plan networks to profitably impose a small but significant price increase.

**Obstetrics and Gynecology Services**

109.

Another relevant market in this case is the market for obstetrics and gynecology services offered to commercially insured patients.  Obstetrician-gynecologists specialize in the general medical care of women as well as care related to pregnancy and the reproductive tract.

110.

Following medical school, obstetrician-gynecologists complete four years of specialized residency training in the areas dealing with preconception health, pregnancy, labor and childbirth, postpartum care, genetic counseling and prenatal diagnosis.  Training in gynecology also covers women's general health, including care of reproductive organs and sexual function, management of hormonal disorders, treatment of infections and training in surgery to correct or treat pelvic organ and urinary tract problems.  After completing a residency in obstetrics and gynecology, a physician may seek board certification from the American Board of Obstetrics and Gynecology.  To obtain board certification, physicians must pass written tests, demonstrate experience in treating women's health, and undergo an oral examination.

111.

Many women require and use the services of obstetrician-gynecologists, and no other specialists provide the same care.

112.

For these reasons, other physicians are not substitutes for obstetrician-gynecologists.  Because there are a substantial number of patients requiring the use of obstetrician-gynecologists, health plans could not offer a successful provider network without including a significant number of obstetrician-gynecologists in the network.  Vantage, and every significant

health plan offering a network in metropolitan Shreveport-Bossier City, includes obstetrician-gynecologists in its network.

113.

Given this dynamic – that health plans must offer ob/gyns' services to effectively compete – obstetrician-gynecologists could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans.  Thus, obstetrician-gynecologists have the leverage with health plan networks to profitably impose a small but significant price increase.

114.

For the reasons described above, additional relevant markets here include each of the physician specialties described above provided o Medicare Advantage members.

## The Relevant Geographic Markets

### General Acute-Care Hospital Services

115.

The relevant geographic market in which to analyze the effects of the transaction on general acute-care services is no broader than the Shreveport-Bossier City metropolitan area (the "Shreveport Area").   The Shreveport Area includes hospitals owned by Willis-Knighton, University Health System and CHRISTUS.  Hospitals outside of the Shreveport Area are not reasonable substitutes for hospitals within the area.  Patients prefer to obtain their medical care close to home, and strongly prefer access to local hospitals and physicians.  In fact, there are no competitive alternatives for general-acute care services outsides of the Shreveport Area within any reasonable distance from the Shreveport Area.   The nearest hospital outside of the Shreveport Area is over 33 miles away and at least a 35 minute drive.  As a result, hospitals outside of the relevant market do not meaningfully compete for general acute care services with

the Shreveport hospitals in the area.  According to public state data, only about 1% of Blue Cross patients in Shreveport and Bossier City receive hospitalization outside of that area.

116.

As a result, health plans offering either commercially insured or Medicare Advantage products must include hospitals from within the Shreveport Area in order to meet their local members' desires, and all area health plans (including Vantage) do so.  Thus, a hypothetical monopolist that controlled the bulk of hospital admissions in the Shreveport Area could profitably increase rates by at least a small but significant amount.  This is demonstrated by the fact that Willis-Knighton already has a dominant position in this relevant market, and, as described above, has been able to maintain prices substantially higher than those of its competitors.

**Adult Primary Care and General Pediatric Physician Services**

117.

The relevant geographic market with respect to adult primary care and general pediatric physician services is no broader than the Shreveport-Bossier City metropolitan area.  Residents of Shreveport strongly prefer to obtain primary care and pediatric physician services within the Shreveport Area.  Because patients generally obtain primary care and pediatric services frequently and often require immediate treatment, such as when they or their children have a cold or the flu, they are unwilling to travel long distances to seek primary care or pediatric physician services, and their preference for access to local providers is strong.

118.

As a result, health plans offering either commercially insured or Medicare Advantage products must include primary care physicians and pediatricians from within the Shreveport Area in order to meet their members' desires, and all area health plans (including Vantage) do so.

44

Thus, a hypothetical monopolist that controlled all of the pediatricians in the Shreveport Area could profitably increase rates by at least a small but significant amount.

### Specialty Physician Services

#### 119.

The relevant geographic market in which to analyze the effects of the transaction for specialty physician services for each of the relevant specialty physician services product markets described above (ENT services; hematology oncology services; neurology services; and ob/gyn services) is no broader than the Shreveport-Bossier City metropolitan area.

#### 120.

There are no competitive alternatives for specialty physician services that are outside of the Shreveport-Bossier City area within any convenient distance from this area.  The nearest concentration of specialty physicians is at least 30 to 40 miles away from Shreveport, and the Shreveport hospital data described above can be expected to also describe patient choices for specialty physicians.  Therefore, specialty physicians outside of the Shreveport Area do not meaningfully compete with specialty physician services in this area.

#### 121.

As a result, health plans must include specialty physicians from each alleged product market from within the Shreveport Area in order to meet their members' desires, and all major area health plans do so.  Thus, a hypothetical monopolist that controlled all of the specialty physicians in any single specialty market in the Shreveport Area could profitably increase rates by at least a small but significant amount.

17525393.36

## ANTICOMPETITIVE EFFECTS

### General Acute-Care Hospital Services

122.

Willis-Knighton's takeover of the commercial business of the LSU Shreveport faculty physicians will result in a shift of the referrals of commercially insured hospital patients from UH-Shreveport to Willis-Knighton.

123.

