## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| **BRFHH SHREVEPORT, LLC, ET AL** | **CIVIL ACTION NO. 15-2057** |
| **VERSUS** | **JUDGE ELIZABETH ERNY FOOTE** |
| **WILLIS KNIGHTON MEDICAL CENTER** | **MAGISTRATE JUDGE HORNSBY** |

### MEMORANDUM RULING

Plaintiffs BRFHH Shreveport, LLC ("BRFHH"), and Vantage Health Plan, Inc. ("Vantage"), a healthcare provider and a healthcare insurer respectively, allege that past and present acquisitions by the Defendant, also a healthcare provider, in Shreveport and Bossier City, Louisiana, violate federal antitrust laws. Before the Court is the Defendant's Motion To Dismiss, [Record Document 30], limited at this stage in the litigation to the question of whether Federal Rule of Civil Procedure 12(b)(6) requires dismissal of Plaintiff Vantage Health Plan Inc.'s federal monopolization claims, Record Document 83. The parties have extensively briefed this question, together filing three memorandums on the initial, broader dismissal arguments raised by the Defendant, Record Documents 30, 65, 75, and four memorandums on the narrower dismissal issue now before the Court, Record Documents 89, 90, 93, 97. After consideration of the foregoing, the Court hereby **DENIES** the Defendant's motion.

# I.   Background

### A.  The Parties

Plaintiff BRFHH Shreveport, LLC, is the operator of University Health Hospital ("University Health") in Shreveport.  Once a state-owned and -operated charity hospital, University Health has been operated by BRFHH Shreveport since September of 2013, when Louisiana State University ("LSU"), whose neighboring medical school has traditionally supplied physicians for University Hospital, and the parent entities of BRFHH Shreveport signed a Cooperative Endeavor Agreement transferring hospital management authority from the state of Louisiana to BRFHH Shreveport's parent entity.  Record Documents 49, p. 3, and 77-1, p. 89.  The  privatization effected by the 2013 agreement, however, is not unbounded: under the terms of the 2013 agreement, University Hospital continues to depend exclusively on admissions from LSU physicians and treat a substantial portion of the Shreveport area's indigent population.  Record Document 1, p. 6, 8.  According to BRFHH Shreveport, sustaining these mandates while remaining financially viable requires that a critical, if minority, mass of the patients treated at University Health have private, commercial insurance; the higher reimbursement rates associated with commercial insurance help offset the relatively low profitability of treating the indigent.  Id. at 8. Vantage Health Plan, Inc., is a health insurance provider specializing in lower-cost HMO coverage.  Id. at 6, 18.  Vantage is headquartered in Monroe, Louisiana, where the large majority of its 35,000 subscribers reside.  Id. at p. 6, 18, 43.  Defendant Willis-Knighton Medical Center ("Willis-Knighton") is a competing healthcare provider that operates four

hospitals and at least six free-standing clinics in Shreveport and Bossier City.   Record Document 48, p. 39.   University Health participates in Vantage's Tier-1 network; Willis-Knighton does not.   Id. at 18.

### B.   Relevant Geographic Market

According to the Plaintiffs, Shreveport and Bossier City (the "Shreveport area") together form the relevant geographic market in which Defendant's antitrust violations occurred and will occur.   Id. at 43.   Within the Shreveport area there are three entities that operate hospitals: Willis-Knighton, BRFHH Shreveport, and CHRISTUS Health Northern Louisiana ("CHRISTUS").   Id. at 7.   According to the Plaintiffs, Willis-Knighton's share of hospital admissions in the Shreveport area is approximately 60% overall and approximately 75% among commercially insured patients, while University Health and CHRISTUS each approximately have a 12% share of commercially insured patients.   Id.

### C.   Plaintiffs' Claims

#### 1. *Past Conduct*

BRFHH Shreveport and Vantage describe two sets of antitrust claims.   The first set is about prior conduct: Vantage—and Vantage alone—asserts that some of Willis-Knighton's prior acquisitions, physician referral practices, and non-compete employment contracts violated section 2 of the Sherman Act, which prohibits monopolization and attempted monopolization, and section 7 of the Clayton Act, which prohibits anticompetitive acquisitions and mergers.   Id. at 10, 15-21, 74-76. From Vantage's perspective, this prior-conduct theory of liability explains how Willis-Knighton has historically violated antitrust

laws to exclude Vantage from participating in the Shreveport area healthcare insurance market and why Vantage is therefore entitled to recover damages.  It proceeds in four parts.

First, at some point in the last fifteen years, Willis-Knighton allegedly gained monopoly power in the Shreveport area in at least the markets for general acute-care hospital services, adult primary care, and Obstetrics/Gynecology ("Ob/Gyn").  Id. at 10, 74. As broad evidence of this ascent, the complaint states that since 2000, Willis-Knighton has enjoyed a sevenfold increase in the number of physicians it employs and a fivefold increase in revenues.[1]  Id. at 10.  It cites assertions made by Willis-Knighton CEO James Elrod in his autobiography that Willis-Knighton is the "dominant" provider in the area.  Id. at 10. It also alleges that based on Blue Cross reimbursement rates, Willis-Knighton now charges up to three times more than University Health does for the same general category of service, such as inpatient stays.  Id. at 14.  More specifically, Vantage alleges that as of 2014-2015, Willis-Knighton's market share of commercially insured patients in the Shreveport area was 78% for general acute-care hospital services, 80% for adult primary care, and 60% for Obstetrics/Gynecology ("Ob/Gyn").  Id. at 10-11, 42-43, 74-75.

Second, over this same period, and while it had monopoly power, Willis-Knighton is alleged to have engaged in various anticompetitive acts in the Shreveport area to gain or maintain the monopolies described above.  Some of these anticompetitive acts were

_____

[1] The complaint does not specify whether those gains occurred within the Shreveport area or whether Willis-Knighton enjoyed those gains in all markets it serves. Willis-Knighton also operates a hospital in Arkansas.  Record Document, p. 9.

acquisitions of rival healthcare providers.  Specifically, the complaint alleges Willis-Knighton acquired the following five providers: Bossier Medical Center, Doctor's Hospital, CHRISTUS's acute-care services, the Northwest Louisiana Surgery Hospital, and "a previously independent cardiology group."  Id. at 5-6, 10, 17.  With respect to the acquisitions of Bossier Medical Center, Doctor's Hospital, and CHRISTUS's acute care services, the complaint describes a type of multi-step acquisition in which first Willis-Knighton acquired physicians from the competing provider, then the competing provider failed, and finally, in two (unidentified) instances, Willis-Knighton purchased the remaining physical assets of the shuttered entities.  Id. at 5-6.  According to the complaint, the closure of CHRISTUS Schumpert's acute care services occurred in 2013.  The complaint does not date the other acquisitions.[2]

In addition to acquisitions, Vantage also alleges that Willis-Knighton gained or maintained its monopoly power through coercive offers to buy medical offices of competing physicians, non-compete contracts with its physicians, and "ruthless" control of physician referrals.  Id. at 12-13.  According to the Plaintiffs, Willis-Knighton has coerced competing physicians by "offering to purchase their medical offices and move them to the Willis-Knighton campus."  Id. at 12.  If the physicians decline the offer, they likely suffer "huge

---

[2] Filings subsequent to the complaint, however, have shed additional light on some of these acquisitions.  One of the exhibits filed in conjunction with the Plaintiffs' Motion for Preliminary Injunction indicates that Willis-Knighton "purchased" Bossier Medical Center for $3.7 million in 2012.  Record Document 24-30.  In its briefing supporting its motion to dismiss Vantage, Willis-Knighton alleges that "Doctor's Hospital was forced into bankruptcy by in [sic] creditors in 2007, and eventually closed its doors in February 2010 . . . ."  Record Document 97, p. 7-8 n. 1 (citation omitted) (citing In re Shreveport Doctors Hospital 2003 Ltd., Case No. 07-BK-10415 (W.D. La.)).

declines in referrals from Willis-Knighton's primary care physicians." Id. Willis-Knighton also allegedly requires anticompetitive non-compete agreements with its physicians. Id. The agreements allegedly prohibit "the physician from practicing anywhere in Caddo or Bossier Parishes for two years after termination of the agreement." Id. Further, many of the agreements provide a financial penalty for failing to treat a prescribed number of patients annually but  also defer collection of that penalty until the physician leaves Willis-Knighton, the alleged result of which is that the debt accumulated by many Willis-Knighton physicians deters them from leaving Willis-Knighton when they otherwise would do so. Id. Finally, Willis-Knighton allegedly restricts virtually all of the referrals by its physicians to other Willis-Knighton physicians. Id. at 13. According to the Plaintiffs, Willis-Knighton accomplishes this by imposing sanctions on noncompliant physicians.  Those sanctions allegedly include "the termination or non-renewal of leases for physician office space, and the direction of its network primary care physicians' referrals away from those specialty physicians who compete with Willis-Knighton or do not refer the bulk of their patients to Willis-Knighton facilities." Id.

   Third, throughout this same period, Willis-Knighton never accepted Vantage's repeated offers to include Willis-Knighton in Vantage's Tier-1 network. Id. at 15-16. According to Vantage, it has unsuccessfully tried to contract with Willis-Knighton for fifteen years. Id. Those attempts were apparently fruitless because Willis-Knighton either was unwilling to engage with Vantage or was willing to engage but only under terms–90% reimbursement of Willis-Knighton's charges–that Vantage saw as "completely uneconomic

for any health plan, and would not allow it to compete effectively in virtually any market."[3] Id. at 16.  Vantage labels Willis-Knighton's posture toward it as "effectively a refusal to deal."   Thus, Willis-Knighton has never been a participant in Vantage's primary Tier-1 network.  Id. at 16-17.  And while Willis-Knighton does participate in Vantage's Tier-2 network, its Tier-2 status means that Vantage subscribers must pay a markedly higher out-of-pocket rate to receive care at Willis-Knighton.  Id.; see also id. at 32, 64.

