UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, L.L.C. d/b/a UNIVERSITY HEALTH SHREVEPORT AND VANTAGE HEALTH PLAN, INC.<br><br>              Plaintiffs,<br><br>v.<br><br>WILLIS-KNIGHTON MEDICAL CENTER, d/b/a WILLIS-KNIGHTON HEALTH SYSTEM<br><br>              Defendant. | No. 5:15-cv-02057<br><br>Judge Elizabeth E. Foote<br><br>Mag. Judge Mark L. Hornsby |

**PLAINTIFFS' JOINT OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR DANIEL P. KESSLER**

# TABLE OF CONTENTS

**Page**

I.  Professor Kessler's Expert Opinions ...................................................................................1

    A.  The empirical economic literature on the impact of concentration and integration in markets for hospital and physician services .....................................2

        1.  Hospital services market concentration ....................................................2

        2.  Physician services market concentration .................................................4

        3.  Hospital-Physician Integration.................................................................4

    B.  Dr. Kessler's opinions are based on the empirical economic literature.................6

        1.  The Physician Practice Acquisitions.........................................................7

        2.  The WK-LSU Clinic Contracts..................................................................8

        3.  The WK-LSU scheme.................................................................................8

II. Professor Kessler's expert opinions fully Satisfy Rule 702 and *Daubert* ..........................9

    A.  The relevant standard...........................................................................................9

    B.  Professor Kessler reliably based his expert opinions on the relevant economic literature.............................................................................................10

        1.  Professor Kessler's opinion grows directly out of the empirical research he and others have conducted on the impact of horizontal and vertical consolidation involving hospitals and physicians .................10

        2.  Professor Kessler's opinion reliably "fits" the empirical economic literature to the facts of this case...............................................................11

        3.  Professor Kessler reliably Applied the empirical economic literature to the facts of this case...............................................................14

    CONCLUSION...................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547 (E.D. La. 2015)........................................................10

*Byrd v. City of Bossier*, 23 F. Supp. 3d 665 (W.D. La. 2014), *aff'd in part, vac'd in part
    and rev'd in part on other grounds*, 624 F. App'x 899 (5th Cir. 2015) ...........................20

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548 (11th Cir. 1998) ...............................19

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995).........................................10

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................................1, 10

*In re Bordelon Marine, Inc.*, No. 11-1473, 2012 WL 1995802 (E.D. La. June 4, 2012) ..............19

*Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320 (5th Cir. 1996)...............................................20

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2016 WL 2756437
    (E.D. La. May 12, 2016) ........................................................................................................11

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................................9

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013) ..................................................19

*Moore v. International Paint, L.L.C.*, 547 F. App'x 513 (5th Cir. 2013)......................................20

*Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-CV-1486-D, 2010 WL 2540754
    (N.D. Tex. June 22, 2010)........................................................................................................9

*Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776 (N.D. Tex. 2013)..................................19

*Piptone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) ..............................................9, 10, 20, 21

*Prepaid Wireless Servs., Inc. v. Sw. Bell Wireless, Inc.*, No. M-00-302, 2002 WL 34367238
    (S.D. Tex. Jul. 23, 2002)..........................................................................................................9

*Sheehan v. Daily Racing Form., Inc.*, 104 F.3d 940 (7th Cir. 1997)............................................11

*United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5th Cir. 1996)............................................9


**Statutes and Rules**                                                                       **Page(s)**

Fed. R. Evid. 702 ............................................................................................................1, 9, 10

## TABLE OF AUTHORITIES - Continued

**Other Authorities**                                                               **Page(s)**

Advisory Committee Note to 2000 Amendment, Fed. R. Evid 702...............................................21

Daniel R. Austin & Laurence C. Baker, *Less Physician Practice Competition Is
    Associated with Higher Prices Paid for Common Procedures*,
    34 Health Aff. 1753 (2015)............................................................................4

Laurence C. Baker et al., *Physician Practice Competition and Prices Paid by Private
    Insurers for Office Visits*, 312 JAMA 1653 (2014) .............................................4

Laurence C. Baker et al., *The Effect of Hospital/Physician Integration on Hospital Choice*,
    50 J. Health Econ. 1 (2016) ..........................................................................6

Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician
    Practices Is Associated with Higher Prices and Spending*,
    33 Health Aff. 756 (2014)............................................................................3

Cory Capps et al., *The Effect of Hospital Acquisitions of Physician Practices on Prices
    and Spending*, Inst. for Pol'y Res., Nw. Univ. Working Paper WP-15-02 (2015)..............5

Federico Cilberto & David Dranove, *The Effect of Physician-Hospital Affiliations on
    Hospital Prices in California*, 25 J. Health Econ. 29 (2006)............................................16

Zack Cooper et al., *The Price Ain't Right?  Hospital Prices and Health Spending on the
    Privately Insured*, NBER working paper (2015) ............................................. 3-4

Abe Dunn & Adam H. Shapiro, *Do Physicians Possess Market Power?*,
    57 J.L. & Econ. 159 (2014)............................................................................4

Martin Gaynor & Robert J. Town, *Competition in Health Care Markets, in Handbook of
    Health Economics* (Pauly, McGuire & Barros eds. 2012)....................................... 2, 16-17

Daniel P. Kessler & Mark B. McClellan, *Is Hospital Competition Socially Wasteful?*,
    115 Q. J. Econ. 577 (2000) ..........................................................................3

Hanna T. Neprash et al., *Association of Financial Integration Between Physicians and
    Hospitals With Commercial Health Care Prices*, 175 JAMA Internal Med. 1932
    (2015)..................................................................................................5