LSU Shreveport's own physician executives predict a shift in referrals away from their practice at UH-Shreveport and, therefore, away from the Shreveport hospital.  The LSU Shreveport Hospital-Based Department Heads stated in a memorandum to the Chancellor and Dean of LSU Shreveport, that "[t]he financial impact on hospital-based departments will be huge.  Patients that will be seen in outside clinics will elect for all their care to be at the outside institution resulting in marked loss of income."

124.

Willis-Knighton's history is unequivocal – it takes every possible step to control the referrals of physicians on its campuses.  It is virtually certain that the LSU Shreveport's employed faculty's referrals of the commercial patients treated at Willis-Knighton clinics will shift away from UH-Shreveport to Willis-Knighton's hospitals.

125.

The employment of non-physician staff at the new clinics by Willis-Knighton will also help ensure the shift in referrals to Willis-Knighton.  It is common for non-physician staff to adopt and implement procedures relating to referrals, especially ancillary referrals, such as lab tests and radiologic tests.

17525393.36

126.

Thus, the transaction will result in the foreclosure of a critical source of the patients and admissions (i.e. the LSU Shreveport faculty physicians). "Foreclosure" involves impeding a rival or rivals from access to a necessary input. In this case, the input is the patients.

127.

Foreclosure will be significant in this case because physicians have a very large influence on where their patients go for the next level of care. Many patients do not have a preference about where they are hospitalized and will just follow their physicians' recommendations. Physicians control the input to outpatient services, diagnostics and the use of hospital services.

128.

Willis-Knighton's control of physician referrals interferes with decisions on the merits of patient care, quality and price, and for those reasons as well is anticompetitive. Referrals to Willis-Knighton result in higher prices to insurers, to self-insured employers, and to individual subscribers and employees to the extent of their copays and deductibles.

129.

After the takeover of LSU Shreveport's faculty physicians' commercial practice, Willis-Knighton will have control over a dominant share of commercially insured patients in each alleged physician services product market. Thus, for example, just as a result of the initial round of contracts, UH-Shreveport will be foreclosed from referrals for the following shares of commercially insured patients in each alleged physician services market:

      a.      50% of commercially insured patients in the market for ENT services;

      b.      58% of commercially insured patients in the market for hematology/oncology services;

     c.     80% of commercially insured patients in the market for neurology services;

     d.     70% of commercially insured patients in the market for Ob/Gyn services; and

     e.     65% of commercially insured patients in the market for general pediatric services.

Moreover, the remaining physicians cannot (by contract with LSU) serve on UH-Shreveport's medical staff, and therefore are very unlikely to refer commercially insured hospital patients to UH-Shreveport.

130.

The shift in referrals that would follow the completion of the transaction would harm competition in two ways.  It would increase Willis-Knighton's dominance.  It would also dramatically reduce the market strength of one of its only competitors in the Shreveport area, UH-Shreveport.  Both effects are likely to result in greater market power for Willis-Knighton and successful efforts by Willis-Knighton to charge even higher prices.  In fact, UH-Shreveport's status as a much lower priced hospital than Willis-Knighton means that any shift in referrals away from it will necessarily increase the cost of care.  This shift in referrals is likely to increase Willis-Knighton's share of hospital admissions for commercially insured patients from 75% to approximately 85% or more.  The applicable post-transaction hospital market shares are far above the levels at which hospital and other combinations have been forbidden in the past:

48

| Case | Combined Share | Holding |
|------|----------------|---------|
| *Phila. Nat'l Bank* (Supreme Court 1963) | 30% | Enjoined |
| *Rockford Mem'l* (N.D. Ill. 1989) | 68% | Enjoined |
| *Univ. Health Inc.* (11th Cir. 1991) | 43% | Enjoined |
| *Cardinal Health, Inc.* (D.D.C. 1998) | 37% | Enjoined |
| *H&R Block, Inc.* (D.D.C. 2011) | 28% | Enjoined |
| *ProMedica* (N.D. Ohio 2011) | 58% | Enjoined |
| *OSF Healthcare* (N.D. Ill. 2012) | 59% | Enjoined |
| ***Willis-Knighton/LSU Shreveport*** | ***86%*** | |

131.

These anticompetitive effects, including Willis-Knighton's resulting market share in the

relevant hospital markets, would be even more clear if UH-Shreveport were terminated as the

operator of the Shreveport hospital and Willis-Knighton took it over, directly or indirectly.

Moreover, these anticompetitive effects would be highly likely, even if termination of UH-

Shreveport were followed by a hypothetical future bidding process. Just as Willis-Knighton is able to offer greater research funds to LSU Shreveport out of the monopoly profits that it has earned, it will be able to pay more to operate UH-Shreveport than any other bidder, because of the greater monopoly profits that Willis-Knighton will thereby recoup through the elimination of UH-Shreveport's competition.

132.

Analysis of the Federal Merger Guidelines standards also supports the conclusion that these transactions would be highly anticompetitive. The Merger Guidelines measure market concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI measures the sum of the squares of the market shares of the competitors in a market. Under the Merger Guidelines' HHI test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2500 points and the merger or acquisition increases the HHI by more than 200 points.

133.

The transactions at issue would also involve an increase in the HHI of more than 1900 to more than 7700. Therefore, the market concentration levels after the transaction would be more than triple the levels at which the Federal Trade Commission presumes market power.

134.

In fact, even a small shift of commercially insured business from UH-Shreveport to Willis-Knighton would be significantly anticompetitive here. Because concentration is already great here, even slight increases in concentration create antitrust problems. Because of Willis-Knighton's monopoly level share, the current HHI in the relevant hospital market is already more than 5700. Even a 2% shift from UH-Shreveport to Willis-Knighton would result in an increase of the HHI by more than 250 points to more than 6000. The transaction would clearly

50

be harmful to health care competition.  Indeed, the price differences here are already far beyond the "small but significant" increase at issue in the merger guidelines.