Fourth, according to Vantage, the effect of these combined Willis-Knighton efforts has been to foreclose business opportunities in the Shreveport area that otherwise would have been available to Vantage.  Id. at 66.  But for Willis-Knighton monopolizing the Shreveport area provider market through its acquisitions, referral practices, and non-compete agreements and then leveraging that monopoly power to box Vantage out of the Shreveport area market, Vantage estimates that it "would have achieved a per capita level of success in the Shreveport area of at least one-third of the level that it has achieved in the Monroe area."  Id. at 17, 66.  The loss Vantage describes is thus not a loss of preexisting business, but the loss of opportunities to expand its business in the Shreveport area.  Id. at 17.  Vantage monetizes this loss of business at a minimum of $5.7 million annually, or at least $22.8 million in the last four years, the relevant limitation period.  Id. at 66; see 15 U.S.C. § 15b (2012).  Pursuant to the Sherman Act's treble-damages scheme,

---

[3] Vantage argues that a more customary rate would be 50% of charges that are set by Medicare's Diagnostic Related Group system, not by the hospital.  Record Document 1, p. 16.  Plaintiffs also assert that "Willis-Knighton's reimbursement rates are from 50% to several hundred percent higher than those at UH-Shreveport."  Id. at 14.

15 U.S.C. § 15(a), Vantage seeks an award of "three times any damages suffered," which presumably means it seeks roughly $67 million in damages.  Id. at 76.

### 2. *Present and Future Conduct*

The second set of antitrust claims revolve around present and future conduct. Vantage and BRFHH Shreveport assert that a new joint venture to open clinics located at Willis-Knighton facilities but staffed by LSU physicians–the same LSU physicians who staff University Hospital–constitutes an illegal combination under section 1 of the Sherman Act, both an illegal monopoly and an illegal attempted monopoly under section 2 of the Sherman Act, and an illegal merger under section 7 of the Clayton Act.[4]  Id. at 70-76.  The Plaintiffs seek the Court to enjoin the opening of the new clinics.  Id. at 76.

In March of 2015, Willis-Knighton and LSU's medical school in Shreveport signed a series of agreements governing the operation of several new clinics providing care in as many as eleven specialty or subspecialty fields of medicine.  Id. at  27; Record Documents 24-6 to 24-15, 30-6, and 42.  According to the terms of these agreements, LSU would supply the physicians for the clinics and Willis-Knighton would supply the facilities and remaining staff.  Record Documents 24-6 to 24-15, 30-6, 42.

The Plaintiffs' description of control over the clinics goes further, placing Wills-Knighton at the center of both business and medical decision making–to the point that LSU physicians involved in the clinics "would effectively be working for Willis-Knighton."  Record

_____

[4] The complaint also initially alleged that Willis-Knighton was planning an outright takeover of University Hospital.  Record Document 1, p. 23-30.  But Plaintiffs later abandoned this theory.  Record Document 83, p. 2.

Document 1, pp. 23-24.  According to the Plaintiffs, Willis-Knighton will supervise physician performance–giving it more influence over physician referrals–and control billing–meaning the clinics will not accept coverage by managed care providers like Vantage without substantially increasing its charges.  Id. at 23-24, 28, 46-47.  Plaintiffs also assert that the clinics will primarily treat commercially insured patients.  Id. at 24.

Given this alleged level of control and the assumption that more time worked by LSU physicians at the new joint clinics means less time worked at University Health, Plaintiffs believe that by design these clinics will shift the treatment of all of University Health's commercially insured patients from University Health facilities to Willis-Knighton facilities.  Id.  Plaintiffs thus allege that Willis-Knighton is in effect attempting to acquire the commercially insured business of BRFHH Shreveport.  Id. at 2.  Willis-Knighton would accomplish this coup not only by shifting initial treatment away from University Health, but also by steering all subsequent referrals away from University Health.  Id. at 46-47.  To substantiate this allegation, Plaintiffs indicate that the capacity of the new clinics to treat new patients will meet the current volume of commercially insured patients currently treated at University Health.  Id. at 27.  Further, Plaintiffs point to the alleged pattern of Willis-Knighton's previous acquisitions and offer statements by BRFHH, LSU, and Willis-Knighton officials suggesting, in Plaintiffs' eyes, a scheme to deprive University Health of it commercially insured business.  Id. at 27.  BRFHH estimates that the loss of its commercially insured business would cause it to lose $15 million annually in profits and endanger its survival as the operator of University Health.

Inversely, the migration of commercially insured patients from University Health to Willis-Knighton would significantly increase Willis-Knighton's market share in the Shreveport area, according to the Plaintiffs. Id. at 47-51.  Were the new clinics to siphon away all of University Health's commercially insured care, "Willis-Knighton's 75% share in the relevant hospital market will increase to even higher levels, near 90%."  Id. at 4. Among some of the specialties identified in the clinic agreements, a total shift in care to the clinics would result in Willis-Knighton's share of the commercially insured market increasing to 50% in Otorhinolaryngology (ENT), 58% in hematology/oncology, 80% in neurology, 70% in Ob/Gyn, and 65% in general pediatrics.  Id. at 55.

The new clinics would also allegedly injure Vantage.  Id. at 67-69.  Because University Health is currently in Vantage subscribers' Tier-1 network but Willis-Knighton is not, Vantage contends that a migration of commercially insured patients from University Health to Willis-Knighton will be followed by an equivalent loss of Vantage subscribers. Id. at 5, 18, 58, 67-69.  This is so allegedly because in the past, whenever a physician under contract with Vantage joined the Willis-Knighton Physician Network, that contract was immediately terminated.  Id. at 58.  Vantage also alleges that in the past whenever a LSU physician in other regions of the state joined a clinic operated by a provider with whom Vantage does not have a relationship, that physician stops accepting Vantage coverage. Id.  Thus, because LSU physicians allegedly represent more than half of the physicians in Vantage's Shreveport area network, the loss of those patients would "effectively shut Vantage out of the market in the Shreveport Area."  Id. at 67.  Vantage believes this loss

would be irreparable.  Id. at 69.

    D.  Procedural History

    After limited initial discovery, Plaintiffs moved to preliminarily enjoin the Willis-Knighton/LSU clinics, Record Document 24, and Willis-Knighton moved to dismiss all claims against them soon thereafter, Record Document 30.  The Court held a hearing to address the parties' motions.  Record Document 83.  Ruling from the bench, the Court denied the Plaintiffs' Motion for Preliminary Injunction and denied Willis-Knighton's Motion To Dismiss on all but one ground.  Record Document 83, p. 2.  With respect Vantage's section 2 claims, the Court declined to rule on dismissal and instead ordered additional briefing from both parties.  Id.  After thorough briefing from the parties, see Record Documents 89, 90, 93, and 97, the question now ripe before the Court is whether Vantage's section 2 claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

    Willis-Knighton argues that there are three principal reasons to dismiss Vantage's claims.  First, Vantage has not, according to Willis-Knighton, alleged a cognizable theory of anticompetitive conduct, an element of a section 2 claim.  Record Document 90, p. 6-7.  Second, Willis-Knighton asserts that Vantage has not established antitrust injury, a threshold requirement for a plaintiff in any antitrust claim.  Id. at 7.  Because antitrust injury is a universal requirement for antitrust claims, Willis-Knighton further argues that Vantage's inability to establish it warrants dismissal of all of its antitrust claims, not just its section 2 claims.  Id.  Third, Willis-Knighton argues that the conduct of which Vantage complains is so vaguely or conclusorily described in its complaint that it cannot support a

plausible, non-speculative claim under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 554 (2007).

## II.    Dismissal Pursuant to Rule 12(b)(6)

To survive a challenge under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  Courts are required to accept the plaintiff's "well-pleaded" facts as true and construe the complaint in a light favorable to that plaintiff. <u>In re Great Lakes Dredge & Dock Co.</u>, 624 F.3d 201, 210 (5th Cir. 2010) (citations omitted).  Nonetheless, courts are not required to accept the veracity of legal conclusions framed as factual allegations. <u>Iqbal</u>, 556 U.S. at 678 (reasoning that under Rule 8, it is not sufficient to merely recite a cause of action's elements with supporting conclusory statements).  Overall, determining when a complaint states a plausible claim is a context-specific task, requiring courts to rely on judicial experience and common sense to assess when a complaint crosses the line from conceivable to plausible.  <u>Id.</u> at 678-80.

A claim is facially plausible when a plaintiff pleads factual content that permits the court to reasonably infer a defendant is liable for the alleged misconduct.  <u>Iqbal</u>, 556 U.S. at 678-79. This plausibility standard is not a probability requirement, "but it asks for more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).

## III.   Discussion

A.  Failure To Plead Anticompetitive Conduct Under Section 2 of the Sherman Act

Willis-Knighton argues that Vantage fails to plead anticompetitive conduct, an element of a monopolization claim asserted pursuant to section 2 of the Sherman Act. Record Document 90, 4-8.  A defendant is liable for monopolization under section 2 where it (1) possesses monopoly power and (2) achieves or maintains its monopoly power through anticompetitive conduct.[5]  See 15 U.S.C. § 2 (2012); Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398, 407-08 (2004); United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).  The necessity of proving more than monopoly power reflects federal courts' judgment that in the short term, the monopolist's ability to charge above-market prices invites more, rather than less, competition.  Trinko, 540 U.S. at 407 ("The opportunity to charge monopoly prices . . . induces risk taking that produces innovation and economic growth.").  Thus, while the definition of anticompetitive conduct[6]

---

[5] Vantage has alleged attempted monopolization, another cause of action under section 2 of the Sherman Act.  See 15 U.S.C. § 2 (2012); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Record Document 1, pp. 73-75.  Vantage's attempted monopolization claim is indistinguishable from Vantage's monopolization claim for the purposes of evaluating Willis-Knighton's dismissal arguments. Because anticompetitive conduct is still an element of an attempted monopolization claim, Spectrum Sports, 506 U.S. at 456, the viability of both Vantage's monopolization and attempted monopolization claims turns in equal measure on whether Vantage can show anticompetive conduct.  Moreover, Willis-Knighton's remaining two dismissal arguments–lack of antitrust injury and lack of Twombly specificity–also equally affect Vantage's monopolization and attempted monopolization claims.  The Court therefore need not separately address Vantage's attempted monopolization claim for a large part of this ruling.