James C. Robinson, *Hospital Market Concentration, Pricing, and Profitability in
    Orthopedic Surgery and Interventional Cardiology*,
    Am. J. Managed Care 241 (2011)....................................................................3

**TABLE OF AUTHORITIES - Continued**

**Other Authorities**                                                                 **Page(s)**

Kirstin W. Scott et al., *Changes in Hospital Physician Affiliations in U.S. Hospitals and
    Their Effect on Quality of Care*, Annals of Internal Med. (web only) (2016).........6, 11, 18

Eric Sun & Lawrence Baker, *Concentration in Orthopedic Markets Was Associated with
    a 7 Percent Increase in Physician Fees for Total Knee Replacements*, 34 Health
    Aff. 916 (2015) ..................................................................................................................4

As with all of plaintiffs' other expert witnesses, Willis-Knighton has moved to exclude Professor Daniel P. Kessler's expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  But because Professor Kessler reliably applies well-established empirical economic learning to the facts of this case, his testimony fully meets the admissibility standards of Rule 702 and *Daubert*.

Willis-Knighton's brief consists largely of ad hoc lawyers' argument about the relevance and fit of particular studies to the facts of this case.  But these are issues which Dr. Kessler specifically addressed in his reports, based on his extensive experience in health care economics (including conducting several of the studies at issue).  The opinions of Willis-Knighton's lawyers are not more probative or credible than Dr. Kessler on these issues.  Plaintiffs therefore respectfully submit this memorandum in opposition to Willis-Knighton's motion to exclude his testimony.

## I.      PROFESSOR KESSLER'S EXPERT OPINIONS

With a Ph.D. in economics as well as a J.D., Professor Kessler is a member of the faculties of Stanford Law School, the Stanford Graduate School of Business, and the Stanford Medical School.  He is a much-published expert on health economics, health insurance and regulation; he has written six peer-reviewed research papers on the effects of competition among hospitals, the effects of hospital-physician integration, and the role of public policy in promoting competition among hospitals and physicians.  *See* Ex. 1, D. Kessler Expert Report 1 & app. A. In this case, he has brought his expertise and the relevant economic literature to bear on the conduct that has formed the basis of the Amended Complaint:  (a) Willis-Knighton's expansion of the Willis-Knighton Physician Network ("WK Physician Network"), which was already at 350 employee physicians as of early 2011, to over 400 by 2014  through a series of acquisitions of individual physicians and physician groups (the "Physician Practice Acquisitions"); (b) Willis-Knighton's ten contracts (one master agreement with nine supplements) with Louisiana

1

State University-Shreveport ("LSU-Shreveport") requiring LSU-Shreveport to supply full-time-equivalent ("FTE") faculty physicians to work at clinics controlled and operated by Willis-Knighton (the "WK-LSU Clinic Contracts"); and (c) Willis-Knighton's scheme to transfer plaintiff University Health-Shreveport's commercially insured patients to itself (the "WK-LSU Scheme").

A.      **The empirical economic literature on the impact of concentration and integration in markets for hospital and physician services**

Professor Kessler bases his expert analysis of Willis-Knighton's conduct on a review of the recent empirical economic literature on competition and health care, including several peer-reviewed articles that he co-authored.

1.      Hospital-services market concentration

The literature shows that concentration of ownership in hospital markets affects prices and quality:  Increases in concentration lead to higher prices (for both inpatient and outpatient services) and lower quality (for inpatient services).  Ex. 1, D. Kessler Expert Report 8-13. Professor Kessler bases this observation on several sources:

- A 2012 survey of economic studies in the *Handbook of Health Economics*, finding that:  (a) eight out of nine studies on the effects of hospital mergers found that prices increased for hospitals that merged relative to the prices for hospitals that had not merged; and (b) seven out of eight studies that examined the issues found a positive relationship between hospital concentration and prices.  Ex. 1, at 10 (citing Martin Gaynor & Robert J. Town, *Competition in Health Care Markets*, *in Handbook of Health Economics* 501-637 (Pauly, McGuire & Barros eds. 2012) (attached as Ex. 3)).

- A 2015 study, which found that:  (a) "ha[ving] to negotiate with hospital systems in highly concentrated markets . . . likely reduced [health insurers'] bargaining

leverage"; and (b) "[I]t is clear that concentration affects hospital quality." *Id.* at 11 (citing Martin Gaynor, Kate Ho & Robert Town, *The Industrial Organization of Health Care Markets*, 53 J. Econ. Lit. 235, 235-84, 260, 239 (2015) (attached as Exhibit 4)).

- A 2000 study Professor Kessler conducted of data on hospital spending (price data was not yet available at that time) and mortality for all non-rural Medicare beneficiaries who suffered a heart attack in selected years from 1985 to 1994, which found that hospital market concentration reduces consumer welfare and social welfare. This conclusion was based on findings that, when holding other factors constant: (a) patients in the most concentrated hospital markets (as measured by the HHI) had both higher spending and higher mortality; and (b) patients from areas that became highly concentrated experienced statistically significantly higher rates of readmission. *Id.* at 11 (citing Daniel P. Kessler & Mark B. McClellan, *Is Hospital Competition Socially Wasteful?*, 115 Q. J. Econ. 577, 577-615 (2000) (attached as Ex. 5)).

- Three more recent studies that analyzed data on actual market prices that employer sponsored health-insurance plans paid for hospital services to individual beneficiaries, and which show that increases in hospital-services concentration, as measured by the HHI, are associated with increases in in-patient and out-patient hospital prices. Ex. 1, at 12 (citing Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician Practices Is Associated with Higher Prices and Spending*, 33 Health Aff. 756, 756-63 (2014) (attached as Ex. 6); James C. Robinson, *Hospital Market Concentration, Pricing, and Profitability in Orthopedic Surgery and Interventional Cardiology*, Am. J. Managed Care 241, 241-48 (2011) (attached as Ex. 7); and Zack

3

Cooper et al., *The Price Ain't Right?  Hospital Prices and Health Spending on the Privately Insured*, NBER working paper 21815 (2015) (attached as Ex. 8)).