135.

Even Willis-Knighton acknowledged its antitrust exposure in its announcement of its prior decision not to pursue acquisition of the LSU hospital in Shreveport back in 2013.  A Willis-Knighton press release stated then that, "Willis-Knighton is unlike any health care provider in Louisiana by virtue of our share of the health care services market."  Because of the great likelihood of "costly antitrust challenges," Willis-Knighton said that it would not pursue the transaction at that time.

136.

Economic research overwhelmingly shows that greater market concentration of this sort substantially increases hospital prices.  The relevant studies have concluded that when hospital markets become highly concentrated, with few competitors and high market shares, prices generally substantially increase:

a.  A 2011 study examined the effect of hospital market concentration on specific procedures.  It found that in concentrated hospital markets, hospitals charged **29% more** for cervical fusion, **31% more** for lumbar fusion, **45% more** for total knee replacement, **49% more** for total hip replacement, **50% more** for angioplasty, and **56% more** for CRM device insertion.  James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology*, 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b.  One study from 2009 looked at the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the

51

prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996. It found that non-merging hospitals increased prices 40 percent in response to hospital mergers.  Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers*, 52 J. L. & Econ. 523, 544 (2009).

c.    Health Affairs published a 2005 study looking at the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system). It found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day." Alison Evans Cuellar and Paul J. Gertler, *How the Expansion of Hospital Systems has Affected Consumers*, 24(1) HEALTH AFFAIRS 213, 217 (Jan. 2005).

d.    A 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point increase in the Shreveport hospital concentration index raises prices by approximately 8.3 percent."  Glenn A. Melnic, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices*, 30(9) Health Affairs 1728, 1729-31 (2011).

e.    Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, *The Impact of Hospital Consolidation –*

*Update*, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

137.

In addition, recent economic studies have established that the control of large numbers of physicians by hospitals substantially increases prices and costs:

a.      One study found that "total per-beneficiary spending was $849 higher" at hospital-based physician groups.  J. Michael McWilliams et al., *Delivery System Integration and Health Care Spending and Quality for Medicare Beneficiaries*, 173 JAMA INTERNAL MED. 1447, 1451 (June 17, 2013).  That study also found that "[patient] readmission rates were highest for hospital-based groups." Id. at 1452.

b.      Another study found that "[r]ecent increases in the employment of physicians and acquisition of community-based physician practices by hospitals . . . result[ed] in more and more services being paid at higher hospital outpatient rates."  James D. Reschovsky and Chapin White, *Location, Location, Location: Hospital Outpatient Prices Much Higher than Community Settings for Identical Services*, 16 NAT'L INSTITUTE FOR HEALTH CARE REFORM 2 (June 2014).  This study found that hospitals charged $919 for MRI scans versus $606 in community settings; $1,383 for colonoscopies versus $625 in community settings; $37.11 for a comprehensive metabolic panel versus $12.75 in community settings; and $58 per 15-minutes of manual physical therapy versus $35 per 15-minutes in community settings. Id. at 2-3.

c.      Yet another study found that "[v]ertical integration . . . lead[s] to statistically and economically significant increases in hospital prices and spending. This is consistent with the hypothesis that vertical integration increases hospitals' market power." Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician Practices Is Associated with Higher Prices and Spending*, 33 HEALTH AFF. 657 (May 2014).

138.

This occurs for a simple reason:  Once there are few alternatives to a dominant firm in a market, managed care plans have fewer competitive options to offer in their networks.  In the absence of good options, a managed care plan is forced to agree to higher rates demanded by a dominant provider.  Otherwise, it would not be able to offer the Shreveport hospitals and doctors that its members want, and therefore those members and their employers would choose other plans.

139.

Moreover, the further entrenchment of Willis-Knighton would weaken any incentives for Willis-Knighton to control costs, improve quality, or take the steps to transform health care that are proceeding across the United States.  Without the spur of competition, the risk is that health care will stagnate in the Shreveport Area to the detriment of the public.

140.

Economic research also reveals that high concentration, and less competition, can result in poorer health care quality.  One study found that "the evidence suggests that increasing hospital concentration lowers quality."  William B. Vogt and Robert Town, *How has hospital consolidation affected the price and quality of hospital care?*, 9 THE SYNTHESIS PROJECT 4, 8-9 (ROBERT JOHNSON WOOD FOUNDATION, Feb. 2006).  A follow up Synthesis Project

review in 2012 by Martin Gaynor and Robert Town confirmed that "increases in hospital market concentration lead to increases in the price of hospital care."  Martin Gaynor and Robert Town, *The impact of hospital consolidation – Update*, THE SYNTHESIS PROJECT (ROBERT JOHNSON WOOD FOUNDATION, Jun. 2012). The update by Gaynor and Town found that "[a]ll of the U.S. studies except for one find that competition improves quality. . ."  Gaynor and Town at 4 (2012).

141.

LSU Shreveport's own physicians acknowledged that the proposed Willis-Knighton plan is not efficiency-enhancing.  Dr. Steven Levine, the Chair of LSU Shreveport's Department of Medicine stated in August of 2014, "I think it is fair to say that we feel that it would be preferable, and mutually beneficial to our faculty and University Health to centralize our clinical activities at the present UH clinic facilities."  Therefore, the arrangement is exclusionary.