[6] Courts also label anticompetitive conduct exclusionary conduct, predatory conduct, and improper conduct.  See Taylor Pub. Co. v. Jostens, Inc., 216 F.3d 465,

has many accepted permutations,[7] the essence of the conduct that it makes actionable is the achievement or maintenance of monopoly power by means other than competition on the merits.  See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999) (citing Aspen Skiing Co. v. Aspen Highlands, 472 U.S. 585, 605 (1985) ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as [anticompetitive].")); see also United States v. Microsoft Corp., 253 F.3d 34, 58-59 (D.C. Cir. 2001) (To be condemned as anticompetitive under section 2, the conduct "must harm the competitive process and thereby harm consumers.").[8]  In the Fifth

---

475 n.2 (5th Cir. 2000) ("We use the terms 'predatory' and 'exclusionary' interchangeably . . . ."); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 298 (2d Cir. 1979) ("improper" conduct).  Some authorities, however, view the term "exclusionary" as too narrow.  See 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 701b (3d ed. 2008) ("Although we often say that § 2 requires an 'exclusionary' act, our real meaning is that § 2 requires one or more forbidden *anticompetitive* acts. Not all anticompetitive acts are exclusionary.").

[7] See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n.32 (1985) ("[E]xclusionary comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.") (quoting 3 Phillip E. Areeda & Donald F. Turner, Antitrust Law 78 (1978)); United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966) (The monopolist must have "acquired or maintained that power wilfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident."); 3 Areeda & Hovenkamp, Antitrust Law ¶ 651a (3d ed. 2008) ("We define monopolistic conduct as acts that: (1) are reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals; and (2) that either (2a) do no benefit consumers at all, or (2b) are unnecessary for the particular consumer benefits claimed for them, or (2c) produce harms disproportionate to any resulting benefits.")

[8] See also United States v. Aluminum Co., 148 F.2d 416, 430 (2d. Cir. 1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

Circuit, proving anticompetitive conduct also "[g]enerally" requires "some sign that the monopolist engaged in behavior that—examined without reference to its effects on competitors—is economically irrational." Stearns, 170 F.3d at 523.

Vantage argues that by alleging that Willis-Knighton has acquired (and is attempting to acquire) competing healthcare providers, has used punitive non-compete contracts with its physicians, and has restricted patient referrals to other Willis-Knighton providers, the complaint has plead anticompetitive conduct.[9]  The Court separately addresses whether any of these three groups of allegations constitute a viable theory of anticompetitive conduct.[10]

---

[9] Notably, Vantage does not contend that Willis-Knighton's "effective refusal to deal" with it constituted anticompetitive conduct.  A refusal to deal may qualify as anticompetitive conduct, but only under limited circumstances.  See Aspen Skiing, 472 U.S. 585; Trinko, 540 U.S. 398.  Instead, Vantage alleges that Willis-Knighton's refusal to deal with it represents its injury.  Record Document 89, p. 25.

[10] The separate analysis of these three groups of conduct is not impermissible "compartmentalizing" of allegedly anticompetitive conduct.  See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698 (1962). As Vantage has alleged elsewhere Continental Ore and Associated Radio Services Co. v. Page Airways, Inc. hold that courts should determine anticompetitive conduct by measuring the cumulative effect of the defendant's allegedly anticompetitive conduct, rather than evaluating each instance of allegedly illegal conduct in isolation.  See Continental Ore, 370 U.S. at 698; Assoc. Radio Serv. Co. v. Page Airways, Inc, 624 F.2d 1342, 1356 (5th Cir. 1980).  This instruction, however, is limited to the analysis of conduct that although in theory may constitute anticompetitive conduct, in fact has such a de minimus effect on competition that it should not be actionable.  See Assoc. Radio, 624 F.2d at 353-56 ("We agree . . . that a de minimus rule should be applied by our courts, but we believe that [there were] enough instances of exclusionary behavior on the part of defendants to constitute far more than de minimus violations of section 2.").  The Court may therefore separately address whether Willis-Knighton's acquisitions, non-competes, or referrals theoretically could give rise to anticompetitive conduct before cumulatively determining the effect of these actions.

1.  *Acquisitions*

In general, Willis-Knighton argues that none of the conduct that Vantage claims is anticompetitive–the acquisitions, the non-competes, the referrals–can be anticompetitive because in the Fifth Circuit, conduct is anticompetitive under section 2 only where it is economically irrational for the defendant and here Willis-Knighton had a rational business purpose for all of its challenged actions: growing its business.  See id; Record Document 90, pp. 9-10.

In Stearns, a manufacturer of airport-to-airplane boarding bridges sued a rival manufacturer for monopolization under section 2 of the Sherman Act.  Id. at 520-21. Stearns, the plaintiff manufacturer, alleged in relevant part that its competitor, FMC, illegally gained and maintained its monopoly through exclusionary manipulation of municipal bids. Specifically, Stearns alleged that FMC illegally manipulated the airport competitive bid process through four strategies:

> First, FMC was to attempt to convince municipalities that they should avoid competitive bidding and strike a purchase agreement with FMC directly—so called "sole-sourcing." Second, if bidding appeared inevitable, FMC should strive to drive the criteria for the award away from price alone by requesting various product features be weighted against cost in the final calculation of the best bid. Third, efforts were to be made to insure that the specifications adopted by a municipality were tailored to fit FMC's product and exclude Stearns. Lastly, FMC would "induce complexities in the bidding process" by suggesting certain certifications and restrictions be added that worked to the detriment of Stearns.

Id. at 522.  The Fifth Circuit held that these strategies did not amount to anticompetitive conduct for the purposes of a section 2 monopolization claim.  Id. at 527.  The court found that the test for determining when conduct becomes anticompetitive is when the conduct

does not involve competition on the merits.  Id. at 522-23, 527.  For three reasons, Stearns failed to show that FMC's four-part strategy did not constitute competition on the merits.  Id. at 523-27.  One reason was that this type of competition generally is not an antitrust violation under section 1 of the Sherman Act.  Id. at 522-523, 527 (citing Security Fire Door Co. v. County of Los Angeles, 484 F.2d 1028, 1030–31 (9th Cir. 1973)).  The second reason that FMC's conduct was competition on the merits was that it was done for a rational business purpose.  Id. at 523-24.  The court found that the lack of a rational business purpose, i.e., engaging in conduct that may harm a competitor but also knowingly causes itself real losses, is the key factor in determining when there is competition on the merits: "If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported."  Id. at 522.[11]  The court stated that there was an "obvious" rational business justification for FMC's four-part strategy: selling more of its product.  Id. at 524.  The third reason that FMC's strategy was competition on the merits was that it could not succeed without the active, voluntary consent of the consumer, the airport.  Id. at 524.[12]  Based on these reasons, the court concluded that "Stearns does not and cannot claim that it has been excluded from competing on the merits" and affirmed summary judgment dismissal of Stearn's section

---

[11] See also id. at 523 ("Generally, a finding of exclusionary conduct requires some sign that the monopolist engaged in behavior that—examined without reference to its effects on competitors—is economically irrational.").

[12] Although the court stated that this determination would be upset if there were evidence that airports' decision making had been coopted or coerced, id. at 526 ("Bribery and threats are not competition on the merits."), the court found that Stearns had failed to introduce any such evidence.  Id.

2 claims.  Id. at 527.

Vantage argues that Stearns notwithstanding, the allegations of Willis-Knighton acquiring competitors is a viable theory of anticompetitive conduct because courts–including the Supreme Court–recognize horizontal acquisitions as anticompetitive conduct.  Record Document 89, pp. 13-14.  The Supreme Court has established that acquiring a viable competitor constitutes anticompetitive conduct under section 2.  See Grinnell, 384 U.S. at 576; see also 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 701a (3d ed. 2008) ("Historically and today, merging viable competitors to create a monopoly is a clear § 2 offense . . . .").  In Grinnell, the Court held that a home security conglomerate had engaged in anticompetitive conduct under section 2 because it achieved its monopolization through the acquisition of competing entities, among other acts.  384 U.S. at 576.  The Court explained that because the acquired entities were previously the defendant's competitors, their acquisitions by the defendant lessened competition in the given market and increased the defendant's market power, allowing the Court to determine that they qualified as the types of anticompetitive conduct that section 2 forbids.  See id.

Courts continue to hold that acquisitions can give rise to anticompetitive conduct for the purposes of a section 2 claim.  See Behrend v. Comcast Corp., No. CIV.A. 03-6604, 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012).  In Behrend, consumers sued Comcast, a cable provider, in part under section 2 of the Sherman Act for monopolizing cable services in the greater Philadelphia market.  Id. at *1.  Comcast accomplished this monopolization through a series of acquisitions, taking the various forms of outright

acquisitions, swaps of assets in different geographic regions, and purchases of assets in receivership through bankruptcy, over the span of a decade.  Id. at *3-5.  These acquisitions increased Comcast's market share in the greater Philadelphia area from 24% in 1998 to 69.5% in 2007.  Id. at *20.  On summary judgment, the plaintiff consumers argued that the acquisitions themselves represented the anticompetitive conduct required to prevail on a section 2 claim.  Id.  The court agreed, holding that the acquisitions constituted anticompetitive conduct.  The court reasoned that because the consumers had provided evidence that the acquisitions and the increased market power that followed the acquisitions allowed Comcast to increase price, the consumers could rely on the "transactions themselves . . . as proof of [anticompetitive] conduct."[13]  Id.