2.      Physician-services market concentration

The literature Professor Kessler relied on shows that concentration among physicians in a market affects price levels and price growth for physician services in that market; specifically, increases of concentration among physicians lead to higher prices, while decreases of concentration lead to lower prices.  Four recent studies that analyzed data on the actual market prices that employer-sponsored health-insurance plans paid on behalf of their beneficiaries for physician services found that:  (a) increases in concentration of physicians in a geographic area, as measured by the Herfindahl-Hirschman Index ("HHI"), are associated with increases in physician prices; and (b) more concentrated areas had higher price levels, and areas that became more concentrated had higher price growth, holding other factors constant.  Ex. 1, at 12 (citing Daniel R. Austin & Laurence C. Baker, *Less Physician Practice Competition Is Associated with Higher Prices Paid for Common Procedures*, 34 Health Aff. 1753, 1753-60 (2015) (attached as Ex. 9); Eric Sun & Lawrence Baker, *Concentration in Orthopedic Markets Was Associated with a 7 Percent Increase in Physician Fees for Total Knee Replacements*, 34 Health Aff. 916, 916-21 (2015) (attached as Ex. 10); Laurence C. Baker et al., *Physician Practice Competition and Prices Paid by Private Insurers for Office Visits*, 312 JAMA 1653, 1653-62 (2014) (attached as Ex. 11); Abe Dunn & Adam H. Shapiro, *Do Physicians Possess Market Power?*, 57 J.L. & Econ. 159, 159-93 (2014) (attached as Ex. 12)).

3.      Hospital-Physician Integration

The recent empirical economic literature on which Professor Kessler relied shows that close, or "tight," integration between hospitals and physicians, in which hospitals and physicians are integrated financially, strategically and operationally (referred to as "Integration"), leads to higher prices for hospital and physician services, and to substantially increased referrals by the

4

physicians to the integrated hospital with no increase in quality.  As Professor Kessler put it, this economic literature "uniformly finds that Integration is associated with higher prices but not with better quality."  Ex. 1, at 13.  Specifically, this literature discusses:

- Higher in-patient price growth.  A 2014 study Professor Kessler and his co-authors conducted of the impact of Integration on inpatient hospital prices, admission rates and spending.  Comparing hospital service price trends over 2001-2007 for counties with and without increases in Integration, holding constant trends in other market characteristics, the study found that increases in the percentage of the market accounted for by hospitals that are Integrated with physicians are associated with greater hospital-price growth rates.  *Id.* at 14 (citing Ex. 6).

- Higher out-patient price growth.  A 2015 study found that, holding constant other characteristics, greater outpatient price growth is associated with increases in the portion of the market accounted for by hospitals that are Integrated with physicians.  *Id.* at 14-15 (citing Hannah T. Neprash et al., *Association of Financial Integration Between Physicians and Hospitals With Commercial Health Care Prices*, 175 JAMA Internal Med. 1932, 1932-39 (2015) (attached as Ex. 13)).  Another 2015 working paper found not only that Integration of a hospital with physician practices is associated with an average price increase for the acquired group of 14%, but also that Integration increases prices even more dramatically when undertaken by a larger hospital.  *Id.* at 15 (citing Cory Capps et al., *The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending*, Inst. for Pol'y Res., Nw. Univ. Working Paper WP-15-02 (2015) (attached as Ex. 14)).

- No increase in quality.  A 2016 study calculated three hospital-level measures of clinical quality by using data on elderly Medicare beneficiaries (adjusted for health status at admission), and compared trends in those quality measures over 2003-2012

for 803 hospitals that became Integrated to trends for 2085 hospitals that did not become Integrated.  The study found that hospitals that are Integrated with physicians do not have higher quality than otherwise similar hospitals that were not Integrated. *Id.* at 14 (citing Kirstin W. Scott et al., C*hanges in Hospital-Physician Affiliations in U.S. Hospitals and Their Effect on Quality of Care*, Annals of Internal Med. (web only) (2016) (attached as Ex. 15)).

- <u>Skewed referrals</u>.  Another study co-authored by Professor Kessler, matched hospital admission data for Medicare beneficiaries, including their doctors' identities, to data from the hospitals with which the physician's practice was Integrated.  The study found that physicians Integrated with hospitals are much more likely to refer patients to the Integrated hospital than to other hospitals, and that patients were more likely to choose a high-cost, low quality hospital when their physician was Integrated with that hospital.  *Id.* at 15 (citing Laurence C. Baker et al., *The Effect of Hospital/Physician Integration on Hospital Choice*, 50 J. Health Econ. 1, 1-8 (2016) (attached as Ex. 16)).  The increased referrals by physicians to their Integrated hospitals increased the Integrated hospitals' shares of in-patient and out-patient hospital services at the expense of other competing hospitals.  This effect means that when the Integrated hospital is already larger than the competing hospitals, hospital-market concentration increases, and further increases in price and decreases in quality follow.  Therefore, the anticompetitive effects of hospital-physician Integration on competition are even greater when the Integration involves the largest hospital in the relevant area.