## Physician Services

142.

The transaction also threatens to increase Willis-Knighton's dominance in each alleged physician services product market.  After the takeover of the commercial business of the LSU Shreveport-employed physicians in the initial round of contracts, Willis-Knighton will control shares of the relevant physician markets for commercially insured patients of approximately 50% (ENT), 58% (hematology/oncology); 80% (neurology); 70% (Ob/Gyn); and 65% (general pediatrics).

143.

The acquisition would result in the following HHI levels and increases in HHI in each relevant physician services product market as follows:

a.      The applicable HHI in the market for general pediatric physician services would be 5150, with a change in the HHI exceeding 1900.

b.      The applicable HHI in the market for ENT services would be 5000, with a change in the HHI exceeding 2000.

c.      The applicable HHI in the market for hematology oncology services would be over 4200, with a change in the HHI exceeding 1300.

d.      The applicable HHI in the market for neurology services would be 6800, with a change in the HHI of 3100.

e.      The applicable HHI in the market for Ob/Gyn services would exceed 5800, with a change in the HHI exceeding 1300.

144.

Even before Willis-Knighton's unlawful transaction with LSU Shreveport, Willis-Knighton has, through its addition of physicians to the Willis-Knighton Physician Network, attained market dominance in a number of physician specialties, including adult and pediatric primary care and ob-gyn, among others.  In each of the relevant physician services markets, the existing HHI is already greater than 2500 even before the planned transactions with LSU Shreveport.  This indicates that Willis-Knighton's prior acquisitions have already had anticompetitive effects in each of these markets.

145.

Willis-Knighton's share of physician services provided to Medicare and Medicare Advantage members will be at comparable levels or higher after the transaction is completed.

146.

Under the government's Horizontal Merger Guidelines, these HHI levels and increases create a presumption that the transaction will create or enhance the merged entity's market power.

### Effect On Vantage, Managed Care Plans Generally, And Consumers

147.

As a result of the threatened increases in concentration in each relevant market resulting from Willis-Knighton's anticompetitive scheme, Willis-Knighton will become even more essential for managed care plans seeking to serve companies with employees in the Shreveport Area. This significant change in the negotiating dynamic will give Willis-Knighton enhanced bargaining clout in contract negotiations and the ability to extract even higher rates for services. As Mr. Elrod stated in his book, the greater Willis-Knighton's market dominance, the higher the rates it can charge.

148.

Price increases resulting from the transaction will be passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and, as a result, they will immediately and directly bear the full burden of higher rates charged by hospitals or physicians. Fully-insured employers will also inevitably be harmed by higher rates, because health plans will be forced to pass on at least a portion of hospital rate increases to these customers.

149.

Employers, in turn, will pass on their increased health care costs to their employees, in whole or in part. Employees will bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services. Some Shreveport Area residents will

undoubtedly forego or delay necessary health care services because of the higher costs, and others may drop their insurance coverage altogether.

150.

If Willis-Knighton has control of billing and collection for LSU Shreveport physicians, it will certainly bill those physicians according to its own contracting policies, and, as a result, will not make those physicians available to Vantage, except through the "Tier 2" PHCS network.  In the past, whenever a physician under contract with Vantage has joined the Willis-Knighton Physician Network, that physician's contract with Vantage has been immediately terminated.  On one occasion, a Vantage employee, appearing at a physician's office to provide an update on its policies, learned from a Willis-Knighton representative present that the physician was now part of the Willis-Knighton Network, and was told to immediately leave the premises.  Moreover, Vantage has experienced similar results when LSU physicians in other locations (such as Baton Rouge) have begun to practice at clinics operated by providers who do not have a contract with Vantage.

151.

The result will be that Vantage's innovative care will become less available in all the relevant markets, and all purchasers of health care will suffer.

**Entry Barriers**

**Adult Primary Care, General Pediatric and Specialty Physician Services**

152.

Entry into the relevant physician markets by new physician competition will neither be sufficiently timely nor sufficient in scale to offset the anticompetitive effects described above.

153.

For physicians coming into a new market, the entry barriers are considerable.  Most entry currently is not by individual physicians setting up their own practices, but through recruitment by existing practices.  This recruitment process typically takes up to six months to a year.

154.

Once a new physician commences practice in the area, there will be a substantial period of time before that physician can, if ever, become an effective competitor.  A new physician must establish a reputation so he or she can obtain recommendations and must also establish referral relationships with other area physicians.

155.

Additionally, many independent physician practices do not have sufficient capital to undertake the expense of recruiting and hiring a new physician, and subsidizing that physician during the period of time it takes for that physician to build up a practice.  This also makes successful entry and recruitment that much more difficult and unlikely.

156.

Existing physicians have a difficult time attracting patients because it is hard to persuade patients to leave their preferred providers.  Patients establish relationships with their doctors and do not want to leave them.

157.

The LSU Shreveport physicians typically represent 20-30% of all specialty business in the relevant physician specialty commercially insured markets.  Entry by at least 3-4 physician FTEs per specialty would be necessary simply to numerically offset the effect of the foreclosure of competition from these physicians as a result of the Willis-Knighton transaction.  Entry on this scale over a short period of time has never occurred in any relevant physician market in the

Shreveport-Bossier City metropolitan area.   Therefore, the anticompetitive effects described herein will certainly be sustainable for at least several years, before there is any possibility of entry on a scale sufficient to offset these effects.

158.