For three reasons, Willis-Knighton argues that Grinnell and its progeny do not support a finding that the acquisitions challenged in this lawsuit are anticompetitive under section 2.

_____

[13] Vantage also asserts that Electronic Data Systems v. Computer Associates, 802 F. Supp. 1463 (N.D. Tex. 1992), and Brown Shoe Co. v. United States, 370 U.S. 294 (1962), support its contention that acquisitions alone constitute anticompetitive conduct under section 2.  Record Document 89, p. 20.  No such holding is found in either case.  In Electronic Data Systems, the defendant moved to dismiss the plaintiff's section 2 claim not because it did not allege anticompetitive conduct, but because it did not allege monopoly power.  See id. at 1466-67.  The question of whether the defendant's acquisitions gave rise to anticompetitive conduct was therefore not before the court.  In Brown Shoe, the Court, in evaluating whether a horizontal and vertical merger violated section 7 of the Clayton Act, stated, "If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated; but the arrangement will also have run afoul of the Sherman Act."  370 U.S. at 328.  This statement does not support Vantage's position because it was not the holding of the Court and, even if it were, its import is substantially diminished by the fact that it was made before Grinnell, which was the first Supreme Court case requiring anticompetitive conduct as an element of a section 2 violation.

First, as a threshold issue, Willis-Knighton argues that the label "acquisition" mischaracterizes its past conduct.  According to Willis-Knighton, the complaint only pleads that it has hired talent from its rivals, not that it has acquired them.  Record Document 90, pp. 6-8.  And whether hiring talent from a rival is anticompetitive under section 2 is governed by a standard that is far more stringent than the one set forth in Grinnell. Vantage for its part asserts that the complaint alleges more than the mere hiring of talent. The complaint, according to Vantage, alleges that hiring talent from a target provider is but one initial step Willis-Knighton takes in accomplishing its ultimate aim of acquiring the target provider.

The question then becomes how courts distinguish an acquisition from hiring talent for the purposes of assessing section 2 anticompetitive conduct.  Unfortunately, neither the parties nor the Court have been able to find any law that draws this distinction.  But the law in the Fifth Circuit is that the hiring of rival talent, even if it strengthens a monopolist and weakens a competitor, is generally not anticompetitive.  Taylor Pub. Co. v. Jostens, Inc., 216 F.3d 465, 480-81 (5th Cir. 2000).  Because of the "high social and personal interest in maintaining a freely functioning market for talent," "hiring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and strengthen a monopolist." Id. at 479 (citing 3 Areeda & Hovenkamp, Antitrust Law ¶ 702, at 204).  Consequently, in the Fifth Circuit, a monopolist hiring rival talent is anticompetitive only where the monopolist (1) engages in predatory hiring, i.e., acquiring talent from a rival firm not for its own use but only to deny it to the competitor, and (2)

induces the targeted talent, while still employed by the competitor, to act disloyally toward the competitor by steering its customers toward the monopolist.  Id. at 480-81.  In Taylor Publishing, a monopolist in the school yearbook publishing industry instituted a multi-faceted campaign "to take [the plaintiff competitor] out of business." 216 F.3d at 471. One prong of the defendant's strategy was to hire away key sales personnel from the plaintiff.  Id.  The court held that the defendant's hiring of talent was anticompetitive because the plaintiff was able to demonstrate at trial that (1) the defendant had hired talent away from the plaintiff not for its own use but to deny it to the plaintiff and (2) the defendant had induced the plaintiff's employees, while still in the plaintiff's employ, to violate their non-compete agreements and convert their sales accounts to the defendant. See id. at 480-81.

Taylor Publishing governs any acquisition alleged by the Plaintiffs in which the target provider fails because Willis-Knighton hires away its physicians but otherwise does not involve Willis-Knighton acquiring assets of the target provider before it fails.  See id. at 471, 480-81. The acquisitions in the complaint that meet these criteria are the acquisitions of Bossier Medical Center,[14] Doctor's Hospital, CHRISTUS's acute-care services, and University Hospital's commercially insured business.  Like the hiring of talent in Taylor Publishing, Willis-Knighton's hiring of physicians from these four entities is alleged to have weakened (or will weaken) those entities and was (or is) part of Willis-Knighton's alleged

---

[14] The Court notes that while a filing subsequent to the complaint indicates that Willis-Knighton "purchased" Bossier Medical Center for $3.7 million in 2012, Record Document 24-30, that filing was not an exhibit attached to the complaint and therefore the Court may not consider it in a 12(b)(6) motion to dismiss.

plan to put them out of business.  See id. at 471; Record Document 1, pp. 2, 5-6.

And with respect to these four alleged acquisitions, Vantage has pleaded no facts to support either element of anticompetitive hiring under Taylor Publishing.  The complaint has not alleged that Willis-Knighton hired physicians not for its own use but to deny them to any of the target entities.  See Taylor Publ'g, 216 F.3d at 480.  The complaint has also not alleged that Willis-Knighton induced any physicians to act disloyallly before their employ with Willis-Knighton.  See id.  Consequently, these four acquisitions do not give rise to section 2 liability.

However, the two remaining acquisitions identified in the complaint, the acquisitions of Northwest Louisiana Surgery Hospital and "a previously independent cardiology group," were apparently outright takeovers and therefore are not governed by Taylor Publishing.  For these acquisitions, Willis-Knighton's second argument against the application of Grinnell is relevant.  Willis-Knighton contends that Grinnell does not support a blanket rule that acquisitions establish anticompetitive conduct under section 2.  Record Document 97, p. 4.  Willis-Knighton emphasizes that in Grinnell, the defendant's prior acquisitions were not an independent ground for a finding of anticompetitive conduct.  See 384 U.S. at 576; Record Document 97, p. 4.  In addition to the defendant's prior acquisitions, the Court in Grinnell also included defendant's inclusion of restrictive agreements among the defendant's subsidiaries that prevented competition among them[15] and the defendant's

---

[15] Courts no longer consider intrabrand restrictions on competition enforced by the parent company to be anticompetitive. See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 752-53 (1984).

pricing practices in its catalogue of acts that together "plainly and explicitly" established anticompetitive conduct.  See Grinnell, 384 U.S. at 571, 576.  Willis-Knighton thus distinguishes this matter from Grinnell, arguing that unlike the Grinnell defendant's multifaceted anticompetitive conduct, Willis-Knighton is only alleged to have acquired competing entities.  See 384 U.S. at 576; Record Document 97, p. 4.  Willis-Knighton also argues, perhaps implicitly, that Grinnell must be read in concert with Stearns, which means that an acquisition is anticompetitive only where it is not done for a rational business purpose.  Record Document 90, pp. 4-5.

This line of argument is unpersuasive for several reasons.  First, although not explicit, the language in Grinnell suggests that acquisitions of viable competitors alone may establish the anticompetitive conduct element of a section 2 claim.  In its relatively brief discussion of the defendant's anticompetitive conduct, the Court in Grinnell stated that the defendant's "monopoly was achieved in large part by unlawful and exclusionary practices. The restrictive agreements . . . *were one device*. Pricing practices . . . *were another*.  The acquisitions . . . *were still another*." 384 U.S. at 576 (emphasis added).  This language implies that any of the three practices by the defendant could have satisfied the Court that the defendant's actions constituted anticompetitive conduct.  See id.  Second, courts continue to hold that acquisitions alone establish anticompetitive conduct under section 2. See, e.g., Behrend v. Comcast Corp., No. CIV.A. 03-6604, 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012) (citing Grinnell, 384 U.S. at 576) (finding that defendant's acquisitions were prima facie evidence of anticompetitive conduct).  Third, Willis-Knighton offers no

authority challenging or even questioning the relevant holding in Grinnell as good law. Although it is true, as Willis-Knighton states, that the Second Circuit has held that a vertical acquisition is not by itself anticompetitive conduct, see Record Document 97, pp. 3-4; Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 124-25 (2d Cir. 2007), that holding has no bearing on Willis-Knighton's alleged acquisitions because neither party characterizes them as vertical.  Fourth, Stearns does not require that acquisitions must lack a rational business justification before they may be characterized as anticompetitive.  In Stearns, the court stated that it "generally" requires "some sign that the monopolist engaged in behavior that . . . is economically irrational," Stearns, 170 F.3d at 523.  Thus, by its very own terms, the lack of a rational business purpose is not a universal requirement for anticompetitive conduct.  See id.  Instead, under Stearns, the universal test is whether the conduct is competition on the merits.  Id. at 522-23, 527.  Thus, while a rational business purpose is the most important factor in determining whether there is competition on the merits, it is still a component of the overarching test of competition on the merits.  See id.  And even if Stearns does conflict with Grinnell, it must give way to Supreme Court precedent.  Finally, as shown below, the tension between the analyses of Grinnell and Stearns is alleviated by the viability of a rational business justification as an affirmative defense.

Willis-Knighton's third argument against the application of Grinnell is that even if the Court does not adopt economic irrationality as the test for establishing section 2 anticompetitive conduct, it provides Willis-Knighton with an affirmative defense.  Record

Document 97, pp. 4-5.  To assess anticompetitive conduct under section 2 of the Sherman Act, many courts have adopted the burden-shifting framework articulated by the D.C. Circuit in United States v. Microsoft Corp., 253 F.3d 34, 59 (D.C. Cir. 2001).  See, e.g., New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652 (2d Cir.), cert. dismissed sub nom., Allergan PLC v. New York ex. rel. Schneiderman, 136 S. Ct. 581 (2015).  Under Microsoft, once a plaintiff has met his burden of demonstrating a prima facie case of section 2 anticompetitive conduct, the burden shifts to the defendant to offer a procompetitive justification, i.e., "a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  Microsoft, 253 F.3d at 59.  Then, "if the monopolist's procompetitive justification stands unrebutted . . . the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."  Id.  Though the Fifth Circuit has not explicitly accepted or rejected the Microsoft framework, it previously has suggested that some type of burden-shifting framework is appropriate for analyzing section 2 claims.  See Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co., 615 F.2d 1372, 1389 n.13 (5th Cir. 1980) (finding that analysis of a section 2 claim is similar to the rule of reason analysis for a section 1 claim, which weighs the anticompetitive effects of the plaintiff's conduct against its procompetitive benefits).