### B.     Dr. Kessler's opinions are based on the empirical economic literature

Based on the findings from the empirical economic literature, Professor Kessler opines that Willis-Knighton's conduct likely will have the following effects:

6

1.      The Physician Practice Acquisitions

Professor Kessler identifies three separate sources of effects from the Physician Practice Acquisitions.  First, because the Willis-Knighton Physician Network and Willis-Knighton's hospitals are Integrated – the Physician Network physicians are salaried employees, Willis-Knighton sets their charges and bargains with health insurers over their contract rates, and Willis-Knighton supervises their practices (*see* Ex. 1, at 18-20) – the Physician Practice Acquisitions have been significantly likely to have increased prices for hospital and physician services in the relevant hospital and physician services markets, above what those prices would have been in the absence of the Physician Practice Acquisitions (*see id.* at 23-24).

The second effect stems from the fact that the acquired physician practices were those of physicians that were previously competitors to the employee doctors in the WK Physician Network.  Because the Physician Practice Acquisitions were of horizontal competitors, they increased concentration in physician services markets, including the relevant physician services markets.  The Physician Practice Acquisitions also were significantly more likely to increase prices for physician services in the relevant physician services markets above what they would have been, independent of and in addition to the effects due to Integration described above (*see id.* at 22-24).

Third, because Willis-Knighton is the largest provider of inpatient and outpatient hospital services in the relevant hospital markets, the Physician Practice Acquisitions had an additional effect.  The increased referrals to Willis-Knighton's hospitals that were significantly likely to result from the Physician Practice Acquisitions – referrals of which Mr. Elrod boasted and that Dr. Silberman documented – were significantly likely to increase concentration among hospitals in the relevant geographic market, and thus were significantly likely to increase prices (for inpatient and outpatient hospital services) and lower quality (for inpatient hospital services) (*see id.* at 23-26).

7

2.     The WK-LSU Clinic Contracts

Professor Kessler concludes that the WK-LSU <u>Clinic</u> Contracts are likely to have substantially the same anticompetitive impact as the Physician Practice Acquisitions.  This is because:

First, having reviewed the WK-LSU Clinic Contracts' characteristics (*see* Ex. 1, at 20), he concludes that they will Integrate the LSU-Shreveport FTE physicians working at the Willis-Knighton clinics with the Willis-Knighton hospitals to substantially the same degree as the WK Physician Network physicians are Integrated.  *See id.* at 22-23.

Second, the WK-LSU Clinic Contracts will eliminate or substantially weaken the incentives that the LSU-Shreveport FTE physicians working at the Willis-Knighton clinics would otherwise have had to compete with the physicians in the WK Physician Network.  *See id.* at 25.

Finally, the WK-LSU Clinic Contracts will be significantly likely to increase the LSU-Shreveport FTE physicians' referrals to Willis Knighton's hospitals, thereby increasing Willis-Knighton's hospital market shares at the expense of the smaller University Health.  The WK-LSU Contracts thus are significantly likely to increase concentration in the relevant hospital services markets.  *See id.* at 25-26.

3.     The WK-LSU scheme

Because the WK-LSU Scheme would, by transferring University Health's commercially insured patients to Willis-Knighton, also increase Willis-Knighton's shares of hospital and physician services at the expense of University Health and LSU-Shreveport, respectively, concentration in the markets for hospital and physician services, including the relevant markets, necessarily will increase.  The economic literature cited by Dr. Kessler indicates that these increases in concentration will be likely to increase prices (for in-patient and out-patient hospital and physician services) and reduce quality (for in-patient hospital services).  *See id.* at 23-26.

## II. PROFESSOR KESSLER'S EXPERT OPINIONS FULLY SATISFY RULE 702 AND *DAUBERT*

### A. The relevant standard

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule's objective "is to ensure the reliability and relevancy of expert testimony," and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Thus, an expert's testimony is not admissible where a flaw in the expert's analysis "render[s] the[] testimony entirely speculative and therefore unreliable for purposes of admissibility." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996); *see also Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-CV-1486-D, 2010 WL 2540754, at *9 (N.D. Tex. June 22, 2010) (excluding expert testimony where expert's key theory was "entirely speculative, with no basis in evidence"); *Prepaid Wireless Servs., Inc. v. Sw. Bell Wireless, Inc.¸* No. M-00-302, 2002 WL 34367328, at *5 (S.D. Tex. Jul. 23, 2002) (excluding plaintiff's damages expert where his opinions had "no basis in reality and he provides no credible explanation for the bases of his damages testimony nor resolve his other omissions and inconsistencies").

At the same time, "'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir.

2002) (alteration omitted) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). Even as to "shaky but admissible evidence," a term that hardly describes Professor Kessler's opinion, it is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that "are the traditional and appropriate means of attack[]." *Daubert,* 509 U.S. at 596; *Pipitone,* 288 F.3d at 250 (quoting *Daubert*). "Thus," the Fifth Circuit observed, "while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* at 250. Accordingly, the Fifth Circuit held that the trial court had abused its discretion in excluding an infectious-disease expert's causation testimony because, in the court's view, there were "'many viable alternative sources' for the salmonella infection" that was the subject of the lawsuit. The court concluded that "[t]he fact-finder is entitled to hear [the expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate." *Id.*

Here, as the foregoing review of Professor Kessler's opinion shows, his opinion is both relevant and reliable, and thus admissible under Rule 702 and *Daubert*.

**B.    Professor Kessler reliably based his expert opinions on the relevant economic literature**

1.    Professor Kessler's opinion grows directly out of the empirical research he and others have conducted on the impact of horizontal and vertical <u>consolidation involving hospitals and physicians</u>.