Even if there were specialty physicians ready, willing and able to begin practicing in the Shreveport-Bossier City metropolitan area on such a sufficient scale, they would very likely not be successful in doing so, because the relevant referral source, primary care physicians, will be controlled by Willis-Knighton.  After the takeover of the LSU Shreveport commercially insured business by Willis-Knighton, Willis-Knighton will possess approximately a 60% share of commercially insured adult primary care services in the area.   Therefore, any new specialty physician wishing to enter will only be able to draw upon, at most, the remaining 40% of the primary care physicians as a referral base.  This will make successful entry even more difficult.

159.

Additionally, UH-Shreveport has an agreement with LSU Shreveport that it will rely entirely on LSU Shreveport employed faculty for its medical staff.   Therefore, there is no opportunity for UH-Shreveport to offset the effects of the alleged actions by recruitment or new entry.

**General Acute-Care Hospital Services**

160.

Neither hospital entry nor expansion by any hospital will deter or counteract the anticompetitive effects described herein.

161.

New hospital entry or significant expansion in the Shreveport Area would not be timely. Construction of a new general acute-care hospital would take more than two years from the

initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk.  Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it highly unlikely that a new hospital competitor will enter the Shreveport hospital market.

162.

Construction and operation of an independent competitive hospital is likely to be especially difficult, given the large number of physicians controlled by Willis-Knighton, since these physicians are unlikely to admit patients at a competitive hospital.  Such a hospital would have a very difficult time attracting admissions and operating successfully.

163.

Expansion of an existing hospital is extremely unlikely to occur or to offset the exercise of market power by Willis-Knighton.  Of course, UH-Shreveport could not accomplish such a result by expanding its operations, since it will still be constrained by the absence of commercially insured patients from the LSU faculty physicians.  The only other hospital capable of possibly constraining Willis-Knighton is CHRISTUS.  But Willis-Knighton's practices have resulted in a substantial decline in CHRISTUS' market share and facilities over the years.  There is absolutely no reason to believe that CHRISTUS would reverse field and begin to expand its operations after it has failed to maintain its operations at a larger scale in the past.

**<u>Anticompetitive Harm To, And Likely Damages Suffered By, UH-Shreveport</u>**

164.

The foregoing actions will harm UH-Shreveport in multiple ways.  First, as described above, UH-Shreveport will lose the referrals of its commercially insured patients.  This will cost the Shreveport hospital substantial revenues and profits.

61

165.

The loss of these patients is especially important because UH-Shreveport, like any hospital, depends on the more profitable commercially insured patients to offset the costs of providing care to indigent and poor patients who do not pay at all for health care, as well as patients insured by Medicare and Medicaid, for whom reimbursement is lower.

166.

Second, the loss of significant numbers of incremental patients will be especially costly to UH-Shreveport, as it would be to any hospital.  Since much of the Shreveport hospital's costs are fixed, and do not vary with the volume of patients, each additional patient gained or lost results in a significant amount of incremental profit or loss, since the only additional costs incurred in connection with the treatment of those patients are variable costs.  Approximately 70% of UH-Shreveport's costs are fixed, and therefore each incremental commercially insured patient earns the Shreveport hospital the payments for that patient less only about 30% of the cost of treating that patient.  Therefore, the gain or loss of such incremental patients is critical to UH-Shreveport's bottom line, and the loss of such patients has a disproportionate effect on the bottom line.  This is especially important for UH-Shreveport, because it is still in the midst of its turnaround of LSU Medical Center, and operates on very thin net margins.

167.

Third, the loss of the commercially insured physician care business will lose UH-Shreveport substantial facility fees that it charges insurers for the office-based services provided by the LSU Shreveport physicians.

168.

The increase in concentration Willis-Knighton will gain in various physician markets will harm UH-Shreveport in a number of ways.  These will include the fact that this greater power

62

will allow Willis-Knighton to negotiate better terms with managed care plans.  This can include demands by Willis Knighton to obtain exclusive or preferred contracts, which will make it even more difficult for UH-Shreveport to successfully negotiate with those plans, either for commercially insured business or for Medicaid managed care business.

169.

For all these reasons, the physician transaction threatens to cost UH-Shreveport damages in the amount of at least $15 million annually.  Over a five year period, this will amount to more than $75 million.

170.

Additionally, the loss of these commercially insured patients will force the Shreveport hospital to incur substantial overall losses.  This will prevent the Shreveport hospital from financing additional competitive initiatives and improvements in the Shreveport hospital's facility and equipment.  It will thereby hamper the Shreveport hospital's ability to compete effectively, and to care for its patients most effectively, including those poor and indigent patients who depend critically on UH-Shreveport.  In fact, these actions threaten the overall viability of UH-Shreveport.

171.

Willis-Knighton's actions also threaten to damage the medical residency program at University Health, and to deprive UH-Shreveport of the significant benefits of the operation of the residency program.

172.

The residency program at UH-Shreveport is a broad medical education program, covering 18 different specialties.  The program provides substantial benefits for UH-Shreveport, including

63

additional staffing for patient care, and the reputation and prestige associated with academic medical centers.

173.

Residency "slots" are awarded to individual hospitals by the American Council for Graduate Medical Education ("ACGME"), and are renewed, based on, among other things, the availability of sufficient volumes for training at the Shreveport hospital.  Willis-Knighton has indicated in correspondence to LSU Shreveport that in exchange for providing additional funding, it seeks "control over all of the . . . funded residency slots . . ."

174.