For Willis-Knighton to prevail on this affirmative defense at the 12(b)(6) stage in the litigation, the complaint alone must prove its requisite elements, i.e., the complaint must demonstrate as a matter of law (1) nonpretextual, procompetitive justifications for Willis-

Knighton's allegedly anticompetitive actions, which would include its acquisitions, the non-compete agreements, and the restrictive referrals, and (2) that the procompetitive benefit of these actions outweigh their anticompetitive harm.  See Microsoft, 253 F.3d at 59; Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982).  Vantage argues that Willis-Knighton cannot prevail on a procompetitive justification affirmative defense at the 12(b)(6) stage because the defense requires proof of facts that lie beyond the complaint.  Record Document 93, p. 3.  Willis-Knighton responds by asserting that courts regularly entertain antitrust affirmative defenses and procompetitive/efficiency arguments in 12(b)(6) motions.  Record Document 97, pp. 4-5. Willis-Knighton therefore asserts that the complaint itself supports dismissal under this defense because it alleges a legitimate business purpose for all of Willis-Knighton's challenged actions: treating more patients.  See id. at 4; Record Document 90, pp. 10-11.

The Fifth Circuit has long held that "a claim may [] be dismissed if a successful affirmative defense appears clearly on the face of the pleadings."  Clark v. Amoco Prod. Co., 794 F.2d 967, 970 (5th Cir. 1986) (citing Kaiser, 677 F.2d at 1050); see also Airline Car Rental, Inc. v. Shreveport Airport Auth., 667 F. Supp. 293, 297 (W.D. La. 1986) ("[A] cause of action cannot be dismissed on a 12(b)(6) motion on the basis of an affirmative defense unless the defense clearly appears on the face of the pleading.").  In Kaiser Aluminum, the defendant filed an antitrust counterclaim that the plaintiff sought to dismiss under Rule 12(b)(6) based on the affirmative defense that the claim was filed after the relevant limitation period.  677 F.3d at 1049.  The counterclaim, filed in 1979, alleged that

a contract executed between the defendant and the plaintiff in 1973 constituted an illegal tying arrangement under antitrust law.   Id. at 1048.   The court affirmed dismissal, reasoning that the face of the counterclaim revealed that it was barred by antitrust's four-year statute of limitations and the facts pleaded in the counterclaim, even if taken as true, could not support any judicially recognized exception to the limitation period. Id. at 1050-57.   In Airline Car Rental, the defendant sought dismissal under Rule 12(b)(6) based on the affirmative defense that the claim was barred by the state action doctrine.   667 F. Supp. at 297 (citing Parker v. Brown, 317 U.S. 341 (1943)).   In its complaint, the plaintiff alleged that the defendant, Shreveport Airport Authority, was "a body politic and corporate organized and existing pursuant to the laws of the State of Louisiana." Id. at 297-98.   But the court denied dismissal, holding that the complaint had not stated facts sufficient to meet the requirements of the state action doctrine because that defense requires that the state entity party acted pursuant to a state policy to displace competition and the complaint had made no such claim.   Id. at 298.[16]

---

[16] The other cases on which Willis-Knighton relies to support its affirmative defense argument, Port Dock, 507 F.3d at 124-25, and Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288 (11th Cir. 2004), are misplaced.   See Record Document 97, pp. 3-4.
     In Port Dock, the Second Circuit held that a section 2 monopolization claim alleging a vertical acquisition accompanied by a refusal to deal should be dismissed under Rule 12(b)(6) because it failed to allege anticompetitive conduct. 507 F.3d at 124-26.   The court noted that a vertical acquisition standing alone does not qualify as anticompetitive conduct, id. at 124 (citing Belfiore v. N.Y. Times Co., 826 F.2d 177, 181 (2d Cir. 1987)), and that a refusal to deal generally does not qualify as anticompetitive conduct unless there is an absence of a valid business purposes, id. (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608 (1985)).   The court further noted that in the Second Circuit, "when a monopolist has acquired its monopoly at one level of a product market, its vertical expansion into another level of the same product

Because the Plaintiffs' complaint does not demonstrate as a matter of law either that that there were nonpretextual, procompetitive justifications for Willis-Knighton's allegedly illegal conduct  or that the procompetitive benefits of the acquisitions outweighed their anticompetitive harm, Willis-Knighton is not entitled to prevail on a <u>Microsoft</u> procompetitive affirmative defense at this stage in the litigation.  Unlike the statute of limitation defense in <u>Kaiser Aluminum</u>, but like the state action doctrine defense in <u>Airline Car Rental</u>, the procompetitive defense that Willis-Knighton raises cannot be resolved based solely on the Plaintiffs' complaint because, at the very least, the complaint does not reveal whether the procompetitive benefits of the acquisitions, non-competes, and control of referrals outweigh their anticompetitive harm.  <u>See Microsoft</u>, 253 F.3d at 59.  This affirmative defense is thus better suited for a summary judgment motion.  <u>See Behrend</u>, 2012 WL 1231794, at *22-24 (holding that although consumer plaintiff's allegations of

_____

market will ordinarily be for . . . a prototypical valid business purpose."  <u>Id.</u> (citing <u>G.K.A. Beverage Corp. v. Honickman</u>, 55 F.3d 762 (2d Cir. 1995).  Vantage's monopolization claims and the monopolization claim dismissed in <u>Port Dock</u> are easily distinguishable.  Unlike the relevant challenged acquisition in <u>Port Dock</u>, the acquisitions that Vanta challenges were horizontal, not vertical.  <u>See id.</u> at 119; Record Document 5-6, 10, 17.  Thus, the relevant holdings from <u>Port Dock</u>, that vertical acquisitions are not anticompetitive under section 2 and are usually done for a rational business purpose, have no bearing on Willis-Knighton's acquisitions.

In <u>Morris Communications</u>, a publisher sued the Professional Golf Association for monopolizing the publication of real-time golf scores.  <u>Id.</u> at 1290-93.  The Eleventh Circuit affirmed summary judgment dismissal of the publisher's claim, holding that the defendant had demonstrated, as a defense, that its conduct had a nonpretextual, valid business justification.  <u>Id.</u> at 1297-98.  Because the court in <u>Morris Commc'ns</u> affirmed dismissal of the publisher's monopolization claim on summary judgment, rather than under Rule 12(b)(6), <u>Morris Commc'ns</u> does not support Willis-Knighton's argument that it is entitled to prevail on its affirmative defense of a nonpretextual, procompetitive justification for its allegedly illegal acquisitions.  <u>See id.</u> at 1292.

Comcast's acquisitions constituted a viable theory of anticompetitive conduct under section 2, Comcast was entitled to summary judgment on that claim because Comcast had shown that it had legitimate business justifications for its acquisitions and the consumers could not demonstrate that there was a genuine dispute of material fact that Comcast's business justifications were pretextual).

Therefore, Willis-Knighton's alleged acquisitions of Northwest Louisiana Surgery Hospital and "a previously independent cardiology group" constitute anticompetitive conduct under section 2 of the Sherman Act.  See Grinnell, 384 U.S. at 576; Record Document 1, pp. 10, 17.   These acquisitions could plausibly constitute the type of competitor acquisitions described in Grinnell.  See 384 U.S. at 576; Record Document 1, pp. 5-6, 10, 17.   Like the entities acquired in Grinnell, Northwest Louisiana Surgery Hospital and the cardiology group were competitors of the defendant in the relevant market so their acquisition lessened competition and increased the defendant's market share[17] in the relevant market.  See 384 U.S. at 576; Record Document 1, pp. 10, 17.   Thus, based on its allegation that Willis-Knighton acquired Northwest Louisiana Surgery Hospital and an unknown cardiology group, Vantage has plead anticompetitive conduct.

### 2. Non-Compete Agreements and Control of Referrals

Vantage also asserts that its allegations of Willis-Knighton's non-compete

---

[17] While not dispositive of market power, market share often serves as an imperfect proxy for market power.  See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489-90 (5th Cir. 1984) (citing United States v. Aluminum Co. of Am., 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.)).

agreements with its physicians and its control of physician referrals are anticompetitive under section 2 of the Sherman Act.   Vantage, however, has offered no authority specifically holding or suggesting that non-compete agreements or control of physician referrals are anticompetitive under section 2.   Absent any conflicting authority, the non-competes and the control of referrals are anticompetitive if they lacked competition on the merits.   See Stearns, 170 F.3d at 522-23, 527.   And the most important factor in determining competition on the merits is whether Willis-Knighton had a rational business purpose for its actions.   See id.   Other relevant factors under Stearns are whether courts find these acts violate section 1 of the Sherman Act and whether Willis-Knighton could have accomplished these acts without the consent and participation of consumers.   See id. at 522-24.

Willis-Knighton has a rational business purpose for both the non-compete agreements and its control of referrals.   See id. at 524.   As previously stated, Willis-Knighton argues that its rational business purpose for both of these actions was the same: to treat more patients.   The complaint alleges nothing to contradict Willis-Knighton's argument that the purpose and the effect of the non-compete agreements and the restriction of referrals was to treat more patients.   There is no allegation, for instance, that Willis-Knighton does not  need the physicians subject to the non-compete agreements and keeps them at a loss just for the sake of ensuring that other hospitals do not have access to them.   Nor is there any allegation that Willis-Knighton has steered patients back to Willis-Knighton not because their treatment would be profitable, but because it would

ensure that they are not treated by other providers.  These acts therefore had a rational business purpose.