As shown above, Professor Kessler's opinions in this case "grow[] naturally and directly out of research [he has] conducted independent of the litigation." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995)). He has spent years studying exactly the phenomenon at the center of this case – the Integration of hospitals and employee physicians, and the impact of Integration on health care competition, price and quality. His studies and the related empirical work of his colleagues in the field clearly show the likely impact not only of horizontal consolidation

10

between competing hospitals and between competing physicians, but also of vertical consolidation between hospitals and physicians – in particular, where that vertical consolidation amounts to the close relationship that Professor Kessler describes as "Integration."  The close link between his prior work and his testimony here shows that he "is being as careful as he would be in his regular professional work outside his paid litigation consulting."  *Sheehan v. Daily Racing Form, Inc.,*104 F.3d 940, 942 (7th Cir. 1997); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2016 WL 2756437, at *11 (E.D. La. May 12, 2016) (quoting *Sheehan*).

Willis-Knighton asserts that "certain studies" Professor Kessler relied on "do not support his conclusion."  Def.'s Br. 10.  The only example it gives, however, is the Scott et al. study (Ex. 15), which shows *exactly* what Professor Kessler cites it for:  that Integrated hospitals do not yield higher quality than otherwise similar, non-integrated hospitals.  *See* Ex. 1, at 14, 30 (citing Ex. 15).  He relies on other sources for his conclusions that the Physician Practice Acquisitions, the WK-LSU Clinic Contracts and the WK-LSU scheme would shift referrals, increase concentration and increase prices.   Willis-Knighton's inability to identify a single other study among those discussed above that "do[es] not support his conclusion" reflects how reliably connected his opinion is to the economic literature.

> 2.   Professor Kessler's opinion reliably "fits" the <u>empirical economic literature to the facts of this case</u>.

Moreover, although Willis-Knighton asserts that Professor Kessler's opinion does not "fit the facts of this case" (Def.'s Br. 2), the "fit" between the scholarship and the expansion of the WK Physician Network, whether through the Physician Practice Acquisitions or the WK-LSU Clinic Contracts, is beyond serious dispute.  The record shows that Willis-Knighton's absorption of physician practices into the WK Physician Network is both a horizontal concentration of competing physicians, and a tight vertical Integration of these physicians and Willis Knighton's

11

hospitals.  The implications of the empirical economic literature for competition in the relevant hospital and physician services markets are straightforward.

Willis-Knighton's dominant share of the relevant hospital services markets, which is not a subject of dispute in Willis-Knighton's motion for summary judgment, follows directly from the 61.9 percent share that Willis-Knighton itself reported in its 2015 Continuing Disclosures under SEC Rule 15c2-12, on which Professor Kessler relied.  *See* Ex. 1, at 25 & n.78.

Similarly, there is no basis for doubt that the physicians in the WK Physician Network compete with other physicians practicing in Shreveport and Bossier City, including the faculty physicians that LSU-Shreveport has agreed to supply to Willis-Knighton under the WK-LSU Clinic Contracts (*see* Ex. 2, D. Kessler Rebuttal Report 4).  Consequently, the application of the economic literature studying the empirical data relating to concentration among physicians is directly relevant, and its application to the Physician Practice Acquisitions and the WK-LSU Clinic Contracts is straightforward.  And the applicability of the literature on the impact of increased concentration among hospitals to conduct that inevitably increases Willis-Knighton's shares of the relevant in-patient and out-patient hospital service markets is inescapable.

Moreover, Willis-Knighton's Rule 30(b)(6) testimony and the template physician employment agreement (attached as Ex. 17), leave no doubt that when physicians become part of the WK Physician Network, they are Integrated with Willis-Knighton's hospitals.  *See* Ex. 1, at 18-19.[1]  And the LSU-WK Clinic Contracts Professor Kessler analyzed clearly describe an

---

[1] Willis-Knighton criticizes Professor Kessler for using its Rule 30(b)(6) testimony concerning Gastroenterology Associates as an example of the terms on which physicians join the WK Physician Network (*see* Ex. 1, at 19-20), because it absorbed that practice group prior to the limitations period.  But other portions of the same 30(b)(6) testimony and Willis-Knighton's template physician employment agreement (Ex. 17), both of which Professor  Kessler's report relied on (*see* Ex. 1, at 18-19), show that the Gastroenterology Associates transaction is perfectly representative of both the assets Willis-Knighton acquires in the Physician Practice Acquisitions, and the degree of control Willis-Knighton exercises over its employee physicians.  This evidence

Integrated relationship between Willis-Knighton and the FTE physicians LSU agreed to supply to Willis-Knighton's clinics.  *See id.* at 21-23.   Willis-Knighton disagrees, arguing that the economic literature does not address part-time, non-exclusive physician services arrangements, which is how it chooses to characterize the contracts.  Def.'s Br. 5.  But, as Professor Kessler explained in his deposition, studies of any such contracts would be beside the point:  these contracts are for FTEs of physicians, not for part-time physicians, and "they are exclusive for the period of time that they cover the physicians' time.  And so, in that sense, the aggregation of these contracts does amount to an exclusive arrangement with the LSU physicians."  Ex. 18, D. Kessler Dep. 165:22-166:4; *see also id.* at 167:16-168:7 (explaining logic of FTE physicians being made up of multiple part-time physicians' time).  Willis-Knighton's characterization of the contracts as "part-time" and "non-exclusive," therefore, is false.  At most, its assertion raises a factual issue for the trier of fact, not for the admissibility of Professor Kessler's testimony.

Not surprisingly, then, although Willis-Knighton promises to show "that each and every one" of Professor Kessler's sources in the literature "is distinguishable from the facts of this case" (Def.'s Br. 6), it actually attempts to distinguish only one of those articles, and that attempt fails.  It contends that the Gaynor and Town survey's findings (Ex. 3, discussed above at p. 2) of an unmistakable correlation between increased hospital concentration and increased prices are inapplicable because the studies surveyed concerned hospital mergers.  Def.'s Br. 6.  But as Professor Kessler's report explains (*see* Ex. 1, at 8-10), this research is highly relevant to this case because it shows the likely effects of competition (or the lack thereof) in markets for hospital services.  Those effects are not confined only to merger settings.