Hospital-based physicians at LSU Shreveport have noted the potential harm caused by Willis-Knighton's proposed plan to residency programs at UH - Shreveport:  "This move will irreversibly damage our training programs with the potential of having to close some residency/fellowship programs in our departments.  ACGME requires diversification of cases, and this move will directly impact not only number of cases that will remain at University Hospital but also the case mix that will be available for teaching purposes.  For example, Anesthesiology is already experiencing a great decrease in cardiac thoracic cases, and Pathology has noted a significant decrease in neoplastic cases."

175.

The shift of residency slots to Willis-Knighton will further increase its market dominance, and damage UH-Shreveport, which will lose the prestige and public acceptance that arises from a strong program as an academic medical center with the resulting effects described above.

64

176.

If Willis-Knighton's plan succeeds and UH-Shreveport is terminated as the operator of the hospital, this will cause even more serious damage to UH-Shreveport.  UH-Shreveport has undertaken a number of steps to reduce costs and improve revenues, which it estimates will improve its margin by more than $20 million per year commencing in 2016.  Since the hospital has been operating at break even or better, this will result in a net margin of at least $20 million annually.  It is likely that the hospital will be even more successful, since other improvements are being undertaken on a continuing basis.

177.

If Willis-Knighton's anticompetitive scheme succeeds, and UH-Shreveport is terminated as the operator of the hospital, these actions will therefore result in damages to UH-Shreveport of at least $20 million annually.  Over the next four years, this will result in damages of more than $80 million, before automatic trebling under the antitrust laws.

178.

The loss of facility fees, referrals and the threatened loss of residency slots and the termination of UH-Shreveport's contract to operate the Shreveport hospital, and their resulting impact on UH - Shreveport's ability to compete with Willis-Knighton, are all intended consequences of Willis-Knighton's plan to harm competition and extend its dominance of the relevant markets.  These injuries are inextricably intertwined with, and naturally flow from, the anticompetitive effects of Willis-Knighton's planned transactions and Willis-Knighton's anticompetitive goals.  Willis-Knighton is utilizing the attempted termination of UH-Shreveport as a fulcrum to gain power and injure competition in the relevant markets, including Vantage, employers, and consumers, as described above.  No other party will suffer the same losses.

179.

While UH-Shreveport will suffer substantial monetary damages as described above, these damages will certainly be inadequate to compensate UH-Shreveport for the injury described above, and this injury will be irreparable and substantial.  This injury includes the severe harm to UH-Shreveport's reputation and market position, as described above and (in the event of termination of UH-Shreveport's contract) a complete loss of its hospital business.  Once the LSU Shreveport physician practices are moved to Willis-Knighton, it will very likely be impossible to undo or eliminate this irreparable injury.

**Anticompetitive Effects On, and Damages To, Vantage**

180.

But for Willis-Knighton's past anticompetitive acquisitions, including those made during the last four years, and their impact on the market and therefore on Vantage during the last four years, Vantage would have been far more successful in the Shreveport Area.  Through its physician acquisitions and its effective refusals to deal with Vantage described above, Willis-Knighton has substantially reduced the network available to Vantage and thereby made Vantage far less attractive to employers and subscribers.  But for these actions, Vantage would have achieved a per capita level of success in the Shreveport area of at least one-third of the level that it has achieved in the Monroe area.  Under those circumstances, it would have earned increased incremental profits in the amount of at least $5.7 million annually.  Over the last four years, Willis-Knighton's actions have therefore cost Vantage at least $22.8 million in damages.

181.

In fact, Willis-Knighton's CEO, James Elrod, himself acknowledged in his book that Willis-Knighton's acquisitions of physician practices have given Willis-Knighton power over payors.  As he said in his book, "[a]s our network grew, so would our marketing power with

other health insurers.  This [is an] advantage of market dominance through our multiple hospital locations and critical mass of providers . . ." Willis-Knighton has exercised this power over some health plans by demanding greater reimbursement, and over others, such as Vantage, by an effective refusal to deal, severely limiting their ability to provide an attractive product in the Shreveport area.

182.

Even greater damage will be suffered by Vantage if Willis-Knighton proceeds with its anticompetitive scheme.  The level of success that Vantage has obtained in the Shreveport Area has been dependent in significant part on the participation of LSU Shreveport physicians and UH-Shreveport and its network.  The LSU Shreveport physicians represent more than half of the physicians in the Vantage network in the Shreveport Area.  Additionally, the prestige associated with LSU Shreveport, and the broad range of sophisticated subspecialty care available from LSU Shreveport physicians, provide important attractions for members and employers considering a Vantage managed care product.

183.

The recent improvements in UH-Shreveport have made it a significantly more attractive provider in the Shreveport Area, and therefore in the Vantage network.  Vantage has discussed working with UH-Shreveport on innovative programs, such as shared savings programs, which will have the prospect of reducing the overall cost of care, improving the quality of care, and intensifying hospital competition, in the Shreveport Area.

184.

If the LSU Shreveport physicians no longer participate in the Vantage network, this threatens to effectively shut Vantage out of the market in the Shreveport Area.  Without the LSU Shreveport physicians, Vantage's network will be reduced to the physicians associated with

67

CHRISTUS, a narrow group primarily located in one part of the Shreveport Area.  This would also likely cause serious harm to Vantage's reputation as a network which currently offers a significant (though limited) choice of physician providers. Additionally, if, as is likely, the shift of LSU Shreveport's commercial business to Willis-Knighton causes significant harm to UH-Shreveport, this threatens to make Vantage's hospital network also much less attractive to prospective members, and to eliminate the possibility of innovative improvements in health care undertaken in partnership with UH-Shreveport.  The termination of the agreement with UH-Shreveport to operate the Shreveport hospital, and takeover by Willis-Knighton, would cause Vantage even more significant harm, because it would lose the ability to offer the Shreveport hospital in its Tier 1 network.