The other two, less important, factors under <u>Stearns</u> point in different directions. Neither party has argued that these acts may violate Section 1 of the Sherman Act.  <u>See id.</u> at 522-23.  On the other hand, these acts were done without the participation of consumers, i.e., patients.  <u>See id.</u> at 523.  On the whole, then, the strict application of <u>Stearns</u> to the allegations of Willis-Knighton's non-compete agreements and control of physicians referrals shows that they are not anticompetitive under section 2 of the Sherman Act and therefore do not give rise to a claim of monopolization or attempted monopolization under the Sherman Act.

For the reasons stated above, the Court finds that Vantage has plead anticompetitive conduct with respect to the acquisitions of Northwest Louisiana Surgery Hospital and the cardiology group listed in the complaint.  The Court therefore **DENIES** Willis-Knighton's motion to dismiss for failure to plead anticompetitive conduct.

B.     <u>Antitrust Injury</u>

Willis-Knighton argues that Vantage has not suffered antitrust injury.  Antitrust injury is a component of antitrust standing.  Antitrust standing, in turn, is a judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims.  <u>See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")</u>, 459 U.S. 519, 535 & n. 31 (1983).  The three antitrust standing requirements are "1) injury-in-fact, [i.e.,] an injury to the plaintiff

proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." Sanger Ins. Agency v. HUB Int'l, Ltd., 802 F.3d 732, 737 (5th Cir. 2015) (citing Jebaco, Inc. v. Harrah's Operating Co., 587 F.3d 314, 318 (5th Cir. 2009)). These requirements, which supplement Article III standing requirements, ensure that successful antitrust claims only redress the types of harm that antitrust law was designed to prevent, rather than create a fortuitous windfall for all parties proximate to the defendant, regardless of whether they were injured by anticompetitive conduct. See AGC, 459 U.S. at 535.

The second component of antitrust standing, anitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes the defendant's acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). This means that in an antitrust suit, but-for causation is insufficient. Instead, a plaintiff must be able to trace its injury to the anticompetitive effects of the defendant's antitrust violation. See id. An inquiry into antitrust injury thus always asks whether there is a causal connection between the alleged injury of the plaintiff and the anticipated anticompetitive effect of the specific practice that allegedly violates antitrust law. See Port Dock, 507 F.3d at 122 ("We can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges.").

Vantage asserts that it has suffered antitrust injury because Willis-Knighton's refusal to contract with it (its alleged injury) was made possible by the monopoly power Willis-

Knighton achieved through its anticompetitive acquisitions (the anticompetitive effect of the specific practice that allegedly violates antitrust law).  See Record Document 89, p. 25.

For monopolization claims, refusals to contract with the plaintiff do not constitute antitrust injury because the injury suffered by the plaintiff is one that could have just as easily occurred in the absence of monopoly power.  See Jebaco, 587 F.3d at 319-20; Port Dock, 507 F.3d at 123; Fischer v. NWA, Inc., 883 F.2d 594, 596 (8th Cir. 1989); Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999).  In Jebaco, the Fifth Circuit held that a lessor assignee did not suffer antitrust injury from lessee casinos where the complaint alleged that the casinos had violated antitrust law through an illegal market division and the lessor was injured because the casinos terminated the lease and moved elsewhere. 587 F.3d at 316-17, 319-20.  The lessor plaintiff, Jebaco, was an assignee to a lease with Harrah's casino for two riverboat casinos and as such was entitled to a per-patron fee.  Id. at 16.  After Hurricane Rita, Harrah's decided to sell the casinos and all related licensing rights.  Id.  Though Jebaco bid for the casinos and licensing rights, Harrah's sold them to another defendant, Pinnacle, and coordinated with Pinnacle to secure the license transfer with the Louisiana Gaming Control Board.  Id. at 316-17.  As part of the licensing process, Pinnacle represented that it would move the operations of the two casinos to different locations.  Id. at 317.  Jebaco alleged that these acts injured it in antitrust by depriving it of all revenue under the lease assignment.[18]  Id. at 319.  The Fifth Circuit disagreed, ruling

---

[18] Jebaco also alleged it was injured because the defendants deprived it of an opportunity to compete for the casino bid.  Id.  The court dismissed this claim as failing to allege antitrust injury, albeit for reasons not relevant to Vantage's claims.  See id. at 321.

that Jebaco had not suffered antitrust injury in part because Jebaco could have been deprived of its per-patron fees just as easily if Harrah's had not engaged in the illegal market-division scheme.[19] Id. at 320. The court reasoned: "[I]f a different firm had purchased Harrah's assets, it too might have chosen not to operate at Jebaco's preferred berths. No antitrust violation would have occurred, but Jebaco would have suffered the same injury." Id. The court therefore held that Jebaco had not suffered antitrust injury by the casinos terminating the leases. Id.

Similarly, in Port Dock, the Second Circuit held that a distributer did not suffer antitrust injury from a manufacturer where the complaint alleged that the manufacturer illegally monopolized the manufacturing level through acquisitions and the retailer was injured because the manufacturer, post-monopolization, refused to sell to it. 507 F.3d at 122-24. The plaintiff distributer, Port Dock, alleged that prior to their alleged antitrust violations, the defendant entities (collectively "Tilcon") possessed an 85% market share in the manufacture of crushed stone in the relevant geographic market, with only one

---

[19] The court also reasoned that there was no antitrust injury because the termination of the lease was the product of "downstream" allegedly anticompetitive conduct. Id. at 320. The court found that courts generally do not recognize antitrust injury for the termination of a contract or lease that is caused by "downstream" anticompetitive conduct, i.e., conduct by entities that are closer to the consumer in the stream of commerce than the plaintiff. See id. (citing 2 P. Areeda & H. Hovenkamp, Antitrust Law, 350(f-g), at 422-23 (2d ed. 2000) ("When a downstream firm merely substitutes one supplier for another, there is certainly injury-in-fact to the terminated supplier, but there is rarely antitrust injury.")). Applying this rule to Jebaco's claims, the court reasoned that Jebaco had not suffered antitrust injury because it alleged that its lease (assignment) was terminated as a result of anticompetitive acts by casinos operators, which are farther "downstream" in the market for gambling than Jebaco as lessor. Id.

viable competitor, Trap Rock.  Id. at 119.  As a distributor of the crushed stone, Port Dock was Tilcon's biggest customer.  Id.  In that same time period, Tilcon tried to raise prices unilaterally, but when Trap Rock did not follow suit, Tilcon was forced to lower prices to their former levels.  Id.  Tilcon then decided to sell its crushed stone directly to Port Dock's customers, thereby integrating vertically into the distributer level of the market and competing with Port Dock.  Id. at 120.  After its vertical integration, Tilcon acquired Trap Rock, perfecting a complete monopoly in the manufacture of crushed stone in the relevant market.  Id.  With its newfound monopoly, Tilcon refused to sell stone to Port Dock, and, because Port Dock lacked any alternate supply of stone, proposed buying Port Dock's assets at a sacrifice to Port Dock.  Id.  Port Dock sold its assets and eventually filed for bankruptcy; Tilcon, after acquiring Port Dock's assets, raised the price for crushed stone.  Id.  The Second Circuit held that Port Dock had not suffered antitrust injury.  Id. at 124.  The anticompetitive effect of Tilcon's acquisition of Trap Rock, according to the court, was the specter of Tilcon rasing prices and restricting output due to its enhanced monopoly power.  Id. at 123.  The court identified the injury to Port Rock as Tilcon's complete refusal to deal with Port Rock, an injury that the court distinguished from a claim that Tilcon had raised prices, which Port Rock conceded had never occurred.  Id.  Based on these findings, the court reasoned that Port Dock's injury of being cut off by Tilcon was unconnected to the anticompetitive danger of monopolization, i.e., increased prices, because it was something Tilcon "could have just as well done without having monopoly power."  Id.  The court stated that antitrust injury was suffered not by Port Dock, but instead by "the dealers

or consumers who were forced to buy at higher prices (or inferior quality) because the defendant had acquired the market power to charge monopoly prices." Id. at 124.

In Fischer, the Eighth Circuit held that a regional airline did not suffer antitrust injury from a national airline where the complaint alleged that the national airline monopolized the market for air service to a particular destination and the regional airline was injured because the national airline, post-monopolization, terminated its service contract with the regional airline at that destination. Id. at 600. The regional airline plaintiff, Fischer, was the exclusive carrier for all of Northwest Airlines's regional flights originating in Detroit under a contract that either party could terminate with or without cause. Id. at 595-96. Northwest then acquired Republic Airlines, another national carrier at the time, which had its own regional airline partner, Simmons Airlines, exclusively servicing its regional flights through Detroit. Id. at 596. That contract was not terminable at will. Id. After considerable effort to mediate the inevitable conflicting demands of Fischer and Simmons, Northwest terminated Fischer, its Detroit carrier. Id. at 597. Fischer sued Northwest under Section 2 for monopolizing the Detroit market, of which Northwest had gained a 75% share though its acquisition of Republic. Id. The court reasoned that Fischer had not plead antitrust injury because its injury, the termination of its Detroit service agreement, had not been caused by the anticompetitive effects of the Republic acquisition, such as increased prices; instead it was caused by Northwest's need to eliminate redundant services out of Detroit, a need that Northwest would have had irrespective of its market power. Id. at 600.