---

strongly supports Professor Kessler's opinion that the WK Physician Network physicians are Integrated with Willis-Knighton's hospitals.

3.      Professor Kessler reliably applied the
empirical economic literature to the facts of this case.

Next, Willis-Knighton tries to show that Professor Kessler failed to perform additional analysis that was purportedly necessary to apply the literature to the facts in this case.  Referring to the above-cited articles that correlate increased concentration with anticompetitive prices and/or quality (Exs. 5-13, discussed above at pp. 3-5).  Willis-Knighton argues, for example, that he failed to "define relevant markets, calculate the HHIs in those markets, and determine how the agreements between Willis-Knighton and LSU-Shreveport impacted those HHIs."  Def.'s Br. 7. But Professor Kessler's report specifically explains how the WK-LSU Clinic Contracts and the WK-LSU Scheme more broadly, would increase concentration in the markets for physician services and outpatient and inpatient hospital services.  *See* Ex. 1, at 24-26.  That hospital-market concentration would increase through additional patient volume for Willis-Knighton, already the largest hospital in the relevant market, is obvious; the conclusion does not require the exercise Willis-Knighton insists on.  Similarly, the increase in physician concentration that follows from the Physician Practice Acquisitions, in which the Willis-Knighton Physician Network adds physicians that had competed with it in Shreveport and Bossier City, is evident without a determination of relevant market or precise market shares.

Willis-Knighton also argues that Professor Kessler's reliance on two of the studies that assessed the impact of vertical integration between hospitals and physicians (Exs. 14 and 16) was unreliable because he did not determine whether the LSU physicians and Willis-Knighton were vertically integrated pursuant to the WK-LSU Clinic Contracts in the same way as the physicians in those two studies.  Def.'s Br. 9-10.  As Dr. Kessler explained, however, the issue is not whether the relationships are identical, but whether they are sufficiently similar in an economically meaningful way.  Dr. Kessler specifically addressed this issue.

14

The studies on which Professor Kessler relies in analyzing this issue – two of which he conducted – measure vertical integration in different ways.   However, as he explains in his report, all of these approaches seek to classify physician/hospital relationships according to the tightness of the parties' real economic linkage along three dimensions:  financial, strategic, and operational.   Ex. 1, at 13.   No single characteristic of any particular vertical relationship determines whether it is "tight" or "loose" overall.   And as Professor Kessler explains in extensive detail, the characteristics of the relationships between Willis-Knighton and the WK Physician Network physicians, and between Willis-Knighton and the LSU-Shreveport physicians, make those relationships "tight."   *Id.* at 18-23.   There is no reasonable basis for asserting that the two articles that Willis-Knighton points to – one of which Professor Kessler authored – would yield different conclusions as to the tightly Integrated WK Physician Network and LSU physicians that are the subject of Professor Kessler's opinion here.[2]   Dr. Kessler's analysis is anything but unreliable.

Despite the literature's clear implications for competition, prices and quality from the expansion of the WK Physician Network through the Physician Practice Acquisitions, the Integration of LSU-Shreveport physician FTEs through the WK-LSU Clinic Contracts, and the shift of commercially insured patients from UH-Shreveport to Willis-Knighton pursuant to the

---

[2] The article by Capps et al. (Ex. 14) hinges vertical integration between a hospital and a physician on the extent to which the physician bills under the hospital's tax ID – a consideration that corresponds to only one of Professor Kessler's three criteria for Integration.  Because Professor Kessler's test for Integration is more demanding than that of the Capps article, his determination that the WK Physician Network employee physicians and the LSU-Shreveport faculty physician FTEs are Integrated into Willis-Knighton's hospitals means that they surely would qualify as integrated under the approach of the Capps article.  And the extent of Willis-Knighton's control over the WK Physician Network employee physicians and LSU-Shreveport faculty physician FTEs suggests that there is a minimal chance, if any, that they would not qualify as "owned" within the meaning of the Baker article (Ex. 16), which Professor Kessler co-authored.  Thus, the tightness that makes these physicians and Willis-Knighton Integrated under Professor Kessler's analysis means that it is very unlikely that their relationship would be viewed any differently under the approaches these two other studies use.

WK-LSU Scheme, Willis-Knighton argues that the literature does not conclude that the impacts Professor Kessler has identified from Willis-Knighton's conduct are "significantly likely."  As the review of the literature in Part I of this brief showed, this argument is incorrect.

Evidently, Willis-Knighton would have the Court believe that Professor Kessler believes that every hospital merger, every increase in concentration, every hospital acquisition of a physician practice, is equally likely to harm competition.  Thus, it emphasizes an economic working paper from the Federal Trade Commission finding that "only" 9 of the 26 hospital mergers the paper studied led to statistically significant price increases larger than the mean increase across the controls.  Def.'s Br. 12.  But as Professor Kessler explained in his rebuttal report, this paper is irrelevant to his opinion because it does not analyze actual prices; instead, it used an imprecise proxy for price, non-Medicare revenues per admission.  Ex. 2, at 13.  In fact, the paper itself "states that it cannot be used to evaluate more modern analyses of hospital mergers that *do* use actual prices – like the studies I discuss in my report."  *Id.*

Willis-Knighton also cites another study that, as Professor Kessler discussed, found no effect from vertical integration on prices.  Def.'s Br. 12-13 (citing Federico Cilberto & David Dranove, *The Effect of Physician-Hospital Affiliations on Hospital Prices in California*, 25 J. Health Econ. 29, 37 (2006) (attached as Ex. 19)).   However, the fact that a single study, using data over 20 years old, found no effect from vertical integration on prices does not rebut Professor Kessler's opinion that vertical integration is significantly likely to increase prices, and certainly does not make his opinion unreliable in the light of the other, more recent studies on which he relies.  Each one of these subsequent studies, including one by the co-author of the earlier study Willis-Knighton cites, finds that tight vertical integration increases prices.