185.

Such actions would also significantly increase Vantage's costs, and ultimately its premium rates and its competitiveness.  Such a substantial reduction in Vantage's specialty care network would likely result in more members choosing Willis-Knighton specialists as "Tier 2" providers, despite the additional 20% co-insurance.  Because of Willis-Knighton's far higher reimbursement rates, this would likely impose much greater costs on Vantage, and would likely result in Vantage being forced to charge higher premiums and, for that reason as well, becoming much less competitive in the market.

186.

All these factors threaten to have a devastating effect on Vantage's market position in the Shreveport Area.

187.

If Willis-Knighton proceeds with its plan to transfer LSU Shreveport's commercially insured business to Willis-Knighton, this will have substantial and irreparable effects on Vantage

68

in the short term.  The "open enrollment" period, during which subscribers and employers choose health plans for the coming 2016 year, will commence in October and November of 2015.  If at that point, LSU Shreveport physicians are treating their patients as part of Willis-Knighton, this will mean that Vantage plans will not be able to offer those physicians as part of its first tier coverage.  This could result in substantial losses of membership to Vantage, and also prevent any prospect of Vantage increasing its membership.

188.

These losses will be very difficult for Vantage to recover.  Employers face significant costs in switching health plans, and do so only reluctantly.  The vast majority of employers renew their current health plans.  Given the significance of the loss of the LSU Shreveport physicians, Vantage could lose its current employers and subscribers in that area, and have a very difficult time ever regaining their participation.

189.

Willis-Knighton's actions are also very likely to be irreparable, because once LSU Shreveport's commercially insured patients are treated at Willis-Knighton clinics operated by Willis-Knighton staff and billed and collected for by Willis-Knighton, Willis-Knighton will then possess those patient files and patient relationships.  There is no reason to believe that Willis-Knighton would relinquish those patient relationships even if LSU Shreveport later decided to undertake a different approach.

190.

Plaintiffs therefore seek all damages they will suffer as a result of Willis-Knighton's contemplated actions, and Vantage seeks damages from Willis-Knighton's past anticompetitive acquisitions.  Plaintiffs also seek an injunction prohibiting the operation of additional LSU Shreveport clinics at Willis-Knighton facilities, and an injunction against further implementation

69

of the scheme to replace UH-Shreveport with Willis-Knighton as the operator of the Shreveport hospital.

## COUNT I

## THREATENED VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT

191.

Plaintiffs restate and reallege the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

192.

The effect of the threatened actions described above would be to lessen competition substantially in interstate trade and commerce in each of the relevant commercially insured markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

193.

The physician transactions described above would give Willis-Knighton substantial control over the business decision making process of the LSU Shreveport physicians with regard to the treatment of commercially insured patients.  It would accomplish the same purposes as a formal acquisition of these physicians' commercially insured practices, and therefore amounts to an indirect acquisition of the commercially insured practices.  It will give Willis-Knighton control over the commercially insured practices of the LSU Shreveport physicians, and harm competition from UH-Shreveport as described above.

194.

LSU's termination of its relationship with UH-Shreveport, followed by the turnover of the Shreveport hospital to Willis-Knighton, will, if effectuated, further enhance Willis-Knighton's monopoly power in the relevant hospital markets, and create the anticompetitive effects described above in the relevant hospital markets.

195.

The transactions would likely have the following effects, among others:

a.      Competition in the relevant markets would be substantially lessened;

b.      Prices in those markets would likely increase to levels above those that would prevail absent the merger;

c.      Patient choice would be substantially reduced.

196.

As a direct and proximate result of Willis-Knighton's threatened violations of Section 7 of the Clayton Act, UH-Shreveport and Vantage will suffer irreparable harm and damages to their business and property.

197.

These violations, and the anticompetitive effects and the irreparable harm caused thereby, will continue unless enjoined.

## COUNT II

## THREATENED VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

198.

Plaintiffs restate and reallege the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

199.

Each of the physician services agreements between Willis-Knighton and LSU Shreveport, as well as the overall agreement between Willis-Knighton and LSU Shreveport with regard to commercially insured patients, described above, and the agreement between Willis-Knighton and LSU with regard to the takeover of UH-Shreveport, is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act (15 U.S.C. § 1).

71

200.

Each of the challenged agreements will cause substantial anticompetitive effects in each of the relevant commercially insured physician markets and each of the relevant hospital markets, as described above.

201.

Each of the challenged agreements will unreasonably restrain trade in violation of Section 1 of the Sherman Act.

202.

As a direct and proximate result of Willis-Knighton's violations of Section 1 of the Sherman Act, UH-Shreveport and Vantage will suffer irreparable harm and damages in their business and property.

203.

These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

## COUNT III

## THREATENED VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION

204.

Plaintiffs restate and reallege the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

205.

Willis-Knighton possesses and has possessed monopoly power in the relevant adult PCP and ob-gyn physician services and general acute care hospital services markets.  Its actions set forth above are exclusionary and constitute unlawful monopolization of these markets in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.

72

206.

As a direct and proximate result of Willis-Knighton's violations of Section 2 of the Sherman Act, UH-Shreveport and Vantage will suffer irreparable harm and damages in their business and property.

207.

The actions of Willis-Knighton threaten to substantially harm competition and increase costs and prices in the relevant markets.