In <u>Serpa</u>, the First Circuit held that a distributer did not suffer antitrust injury from a manufacturer where the complaint alleged that the manufacturer illegally monopolized the manufacturing level through acquisitions and the retailer was injured because the manufacturer, post-monopolization, terminated their distribution arrangement.  <u>See</u> 199 F.3d at 8, 12.  Prior to it filing suit, Serpa had been the exclusive distributor for certain plumbing parts manufactured by Anaco, one of several manufacturers for these parts.  <u>Id.</u> at 9.  One of those competing manufacturers, McWane, acquired Anaco, giving it an 85% share of the relevant manufacturing market, and thereafter terminated Serpa as a distributor of Anaco products.  <u>Id.</u>  Serpa sued McWane for attempting to monopolize the relevant manufacturing market.  <u>Id.</u>  Relying heavily on <u>Fischer</u>, the court reasoned that Serpa had not suffered antitrust injury because its alleged injury, McWane's termination of the distribution contract, was "neither connected with, nor resulted from, defendant's market power in the [relevant plumbing part manufacturing] industry."  <u>Id.</u> at 11-12.

Vantage argues that almost all of these cases are distinguishable from its claims. Record Document 89, pp. 25-59.  Vantage distinguished the position and nature of the plaintiff in <u>Jebaco</u>, a lessor standing above the defendants in the stream of commerce, from itself, a customer standing below Willis-Knighton in the healthcare stream of commerce.  <u>Id.</u> at 28 (emphasizing that the consumer is the intended beneficiary under antitrust law).  This distinction, while in itself true, does not disturb <u>Jebaco</u>'s reasoning of the defendant's termination of the lease contract could have been done just as easily regardless of its antitrust violations.  <u>See</u> 587 F.3d at 320.  Next, Vantage attempts to

distinguish Willis-Knighton's refusal to contract from the contract termination in <u>Fischer</u> and <u>Serpa</u>, arguing in effect that while those courts found that those specific acquisitions had not in fact increased the monopolist's power to terminate the contracts at issue there, those findings do not compel a conclusion that monopoly power can never under any circumstance enhance the ability of a monopolist to terminate or create a contract. Regarding <u>Fischer</u>, Vantage argues that unlike Northwest's power to terminate its contract with Fischer, which the court found "was in no way enhanced by the acquisition," 883 F.2d at 600, Willis-Knighton's power to refuse to contract with Vantage was enhanced by its acquisitions of competing healthcare providers because the acquisitions "resulted in fewer and fewer physicians who were available to Vantage in its network," Record Document 89, pp. 23-27.  Vantage makes essentially the same argument with respect to <u>Serpa</u>.

Vantage's reasoning here is faulty for two reasons.  First, it misses the logic underlying the holdings in <u>Fischer</u> and its cousin cases, which is that *in all instances*, a firm can terminate a contractual relationship (or refuse to start a contractual relationship) just as easily without market power as it can with market power.  Second, it seems to recharacterize Vantage's injury not as Willis-Knighton's refusal to deal, but the shrinking pool of providers available to contract with Vantage.  This is the consequence of Vantage's injury, not its injury in itself.  If Willis-Knighton had agreed to contract with Vantage, Vantage would be unaffected by the shrinking pool of non-Willis-Knighton providers in the Shreveport area.

Vantage also argues that <u>Christian Schmidt Brewing v. G. Heileman Brewing</u>

supports the conclusion that acquisitions coupled with refusals to deal can give rise to antitrust injury.  See 753 F.2d 1354 (6th Cir. 1985).  There, the Sixth Circuit held that small brewers in the Midwest suffered antitrust injury from two large Midwest brewers where the complaint alleged that large brewers illegally merged (under Section 7 of the Clayton Act) and the small brewers would be injured because the brewers combined together would be so big that they would be able to predatorily induce all wholesalers and distributors not to do business with the small brewers.[20]  Id. at 1355-57.  This holding is distinguished from Port Dock and the like for two reasons.  First, the plaintiff competed with the defendant at the market level that the defendant is alleged to have monopolized, rather than participated with the defendant sitting upstream, see Jebaco, 587 F.3d at 319-20, or downstream, see, e.g., Serpa, 199 F.3d at 8-9, of the market level that the defendant is alleged to have monopolized.  Second, and more important, the plaintiff's injury, the deprivation of wholesalers and distributors, resulted from the anticompetitive effects of the merger because it could only could have occurred with the heightened monopoly power that flowed from the merger, unlike the injuries in Port Dock and its kin, which did not result from anticompetitive effects of the acquisitions because they just as easily could have occurred without the increased monopoly power that flowed from the acquisitions, see, e.g., Port Dock 507 F.3d at 124.

Thus, to the extent that Vantage has alleged that it was injured by Willis-Knighton refusing to contract with it, Vantage has not alleged anticompetitive conduct.  See, e.g.,

---

[20] The court also found "tentative evidence" that these adverse effects would actually occur.  Id. at 1357.

Jebaco, 587 F.3d at 319-20.  Like the defendants' refusals to contract with the plaintiffs in Jebaco and its kin, Willis-Knighton's refusal to contract with Vantage was unrelated to its ability to exploit its monopoly power because Willis-Knighton could have decided not to contract with Vantage even if it had no market power whatsoever.  See, e.g., id.

However, to the extent that Vantage has alleged that it was injured because Willis-Knighton demanded exorbitant reimbursement rates, it has plead antitrust injury.  Unlike the injuries alleged by the plaintiff in Port Dock and the like, Willis-Knighton requiring high reimbursement rates is the type of injury that flows from Willis-Knighton's market power because Willis-Knighton could not have demanded what were effectively higher prices without market power.  See Port Dock, 507 F.3d at 123 (finding that the plaintiff never alleged that the defendant was injured by increased prices.)  Although it survives 12(b)(6) dismissal, this theory of antitrust standing may not constitute antitrust injury if later Vantage cannot demonstrate that Willis-Knighton *increased* prices as result of its anticompetitive acts.  That is, if Willis-Knighton had always demanded high prices from Vantage–both before and after its attainment of market power–then Vantage suffered no antitrust injury because the high prices demanded of it did not flow from Willis-Knighton's increased market power.  In its complaint, Vantage indicates that for fifteen years, it has tried to contract with Willis-Knighton, but without success.  The complaint is silent on when these efforts were unsuccessful because Willis-Knighton demanded high prices and when they were unsuccessful because Willis-Knighton refused to deal. The complaint is also silent on whether the prices demanded by Willis-Knighton ever increased.  Nonetheless,

Vantage's allegation of Willis-Knighton demanding high reimbursement rates for its services states a plausible theory of antitrust injury and is thus sufficient to survive 12(b)(6) dismissal.

Based on the above discussion, the Court therefore **DENIES** Willis-Knighton's motion to dismiss based on Vantage's lack of antitrust injury.

C.   Insufficient Detail Under Iqbal and Twombly

Finally, Willis-Knighton argues that all of Vantage's claims must be dismissed because they lack the specificity required under Twombly and Iqbal.  Record Document 90, pp. 21-27.  Under Twombly, a complaint must allege facts sufficient "to raise a right to relief above the speculative level" so that a right to relief "is plausible on its face." 550 U.S. at 555, 570.  Also, "[a] complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  In re Plywood Antitrust Litig., 655 F.2d 627, 641 (5th Cir. Unit A Sept. 1981). So long as it raises a plausible right of recovery and puts the defendant on notice of the plaintiff's claim and grounds upon which it rests, however, the complaint does not need to specify detailed factual allegations.  See Twombly, 550 U.S. at 555.  Generally, then, Vantage's complaint must allege facts that, either directly or inferentially, plausibly show that Vantage has met all the elements of all of its causes of action in this suit. See Twombly, 550 U.S. at 555; In re Plywood, 655 F.2d at 641.  Willis-Knighton, however, has not challenged all aspects of Vantage's allegations under Twombly and instead attacks two categories of Vantage's allegations.

1.   *Whether Vantage Plausibly Alleged that LSU Physicians Working at the Joint Clinics Will Drop Vantage*

Willis-Knighton argues that Vantage's allegations about Willis-Knighton's involvement with LSU fail to state a claim under Twombly because they are conclusory with respect to how Vantage would be injured by LSU physicians treating patients at Willis-Knighton clinics.  Record Document 90, pp. 21-24.

Vantage's complaint must allege facts that, either directly or inferentially, plausibly show that Vantage has been injured.  See Twombly, 550 U.S. at 555; In re Plywood, 655 F.2d at 641; Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill, 561 F.3d 377, 384 (5th Cir. 2009).  Although injury is not strictly an element of an antitrust cause of action, it is necessary for recovery and thus courts may dismiss a claim under Twombly for failing to provide sufficient detail explaining how the defendant's conduct would injure the plaintiff.  See Torch Liquidating, 561 F.3d at 384 ("A complaint must contain direct allegations or permit properly drawn inferences to support 'every material point necessary to sustain a recovery.'" (quoting Campbell v. City of San Antonio, 43 F.3d 973, 975 (5th Cir. 1995))).

Willis-Knighton cites two cases to support its argument.  Corr Wireless Commc'ns, L.L.C. v. AT&T, Inc., is illustrative of the level of specificity required to plead injury. See 893 F. Supp. 2d 789 (N.D. Miss. 2012).  There, a regional wireless carrier, Corr, sued AT&T in antitrust in part because it alleged that AT&T was going to abuse its monopoly power

over certain wireless frequencies to deny Corr access to roaming service.  Id. at 799.  The extent of the pleaded basis for this allegation was Corr's "prior knowledge and experience." Id.  At oral argument Corr was likewise unable to produce any allegations of present conduct by AT&T that served as the basis for its assertion that AT&T would deny it roaming service.  Id.  The court dismissed Corr's roaming antitrust claim under Rule 12(b)(6) in part because its allegation of future conduct was too conclusory and speculative to state a claim for relief under Twombly.  Id. at 807.  The court reasoned that similar to the plaintiff's assertion in Twombly that an agreement to conspire, a section 1 element, existed because there was parallel conduct among the defendants, "conclusory speculation [by Corr] regarding what could happen at some unknown date in the future also fails to plausibly state a violation of federal antitrust laws."  Id.