Willis-Knighton also attempts to show that portions of some of the studies on which Professor Kessler relied indicated that the anticompetitive impacts he identified were not significantly likely.  It argues, for example, that in the Gaynor and Town survey in the *Handbook*

*of Health Economics* (Ex. 3), one of the nine studies found no impact from hospital mergers on prices, while the other eight "only found a price impact in the 'majority of the mergers they analyzed.'" Def.'s Br. 13. *Only* in a majority!  But in any case, as Professor Kessler pointed out in his report, the sentence just after the one Willis-Knighton quotes describes the studies it reviewed in greater detail, reporting that "for 17 of the 23 hospital merger/[managed care organization] combinations, hospital prices increased significantly relative to the control group. The typical increase is often quite large." Ex. 3, at 543 (footnote omitted).  That 74 percent of the combinations reviewed in the chapter resulted in price increases that are "significant" and "quite large" is consistent with Professor Kessler's opinion that horizontal consolidation here is significantly likely to lead to increased prices.

Willis-Knighton also contends that the study by Neprash et al. (Ex. 13) does not support Professor Kessler's opinion that the literature universally concludes that vertical integration is significantly likely to lead to increased prices. Def.'s Br. 14.  But this argument mischaracterizes both the results of the Neprash study and Professor Kessler's opinion.  First, as Willis-Knighton acknowledges, the study *does* support Professor Kessler's opinion that increases in physician-hospital integration are statistically significantly associated with increased out-patient prices. *Id.*; *see* Ex. 13, 1936-37.  Even as to in-patient prices, the study finds that increases in physician-hospital integration are associated with increases in inpatient spending, but that these increases are only marginally statistically significant. *Id.*  Thus, while the Neprash study does not provide strong support for the hypothesis that increases in physician-hospital integration are associated with increases in in-patient prices, it also does not – contrary to Willis-Knighton's suggestion – provide any support for the hypothesis that increases in physician-hospital integration are *not* associated with increases in in-patient prices.  For that reason, Professor Kessler does not rely on the Neprash study for his opinions about the effect of vertical integration on hospital prices.  As he explains in his report, his conclusion that the WK-LSU scheme and the WK-LSU Clinic

Contracts "would shift referrals, increase price, and reduce quality in the market for inpatient hospital services" is completely independent of the Neprash study. Ex. 1, at 25-26.

Further, Willis-Knighton's claim that Professor Kessler opines that "the literature universally concludes that vertical integration is significantly likely to lead to lower quality care" (Def.'s Br. 14) is factually inaccurate. Willis-Knighton makes this claim to attempt to again pit Professor Kessler against the Scott study (Ex. 15). But as discussed above at 11, Professor Kessler's opinion that the WK-LSU Scheme and the WK-LSU Clinic Contracts would shift referrals, increase price, and reduce quality in the market for inpatient services is completely independent of the Scott study.

Finally, ignoring both Fifth Circuit authority and common sense, Willis-Knighton also contends that Professor Kessler's opinions about the WK-LSU Scheme ignore evidence controverting the Scheme's existence, and thus should be excluded. Def.'s Br. 15-18. This argument mischaracterizes Professor Kessler's opinion and improperly asks the Court to use its gatekeeping function to short-circuit an underlying factual dispute that the trier of fact should resolve. Professor Kessler has not opined on whether the WK-LSU Scheme exists or will have anti-competitive effects. *See, e.g.*, Ex. 1, at 24 n.76 ("I do not offer an opinion as to whether the contracts, or the scheme alleged by Plaintiffs more broadly, will in fact have those effects."); Ex. 2, at 10 ("if the scheme alleged by Plaintiffs were carried out" (emphasis omitted)). Rather, he has offered an opinion on the relevance of the economic literature to the alleged scheme.

As Dr. Kessler notes, whether the scheme alleged by Plaintiffs in fact exists, and whether there is still a significant threat that it will occur, are issues for the trier of fact, not for an expert. It is not the expert's role to amass evidence on the issue or to opine on it. In fact, it would be improper for him to do so. That is simply not the economist's role. Indeed, if Dr. Kessler did opine on the likelihood that the scheme existed, he would be going far beyond the appropriate

province of an economist in an antitrust case, especially on such a hotly disputed issue. *See, e.g.,*

*In re Bordelon Marine, Inc.*, No. 11-1473, 2012 WL 1995802, at *2 (E.D. La. June 4, 2012):

> The Court notes that some of Pazos' "Conclusions and Opinions"
> appear to be on issues that are reserved exclusively for the trier of
> fact (i.e. determinations of the facts based on the witnesses'
> testimony and assessments of the credibility of those witnesses).
> To the extent that this is the case, the testimony must be excluded.

*See also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998) (The

economist "need not 'show a successful conspiracy' to be admitted under Rule 702 . . . data and

testimony need not prove the plaintiffs' case by themselves; they must merely constitute one

piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").[3]

Willis-Knighton does not cite a single case that excludes an economist's opinion on the

competitive effects of certain conduct because he did not verify that the conduct (the subject of a

dispute for the trier of fact) would in fact occur.  In fact, the case law clearly confirms that an

expert should not be required to verify any issue reserved for the trier of fact.  As discussed in

plaintiffs' Opposition to Willis-Knighton's motion to exclude the expert testimony of Dr.

Silberman, this situation is quite analogous to the obligation of a damages expert with respect to

liability questions.  *See Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 792 (N.D. Tex.

2013) ("Experts are permitted to assume the fact of liability and opine about the extent of

damages."); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The

soundness of the factual underpinnings of the expert's analysis and the correctness of the

expert's conclusions based on that analysis are factual matters to be determined by the trier of

fact.").  Here, Professor Kessler is testifying only on the likely anticompetitive effects of the

WK-LSU Scheme, based directly on the empirical economic literature.  It would make no sense

---

[3] In any case, as plaintiffs' Opposition to Willis-Knighton's motion to exclude the testimony of
Dr. Silberman shows (at 13-17), there is certainly more than substantial evidence that the
Scheme exists, and that there is a plan to transfer LSU-Shreveport's commercially-insured
patients from University Health to Willis-Knighton.

for him or any economist assessing the anticompetitive effects of alleged actions such as the WK-LSU Scheme to have to prove that they will in fact occur.

What this means is that Professor Kessler's opinion on the WK-LSU Scheme is not based on "altered facts and speculation designed to bolster [plaintiffs'] position" of the sort that led to exclusion in *Moore v. International Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)). In *Moore*, unlike in the present case, the court was confronting "numerous aspects of [the expert's] . . . analysis that either had no support in the record or were flatly contradicted by all the available evidence." 547 F. App'x at 515. *Byrd v. City of Bossier*, 23 F. Supp. 3d 665 (W.D. La. 2014), *aff'd in part, vac'd in part and rev'd in part on other grounds*, 624 F. App'x 899 (5th Cir. 2015), also stands in pronounced contrast to this case. There, this Court excluded the testimony of an expert whose report "relie[d] on factual assumptions that contradict the undisputed facts, fail[ed] to explain how he arrived at his conclusions, and applie[d] the wrong legal standard for an excessive force claim." *Id.* at 676.

Professor Kessler's opinion on the WK-LSU Scheme suffers from no such weakness. What Willis-Knighton complains about is that Professor Kessler's opinion on the WK-LSU Scheme depends on the resolution of competing versions of the facts, a job reserved for the trier of fact. The Fifth Circuit addressed a similar situation in *Pipitone*. There, as discussed above at 9-10, the appellate court held that the underlying factual issue as to the source of the salmonella infection that was the subject of the lawsuit did not warrant exclusion: rather, "[t]he fact-finder is entitled to hear [the expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate." *Pipitone*, 288 F.3d at 250. Explaining its reasoning, the Court quoted the Advisory Committee Notes to the 2000 amendments to Rule 702, which had codified *Daubert*:

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

*Id.* at 249 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).

Here too, the jury "is entitled to hear [Professor Kessler's] testimony" on the likely impact of the WK-LSU Scheme, and decide for itself "whether the predicate facts on which [that opinion] relie[s] are accurate."  *Id.* at 250.  The Court therefore should reject Willis-Knighton's attempt to exclude Professor Kessler's opinion on this subject.

## CONCLUSION

For the foregoing reasons, Willis-Knighton's motion to exclude the expert testimony of Professor Kessler should be denied.

Respectfully submitted.

Dated:  November 7, 2017

By:    s/ Scott L. Zimmer

Scott L. Zimmer, No. 26151
KEAN MILLER, LLP
333 Texas Street, Suite 450
Shreveport, LA  71101
Phone: 318-562-2655
Fax: 318-562-2751
Scott.zimmer@keanmiller.com

James R. Chastain, Jr., No. 19518
(T.A.)
KEAN MILLER LLP
P.O. Box 3513 (70821)
11 City Plaza
400 Convention Street, Suite 700
Baton Rouge, LA 70802
Phone: 225-387-0999
Fax: 225-388-9133
Sonny.chastain@keanmiller.com

Robert E. Bloch (*pro hac vice*)
Scott P. Perlman (*pro hac vice*)
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 263-3203

By:    s/Jerry Edwards

Jerry Edwards, Bar No. 30242
BLANCHARD, WALKER, O'QUIN
& ROBERTS
P.O. Box 1126
Shreveport, LA  71163
Phone:  318-221-6858
jedwards@bwor.com

David A. Ettinger, P 26537 (T.A.)
Lara Fetsco Phillip, P 67353
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Phone:  313-465-7368
dettinger@honigman.com
lara.phillip@honigman.com

*Attorneys for BRFHH Shreveport, L.L.C. d/b/a University Health Shreveport*

21

Facsimile: (202) 263-5203
rbloch@mayerbrown.com
sperlman@mayerbrown.com

Christopher J. Kelly (*pro hac vice*)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306
Telephone: (650) 331-2025
Facsimile: (650) 331-5025
cjkelly@mayerbrown.com

*Attorneys for Vantage Health Plan, Inc.*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, L.L.C. d/b/a UNIVERSITY HEALTH SHREVEPORT AND VANTAGE HEALTH PLAN, INC. | No. 5:15-cv-02057 |
| Plaintiffs, | Judge Elizabeth E. Foote |
| v. | Mag. Judge Mark L. Hornsby |
| WILLIS-KNIGHTON MEDICAL CENTER, d/b/a WILLIS-KNIGHTON HEALTH SYSTEM | |
| Defendant. | |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 7, 2017, I filed the foregoing Plaintiffs' Joint Opposition to Defendant's Motion to Exclude Expert Testimony of Professor Daniel P. Kessler with the Clerk of this Court using the CM/ECF electronic filing system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

s/ Scott Zimmer