208.

These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

## COUNT IV

## THREATENED VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE

209.

Plaintiffs restate and reallege the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

210.

By each of its threatened actions described above, Willis-Knighton seeks to attain monopoly power in each of the relevant markets.  Based on Willis-Knighton's high market share, the high barriers to entry described above, and Willis-Knighton's anticompetitive actions, there is a dangerous probability that Willis-Knighton will achieve its goals and attain monopoly power.

211.

Willis-Knighton specifically intends to attain monopoly power.  Indeed, in his book, Mr. Elrod, Willis-Knighton's CEO, explained that his goal has been to eliminate competition for

17525393.36

Willis-Knighton physicians and to be able to negotiate higher than typical rates from health plans.

212.

As a direct and proximate result of Willis-Knighton's violations of Section 2 of the Sherman Act, UH-Shreveport and Vantage will suffer irreparable harm and damages in their business and property.

213.

The actions of Willis-Knighton threaten to substantially harm competition and increase costs and prices in the relevant markets.

214.

These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

215.

Plaintiffs hereby demand a trial by jury on all issues so triable.

**COUNT V**

**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – DAMAGES SUFFERED BY VANTAGE**

216.

Vantage restates and realleges the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

217.

Willis-Knighton possesses and has possessed monopoly power in at least the relevant adult PCP and ob-gyn physician services and general acute care hospital services markets the relevant physician services and general acute care hospital services markets.  Its actions set forth

74

above, including its anticompetitive acquisitions, are exclusionary and anticompetitive, and constitute unlawful monopolization in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.

218.

Vantage has been damaged in its business and property by Willis-Knighton's monopolistic actions to date, as described above.

**<u>COUNT VI</u>**

**<u>VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE – DAMAGES SUFFERED BY VANTAGE</u>**

219.

Vantage restates and realleges the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

220.

By its anticompetitive actions set forth above, including its anticompetitive acquisitions, Willis-Knighton has sought to attain monopoly power in each of the relevant markets.  Based on Willis-Knighton's high market share, the high barriers to entry described above, and Willis-Knighton's anticompetitive actions, there is a dangerous probability that Willis-Knighton will achieve its goals and attain monopoly power.

221.

Willis-Knighton specifically intends to attain monopoly power.  Indeed, in his book, Mr. Elrod, Willis-Knighton's CEO, explained that his goal has been to eliminate competition for Willis-Knighton physicians and to be able to negotiate higher than typical rates from health plans.

222.

Vantage has been damaged in its business and property by Willis-Knighton's actions to date, as described above.

## COUNT VII

## VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT

## DAMAGES SUFFERED BY VANTAGE

223.

Vantage restates and realleges the allegations of paragraphs 1 – 190 above hereof, as if fully restated herein.

224.

The anticompetitive acquisitions made to date by Willis-Knighton, as described above, have lessened competition substantially in interstate trade and commerce in the relevant physician markets in violation of Section 7 of the Clayton Act, 15. U.S.C. § 18.

225.

Vantage has been damaged in its business and property by Willis-Knighton's anticompetitive actions to date, as described above.

226.

Plaintiffs hereby demand a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, UH-Shreveport and Vantage pray that this Court grant the following relief:

A.   Enjoin Willis-Knighton from acquiring the LSU Shreveport faculty physicians' commercially insured business;

B.   Award UH-Shreveport and Vantage three times any damages suffered, as well as reasonable attorneys' fees; and

76

C.      Award such other relief as this Court finds just.

Dated:  July 16, 2015                      BY:      /s/ Vinson J. Knight
                                                    Vinson J. Knight, Bar No. 19650
                                                    Michael M. Meunier, Bar No. 17056
                                                    SULLIVAN STOLIER KNIGHT LC
                                                    909 Poydras Street, Suite 2600
                                                    New Orleans, LA  70112
                                                    Phone: 504-799-3821
                                                    vknight@sullivanstolier.com
                                                    mmeunier@sullivanstolier.com

                                                              AND

                                                    David A. Ettinger, P 26537 (T.A.)
                                                    Lara Fetsco Phillip, P 67353
                                                    HONIGMAN MILLER SCHWARTZ
                                                    AND COHN LLP
                                                    2290 First National Building
                                                    660 Woodward Avenue
                                                    Detroit, MI 48226
                                                    Phone:  313-465-7368
                                                    dettinger@honigman.com
                                                    lara.phillip@honigman.com

                                                    *Attorneys for University Health
                                                    Shreveport*

                                           BY:      /s/ Scott L. Zimmer
                                                    Scott L. Zimmer, No. 26151
                                                    S. Price Barker, No. 19472
                                                    KEAN MILLER, LLP
                                                    333 Texas Street, Suite 450
                                                    Shreveport, LA  71101
                                                    Phone: 318-562-2655
                                                    Fax: 318-562-2751
                                                    Scott.zimmer@keanmiller.com
                                                    Price.barker@keanmiller.com

                                                    James R. Chastain, Jr., No. 19518 (T.A.)
                                                    Linda G. Rodrigue, No. 20599
                                                    KEAN MILLER LLP
                                                    P.O. Box 3513 (70821)
                                                    11 City Plaza
                                                    400 Convention Street, Suite 700
                                                    Baton Rouge, LA 70802
                                                    Phone: 225-387-0999
                                                    Fax: 225-388-9133
                                                    Sonny.chastain@keanmiller.com
                                                    Linda.rodrigue@keanmiller.com

                                                    *Attorneys for Vantage Health Plan, Inc.*

17525393.36