The second case cited by Willis-Knighton, In re Elevator Antitrust Litigation, shows the limits to which an antitrust plaintiff can rely on conduct by the defendant in one context to plausibly plead that the defendant has engaged in the same conduct in another context.  See 502 F.3d 47, 52 (2d Cir. 2007).  There, the Second Circuit held that the plaintiff's claim was not entitled to relief under Twombly where its allegation of an agreement to violate antitrust law was supported in part by allegations that the defendants were under investigation in Europe for similar agreements to violate antitrust law.  Id. 50-52.  The plaintiffs, elevator maintenance companies, sued the defendants, manufacturers and sellers of elevators, for conspiring to fix prices and to monopolize the elevator maintenance market, causes of action under sections 1 and 2 of the Sherman Act that

require proof of an agreement among the defendant manufacturers to so conspire.  Id. at 49.  The complaint supported its allegation of such an agreement in part with an allegation that the defendants were under investigation by European antitrust officials for colluding to similarly fix prices for their elevators in the European market.  Id. at 51 & n.6.  The court held that the allegations about European antitrust collusion by itself did not provide a plausible ground to support the inference of an unlawful agreement to conspire in the United States and dismissed the plaintiffs' claims.  Id. at 49, 52.  The court reasoned, "Allegations of anticompetitive wrongdoing in Europe—*absent any evidence of linkage between such foreign conduct and conduct here*—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'"  Id. at 52 (emphasis added).  "Without an adequate allegation of facts linking transactions in Europe to transactions and effects" in the United States, the court concluded that "plaintiffs' conclusory allegations do not 'nudge[ their] claims across the line from conceivable to plausible.'"  Id. (quoting Twombly, 550 U.S. at 505).

Vantage's allegation of how physicians migrating from University Health to LSU clinics would harm Vantage is distinguishable from the allegation of harm in Corr Wireless. Unlike the plaintiff in Corr Wireless, who was unable to produce any allegations of present conduct by the defendant that served as the basis for its assertion that the defendant would injure it in the future, Vantage has described with some detail how Willis-Knighton is presently engaged in a joint clinic with LSU physicians working at University Health.  And Vantage's reliance on prior conduct by Willis-Knighton and LSU to establish that LSU

physicians working at the joint clinics will drop Vantage is distinguishable from the plaintiff's reliance in <u>Elevator Antitrust</u> on the defendant's antitrust violations in Europe to establish that the defendant violated antitrust laws in the United States.  Unlike the plaintiff in <u>Elevator Antitrust</u>, who was unable to provide any link explaining why the antitrust violations by the defendants in one market would make it plausible that the defendants committed the same violations in a different market, Vantage has provided a link to explain how the LSU/Willis-Knighton clinics are like other Willis-Knighton clinics in which LSU physicians practice and do not accept Vantage Tier-1 coverage.  Specifically, Vantage has alleged that LSU physicians, currently in their Tier-1 network, will effectively become employees of Willis-Knighton when they participate in the joint LSU-Willis-Knighton clinics because of Willis-Knighton's control over billing and referrals.  <u>Id.</u> at 23-24, 28, 46-47. Vantage has also alleged that in the past, whenever a physician under contract with Vantage joined the Willis-Knighton Physician's Network, that physician immediately cancels his contract with Vantage.  <u>Id.</u> at 58.  These facts provide the causal link that was missing in <u>Elevator Antitrust</u>.  Vantage's claims of future harm by Willis-Knighton's actions thus should not be dismissed under <u>Twombly</u>.

Amid this discussion, Willis-Knighton also inserts an Article III standing rationale for its arguments that Vantage's claims of injury are too speculative.  <u>See</u> Record Document 90, p. 23, and 97, p. 8.  Vantage does not directly address this argument.  Article III standing requires in part that the plaintiff demonstrate it has suffered injury in fact, which is "an invasion of a legally protected interest that is (a) concrete and particularized and (b)

actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations omitted).  Allegations of future injury "must be certainly impending to constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

To establish standing for future injury, a plaintiff needs to credibly explain how present facts create a realistic threat of future injury.  See Lyons, 461 U.S. at 98; United Transp. Union v. Interstate Commerce Comm'n, 891 F.2d 908, 913 (D.C. Cir. 913).   In Lyons, the Supreme Court reviewed the claim of an individual who alleged that he had been injured by an unjustified chokehold administered to him by a Los Angeles police officer and that he "justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death."  461 U.S. at 98.  The Court dismissed on Article III grounds the complainant's prayer for an injunction forbidding the use of such chokeholds by police officers, finding it unduly speculative that the complainant "was likely to suffer future injury from the use of the chokeholds by police officers."  Id. at 105.  The Court asserted that, "to have a case or controversy with the City that could sustain [his claim for an injunction, the complainant] would have to credibly allege that he faced a realistic threat from the future application of the City's policy."  Id. at 106-07 n.7.

Similarly, in United Transportation Union, the D.C. Circuit held that a union plaintiff failed to plead Article III injury where it alleged that the ICC's approval of interlocking directorates of railroad companies would injure the workers of the affected railroad companies.  891 F.2d at 913.  The union had alleged that its members "stand to be hurt" by the "financial wrecking" that would result from the ICC approving the interlocking

directorate and sought to enjoin the ICC's approval of the interlocking directorate.  Id.  The court held that the union had failed to allege Article III injury because it offered no explanation for how or why the interlocking directorate would hurt either the companies or the union workers.  Id. at 913-14.  Without any causal explanation for how the approval of the interlocking directorate would hurt the union workers, the court reasoned that the allegation of injury in the case was "unadorned speculation" and dismissed the union's claims for want of Article III standing.  Id.

Vantage has credibly explained how present facts create a realistic threat of future injury.   Unlike the plaintiff's claims in Lyons and United Transportation Union, which provided no information to link present facts with future injury, Vantage has, as discussed above, provided facts explaining why LSU physicians practicing at the LSU/Willis-Knighton clinics would result in those physicians leaving Vantage's Tier-1 network.  See Lyons, 461 U.S. at 98; United Transp. Union 891 F.2d, at 913-14; Record Document 1, p. 58.  These facts provide the causal link that creates a realistic threat of future injury to Vantage from the joint clinics.  Vantage has therefore satisfied the injury-in-fact requirement of Article III standing.

2. *Whether Vantage Plausibly Stated a Claim for Past Antitrust Violations by Willis-Knighton*

Next, Willis-Knighton argues that Vantage's allegations about Willis-Knighton's past conduct fail to state a claim under Twombly because they allege insufficient details about either the prior alleged acquisitions or the relevant markets that Willis-Knighton

monopolized/attempted to monopolize.   The complaint must plead facts that, either directly or inferentially, plausibly show Willis-Knighton had market power/a dangerous probability of market power and committed acts that, when viewed as a whole, constitute anticompetitive conduct.[21]   See Twombly, 550 U.S. at 555; In re Plywood, 655 F.2d at 641; Assoc. Radio Serv. Co. v. Page Airways, Inc., 624 F.2d 1342, 1356 (5th Cir. 1980).

Specifically, Willis-Knighton argues that the complaint does not plausibly plead market power for Willis-Knighton's past conduct because it does not provide any past market shares for Willis-Knighton. To demonstrate monopoly power, a complaint must specify the specific product and geographic market which defendant is alleged to have monopolized. Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc., 802 F. Supp. 1544, 1550-51 (S.D. Tex. 1991).   The complaint satisfies this requirement because it alleges Shreveport-Bossier as the relevant geographic market at all times and the product markets as general acute-care services, primary care, and OB/GYN.  Willis-Knighton also insists that

---

[21] The elements of Vantage's monopolization claim based on Willis-Knighton's past conduct are (1) Willis-Knighton possessed market power in the relevant market and (2) Willis-Knighton engaged in anticompetitive conduct. See Stearns, 170 F.3d at 522.  The elements of Vantage's attempted monopolization claim based on Willis-Knighton's past conduct are (1) Willis-Knighton engaged in anticompetitive conduct, (2) with a specific intent to monopolize, while (3) there was a dangerous probability of Willis-Knighton achieving monopoly power in a relevant market.  See Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993).  With respect to the anticompetitive conduct element, where the defendant is alleged to have engaged in a pattern of illegal conduct, courts assess whether a section 2 claim demonstrates anticompetitive conduct by measuring the cumulative effect of the defendant's allegedly illegal conduct, rather than evaluating each instance of allegedly illegal conduct in isolation.  See Assoc. Radio, 624 F.2d at 1356 ("[N]o one of the instances of improper conduct, standing alone, would lead to section 2 liability. Taken together, however, they show a pattern of exclusionary behavior sufficient to support the jury's verdict.").

the complaint needs to state Willis-Knighton's shares in these markets at the times at which it is alleged to have committed illegal acts, but cites no case so requiring.  The Court finds this standard too high; instead, all the complaint must do is plead facts that inferentially make a high market share in the past plausible.  By providing the high shares in these markets that Willis-Knighton currently enjoys, the complaint has provided sufficient information to make past monopoly power plausible.

Willis-Knighton also specifically argues that the complaint provides insufficient detail about the past acquisitions, such as their dates, to plausibly plead anticompetitive conduct.  The Court finds that requiring the complaint to identify the details of every prior acquisition would ask more than <u>Twombly</u> demands.  Instead, the complaint must plead facts that, when viewed together, make anticompetitive conduct plausible.  <u>See</u> <u>Twombly</u>, 550 U.S. at 555; <u>Assoc. Radio,</u> 624 F.2d at 1356.  The complaint accomplishes this by providing the names of all entities that Willis-Knighton has acquired, the way in which Willis-Knighton controls referrals, and the type of non-compete agreements it employs.  The complaint has therefore stated a plausible claim for Willis-Knighton's prior antitrust violations.  Accordingly, the Court **DENIES** Willis-Knighton's motion to dismiss based on <u>Twombly</u> and Article III.

## IV.    Conclusion

For all of the foregoing reasons, the Defendant's motion to dismiss [Record Document 30] is **DENIED**.

**THUS DONE AND SIGNED** on this 31st day of March, 2016.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE