UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, L.L.C. d/b/a UNIVERSITY HEALTH SHREVEPORT AND VANTAGE HEALTH PLAN, INC.<br><br>      Plaintiffs,<br><br>v.<br><br>WILLIS-KNIGHTON MEDICAL CENTER, d/b/a WILLIS-KNIGHTON HEALTH SYSTEM<br><br>      Defendant. | No. 5:15-cv-02057<br><br>Judge Elizabeth E. Foote<br><br>Mag. Judge Mark L. Hornsby |

**PLAINTIFF VANTAGE HEALTH PLAN, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**FILED UNDER SEAL**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Introduction ..........................................................................................................................1

Argument .............................................................................................................................2

    A.   There is substantial evidence from which a jury could conclude that Willis-Knighton and Humana entered into an unlawful exclusive agreement for Medicare Advantage services ...........................................................................................2

    B.   Willis-Knighton has complied with the Gentlemen's Agreement, locking up an essential component for competition by other Medicare Advantage plans .......................9

    C.   The Amended Complaint sufficiently pleads facts supporting the exclusive agreement ...................................................................................................................12

Conclusion .........................................................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*Halle v. Galliano Marine Serv., LLC*,
    855 F.3d 290 (5th Cir. 2017) ..................................................................................2

*Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*,
    669 F.2d 1026 (5th Cir. 1982) ...............................................................................13

*Putnam v. Williams*,
    652 F.2d 497 (5th Cir. 1981) .................................................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................................12

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)...................................................................................12

**Statutes, Rules and Regulations**

Sherman Act §§ 1 and 2...............................................................................................2, 12

# INTRODUCTION

"Keeping exclusivity is the whole point."[1]

*April Golenor, Humana Regional President,
Senior Products, Gulf States Region*

Vantage's opposition to Willis-Knighton's motion for summary judgment (Docs. 454, 456) showed that the Willis-Knighton Physician Network ("WKPN") entered into an unlawful exclusive agreement with Humana Health Benefit Plan of Louisiana, Inc. ("Humana"), according to which Willis-Knighton agreed not to contract with any other Medicare Advantage plan, effectively conferring a monopoly on Humana over Medicare Advantage insurance products in Caddo and Bossier Parishes. In exchange for this exclusivity, Humana steered its overwhelming share of Medicare Advantage enrollees (over 80% in both parishes—*see* Ex. 3, Silberman Liability Report, Ex. 12) to WKPN and agreed to ▮▮▮▮ the bonuses it paid to WKPN, granting monopoly payments for WKPN's Medicare Advantage services. The opposition also showed—without any substantive response from Willis-Knighton—that the exclusivity agreement with Humana foreclosed access to substantial shares of the relevant physician service markets and prevented Vantage and other health insurers from entering into Medicare Advantage contracts with the WKPN. Consequently, the other health plans could not offer the WKPN physicians as

---

[1] Ex. 90, Humana-00000864 (email from April Golenor to Ray Blaylock and Jeffrey Fernandez, July 2, 2015); *see also* Ex. 91, Golenor Dep. 71:18-72:15 (explaining statement: "[T]he exclusivity that we enjoyed, the relationship that we enjoyed with Willis-Knighton of having their whole attention or almost their whole attention, with the exception of the Coventry members, is what we were trying to preserve.").

All references to Exhibits 1-89 are to the exhibits to the Storino Declaration in support of Vantage's Opposition to Defendant's Motion for Summary Judgment.  Docs. 454, 456.  All references to Exhibits 90-106 are to the exhibits to the Storino Declaration in support of this Supplemental Brief.

"in network" Medicare Advantage providers. The result was the near-elimination of competition among Medicare Advantage plans in the Shreveport-Bossier City area.[2]

Since the initial summary judgment briefing, the parties have engaged in additional discovery concerning this "Gentlemen's Agreement" between Willis-Knighton and Humana. *See* Docs. 378, 402. Viewing the new evidence (and all prior evidence) in a light most favorable to Vantage (*Halle v. Galliano Marine Serv., LLC*, 855 F.3d 290, 293 (5th Cir. 2017)), there is no room for doubt: Willis-Knighton engaged in an unlawful exclusive deal with Humana, and Vantage suffered antitrust injury as a result as alleged in Paragraph 232 of the Amended Complaint. Any disputes in the evidence on these points are for a jury to decide. Because none of Willis-Knighton's arguments are persuasive, the motion for summary judgment should be denied with respect to Vantage's Sherman Act § 1 claim.

## ARGUMENT

### A. There is substantial evidence from which a jury could conclude that Willis-Knighton and Humana entered into an unlawful exclusive agreement for Medicare Advantage services

As the initial opposition brief showed (at 8-19, 23-39), Willis-Knighton engaged in a years-long campaign of physician-practice acquisitions in an acknowledged effort to become the "must have" physician network for private health insurers. The campaign, of course, succeeded; in April 2014, the WKPN's Greg Gavin could say that, without WKPN in its network, Blue Cross Blue Shield of Louisiana ("BCBSLA") "will have a helluva time selling their product in Bossier." Ex. 14, at WK016650 (emphasis omitted). The WKPN thus could demand supracompetitive reimbursement rates from private health insurers like Vantage, which has

---

[2] Willis-Knighton has baldly asserted (WK Reply 15) that "Vantage provides no evidence of foreclosure in the market as a result of the supposed agreement" without addressing any of the substantial evidence cited in our opposition brief (at 42-43) demonstrating that nearly all other Medicare Advantage policy providers have been locked out of the markets in Bossier and Caddo Parishes.

2

indeed had a "helluva time" trying to compete in Caddo and Bossier Parishes without Willis-Knighton in its provider network.

Although Willis-Knighton's anticompetitive scheme proved straightforward for private health insurance plans, extracting supracompetitive reimbursement rates from insurers for Medicare Advantage insurance products was complicated by the fact that the federal government sets reimbursement rates for Medicare services. Opp. 19. To work around this complication, Willis-Knighton entered into an exclusivity agreement with Humana by which it effectively lent its physician-services monopoly to Humana, which thereby became the only insurer able to market Medicare Advantage products with Willis-Knighton physicians "in network." *Id.* 19-21, 39-45. This arrangement enabled Humana to dominate sales of Medicare Advantage plans in Caddo and Bossier Parishes, and in return to steer its patients to WKPN physicians and share its supracompetitive profits with the WKPN as "bonus" payments. *Id.* (describing evidence). The exclusivity agreement, though extensively documented in emails, was not expressly included in any formal written contract document; instead, it was referred to as the Gentlemen's Agreement. *See, e.g.*, Ex. 41, at WK028219; *see also, e.g.*, Ex. 42, Cochran Dep. 74:9-75:12 (answering "yes" in response to the question, "So the gentlemen's agreement is that Willis-Knighton Physician Network is agreeing that it's not going to contract with other Medicare Advantage payors?").

But as the WKPN-Humana 2015 contract renegotiations began, Willis-Knighton wanted more: it was "adamant" that it wanted larger bonus payments from Humana for what it viewed as a valuable arrangement. *See* Ex. 92, 10/16/17 Cochran Dep. 214:23-215:2. Humana, for its part, became uncomfortable with the arrangement's informality and sought the WKPN's exclusivity commitment in writing. *See* Opp. 21. In their three-month renegotiation, the WKPN and Humana dickered not about whether the WKPN would be exclusive to Humana, or, in any great detail, over how much Humana would pay the WKPN, but only whether they would document the

3

WKPN's exclusivity commitment in writing. New testimony and recently uncovered documentary evidence concerning the 2015 renegotiation, including internal emails from Humana, now confirm beyond reasonable doubt that the renegotiation not only extended the Gentlemen's Agreement, but documented it, and the parties' anticompetitive intent, in writing.

The evidence shows, first, that Willis-Knighton affirmatively offered Humana a continued exclusive Medicare Advantage relationship in their 2015 renegotiations, but only in return for Humana increasing the "shared savings" bonuses it paid to WKPN, from ▮% of the savings to ▮%.[3] An agenda that Willis-Knighton's Thomas Cochran prepared for an April 23, 2015 call with April Golenor, who had just succeeded Jeff Fernandez as the regional president for Humana's Medicare business for the Gulf States Region, and Ray Blaylock, then Humana's Vice President, National Contracting, shows, for example, that Willis-Knighton identified "Exclusivity of Humana" as among the "primary renegotiation points" to justify a larger bonus. Ex. 91, Golenor Dep. 9:18-10:12; Ex. 95, at Humana-00000787-788.[4] Subsequent email ex-

---

[3] Shared savings programs typically compensate providers for providing low-cost, high-quality care according to various metrics and benchmarks. When providers reach certain quality and cost targets, insurers share the achieved savings with the providers as "bonuses." *See* Ex. 93, Breard Dep. 28:25-30:23. But shared savings programs are not supposed to compensate providers "for contracting exclusively with one health plan." Ex. 94, Ellington Dep., 44:15-19. Indeed, it would turn a shared *savings* program on its head to use it as a vehicle for sharing profits from anticompetitively *inflated* premiums. Nor is there any pro-competitive benefit to doubling the bonuses under a shared savings program in exchange for an exclusivity deal that locks out virtually all competition for Medicare Advantage products in the Shreveport/Bossier City area. Thus, although Vantage uses shared savings programs, it has never tied bonus payments to exclusivity commitments (*id*. at 45:5-23) as did Humana in this case.

[4] The evidence is clear that the Gentlemen's Agreement predated the 2015 negotiations. For example, on July 1, 2015, Mr. Blaylock told Mr. Cochran and his WKPN colleagues that "we appreciate the gentlemen's agreement *that has been in place*," and that Humana wanted to "document the connection between the increase in the shared savings amount and the continued exclusive relations we share." Ex. 96, at Humana-00000958 (emphasis added). Mr. Fernandez too told Mr. Cochran that same day that Humana "ha[s] been OK with the gentlemen's agreement up to this point." *Id.* at Humana-00000956. Thus the WKPN had been receiving bonus payments for exclusivity long before 2015. *See, e.g.*, Ex. 38, at Humana-00000523-24.

4

changes confirm that Willis-Knighton was demanding an increased bonus, and that it never offered any other significant justification for that demand apart from continued exclusivity. For example, Mr. Blaylock wrote in a May 7, 2015 email to Mr. Cochran that "[Humana] can support increasing the upside potential as requested as recognition of the exclusive relationship between WK Physician network and Humana." Ex. 97, at Humana-00001080. Mr. Cochran responded that Willis-Knighton was "in agreement with Humana's response" on that point. *Id*., at Humana-00001079; *see also* Ex. 42, Cochran Dep. 70:10-71:20 (confirming that Willis-Knighton agreed "with Mr. Blaylock's statement that the parties would increase this upside potential in recognition of the exclusive relationship between the Willis-Knighton Physician Network and Humana").

Humana, for its part, asked in return that the longstanding exclusivity deal be reduced to writing. As we noted in the initial opposition (at 21), Mr. Blaylock explained to Mr. Cochran that, given Humana's "big investment into the WK physician network" and the "large dollar amounts" in play through the bonus program, "[Humana does] feel we need something in writing to memorialize the agreement." Ex. 39, at WK028506. And reporting in an April 30, 2015 email that Willis-Knighton was offering continued exclusivity, Mr. Blaylock recommended to his Humana colleagues that "[a]ny deal we put in place should have actual exclusivity language tied to additional payments." Ex. 98, at Humana-00000801. As Mr. Blaylock testified, when the WKPN "threw on the table, at least in their agenda, [the] exclusive arrangement, which we thought, okay, they finally want to memorialize, you know, that they're not going to bring other competition into the market, you know, they're only going to work with the plans they got now." Ex. 99, Blaylock Dep. 70:20-71:6. Mr. Blaylock thus prepared a draft agreement with exclusivity language, expressly providing that, "[i]n return for the increase in the shared savings percentage, Physician agrees to contract exclusively with Humana for Medicare Advantage lines of business." Ex. 97, at Humana-00001082. Tellingly, after Mr. Blaylock notified Mr. Fernandez of

5

an agreement in principle on "[i]ncreasing the upside to ▮% in return for exclusivity in MA," Mr. Fernandez responded: "Wo, Are they finally going to commit to exclusivity in writing???" Ex. 100, at Humana-00001002-3.[5]

Ultimately, the answer to Mr. Fernandez's question was *no*. The WKPN would not commit to exclusivity—*in writing*. And the reason why was clear: Willis-Knighton was concerned that any exclusivity agreement was illegal. Mr. Cochran thus reported in straightforward terms to Blaylock on June 30, 2017: "[*L*]*egal is not comfortable in signing off on any exclusive language in any Agreements*." Ex. 96, at Humana-00000959 (emphasis added). The evidence is clear that Willis-Knighton's objection was not to exclusivity itself, but only to reducing the commitment to writing: In the same email in which Mr. Cochran told Mr. Blaylock that Willis-Knighton's lawyers would not permit a written agreement, for example, he assured Mr. Blaylock: "Mr. Gavin did reiterate he had mentioned he is perfectly fine with a 'Gentlemen's Agreement'" as discussed "earlier on in our conversations." *Id*.

Merely continuing with the Gentlemen's Agreement, however, was not what Humana was after. As Mr. Blaylock replied the next day:

> While we appreciate the gentlemen's agreement that has been in place, my concern is if we do not document the connection between the increase in the shared savings amount and the continued exclusive relations we share, there is nothing to prevent Willis Knighton from contracting with another plan while continuing under the higher reimbursement.
>
> I am ok with modifying the language to remove the word exclusive, if that is what concerns your legal team, **as long as the intent of the limited competition is addressed in the amendment**. If your legal team wants to send me some proposed alternate language I can review, or I am willing to speak with them directly if needed to develop the alternate language.

---

[5] Interestingly, an internal Humana document shows that one important factor was the "scary thought" that "8 out of 10 patients go to a WK doctor. Talk about monoploy [*sic*]." Ex. 101, at Humana-00001293.

Ex. 41, at WK028219 (emphasis added); *accord* Ex. 96, at Humana-00000958. Mr. Cochran pushed back again against putting the exclusivity commitment in writing; trying to close the deal, he gave Mr. Blaylock the hard sell:

> What we would like to ask you is to look back at our contractual relationship history and determine if you have found us to be an honorable partner. If your answer is yes and I know of no circumstances that would deem it otherwise, we would reiterate our request for a gentlemen's agreement, or nothing stronger than we will notify you with 60 days prior written notice, if we determine the need to contract with an additional Medicare Advantage plan. We believe this to be a fair and equitable request given our past histories with one another. In exchange for this and due to the fact that the reimbursement have gone significantly down since Humana went to the different STAR model, we are requesting the ██/██ split.

Ex. 96, at Humana-00000952.

Mr. Blaylock's reply proposed a phone conference and reiterated Humana's position: "At this point we are not comfortable increasing the shared savings percentage without documenting its connection to the gentlemen's agreement to limit the number of MA plans in which you participate." *Id.* at Humana-00000951. On July 10, 2017, Messrs. Gavin, Cochran, and Blaylock, along with Ms. Golenor, spoke to "resolve this issue." *See id.* at Humana-00000950. When Mr. Fernandez asked shortly afterwards how the meeting went, Ms. Golenor replied:

> Good, we agreed to ██% share with no change to competitive environment (exclusivity except coventry and med school docs). Neither term in writing. Contract stays as is. If competitive environment changes, we don't have to pay at ██%.

Ex. 102, at Humana-00000981. Mr. Fernandez asked in response, "Is the ██ in writing?," to which Ms. Golenor responded, "No, not in writing, gentleman's agreement." *Id.* at Humana-00000980-981. Mr. Blaylock added: "It is a shame that they are unwilling to commit to anything *in writing*, but at least we retained the right to lower the ██% at our discretion if they bring BCBS[LA] to the market." *Id.* at Humana-00000980. These exchanges make clear that Humana

7

agreed to double Willis-Knighton's bonus, but only so long as Willis-Knighton continued to maintain a favorable "competitive environment" for Humana by guaranteeing Humana "exclusivity." *Id*. at Humana-00000981. Willis-Knighton maintained that "competitive environment," at least until well after this lawsuit was filed, and in exchange has remained eligible for the inflated ▮% bonus share.

That is exactly what is reflected in the contract language that Mr. Blaylock drafted and the parties ultimately adopted, replacing the express exclusivity language that Mr. Blaylock previously had proposed:

> Based upon the competitive environment in Physician's market in a given year, Humana agrees to annually consider increasing the Quality of Care Shared Savings Allocation amount for Physician above the contracted amount listed in Table 1 of the Medicare Advantage Model Practice Amendment.

Ex. 103, at Humana-00000731. *Compare with* Ex. 97, at Humana-00001082.[6]

From all of this, a clear and straightforward story emerges: the WKPN had long been committed to an exclusive Medicare Advantage agreement with Humana, in return for which Humana agreed to pay the WKPN bonuses far above standard Medicare Advantage reimbursements. But in 2015, Humana became uncomfortable with the fact that its obligation to pay bonuses was in writing, while the WKPN's obligation to maintain exclusivity was not. Thus, it attempted to persuade the WKPN not only to agree to continue with the agreement, which the WKPN was willing to do in exchange for more money, but also to reduce both parties' commitments to writing. When Willis-Knighton agreed to continue the exclusivity deal but

---

[6] To be sure, Mr. Blaylock testified at his October 20, 2017 deposition that the words "competitive environment" in the 2015 contract were not an oblique reference to the exclusivity arrangement. *See* Ex. 99, Blaylock Dep. 26:6-29:1. But a jury could discredit that testimony in light of (1) Ms. Golenor's contemporaneous equation of the "competitive environment" with "exclusivity" and the "gentleman's agreement" in her July 10, 2015 email (Ex. 102, at Humana-00000980-981) and (2) Mr. Blaylock's own explanation that the adopted contract language "supports the 'gentlemen's agreements'" (Ex. 104, at Humana-00001125-31).

refused to put it in writing, Humana agreed, but only so long as its promise to ▮ Willis-Knighton's bonus was likewise left as part of the Gentlemen's Agreement. In other words, Humana wanted the flexibility to cancel Willis-Knighton's bonuses if Willis-Knighton reneged on the exclusivity deal.

### B. Willis-Knighton has complied with the Gentlemen's Agreement, locking up an essential component for competition by other Medicare Advantage plans

Willis-Knighton is likely to argue that although Humana undeniably sought WKPN's agreement to exclusivity, the WKPN resisted, and the Gentlemen's Agreement does not commit WKPN to exclusivity. It will cite Mr. Blaylock's testimony that while Humana was "pushing for exclusivity," and "pushing hard," Mr. Gavin's response was "for now I only plan to contract with you and with Aetna Coventry and so that is my gentlemen's agreement with you." Ex. 99 Blaylock Dep. 51:22-52:2. This argument, however, is countered not only by the contemporaneous documents, but also by both Mr. Cochran's testimony and by the WKPN's subsequent actions. Most notably, just a few months after renewing the Gentleman's Agreement, when Aetna purchased Coventry, Mr. Cochran fought off Aetna's attempt to "deem" (that is, take over) Coventry's Medicare Advantage contract with the WKPN. He did not hide Willis-Knighton's reasons for refusing contracting with Aetna for Medicare Advantage:

> As we have discussed, the Willis-Knighton Physician Network is not currently in a position to contract with another Medicare Advantage plan. To do so would jeopardize our contractual relationship with another payor. I'm certain you can understand that and would expect us to honor it if the shoe was on the other foot so to speak.

Ex. 105, at WK044690. Explaining that statement at his deposition, Mr. Cochran confirmed that the "relationship with another payor" referred to WKPN's agreement with Humana and that he "resisted" the contract with Aetna "because I feel like I [would have] violated my, you know, contract" if he had entered a Medicare Advantage agreement with Aetna. Ex. 92, 10/16/17 Cochran Dep. 290:10-23, 292:25-293:5. And when pressed about what "contract" he would be

9

violating if Willis-Knighton contracted with Aetna for Medicare Advantage, he explained: "Well, we had a gentlemen's agreement [with Humana]," and to contract with another Medicare Advantage plan would be to "violate[] my word." *Id*. at 290:18-23. In other words, Mr. Cochran was honoring the exclusive deal he had struck for WKPN with Humana.

Mr. Cochran's testimony also sheds new light on Willis-Knighton's otherwise inexplicable conduct towards Vantage at this same time. Just a month before Mr. Cochran fended off Aetna, Vantage proposed a Medicare Advantage agreement to Willis-Knighton. Ex. 106, at Vantage-00009155. Vantage expected that such a contract would be "an easy deal" to negotiate because the rates are "just 100 percent of Medicare." Ex. 51, Haygood Dep. 210:12-211:6 (explaining that agreeing to a Medicare Advantage contract should be "pretty straightforward" because it involves "really no negotiation"). Willis-Knighton, however, refused Vantage's offer. Ex. 63, Vantage 30(b)(6) Dep. 184:13-21. Now, Mr. Cochran's testimony as to Aetna also explains Willis-Knighton's refusal of Vantage's offer: it could not enter into such a contract without breaching the Gentlemen's Agreement.

The Gentlemen's Agreement thus had the effect Humana sought: it foreclosed access to an enormous share of physician services for Medicare Advantage insurance products. Humana understood that, by extracting an exclusivity deal from Willis-Knighton and incentivizing it to comply with the agreement, it would have exclusive access to a physician network that serves "8 out of 10 patients" in Caddo and Bossier Parishes. *See* Ex. 101, at Humana-00001293. *Cf.* Ex. 14, at WK016650 (Greg Gavin of Willis-Knighton stating that, without a contract with Willis-Knighton, BCBSLA "will have a helluva time selling their product in Bossier") (emphasis omitted).

The new evidence also shows that Humana clearly understood the causal link between the increased bonus, WKPN's continued exclusivity, and Humana's continued Medicare Advantage dominance: in articulating the deal on April 30, 2015, Mr. Fernandez described it as

10

increasing the WKPN's Shared Savings percentage "to ▇ percent [if] exclusive and keep blue cross out of Shreveport." Ex. 98, at Humana-00000801. A month later, when he enthused that a written exclusivity commitment from WKPN "will be extra special to block blue cross from Shreveport for a little while longer," Ms. Golenor replied, "Yep, that's the plan! :-)." Ex. 100, Humana-00001002. As Ms. Golenor testified, "[t]he plan that they were going to put in writing that they would limit the number of Medicare Advantage plans, that they contracted with in exchange for an increase in share, and that that would make the competitive environment less attractive for Blue Cross to decide taking in the market." Ex. 91, Golenor Dep. 54:15-21. Of course, if the Gentlemen's Agreement would exclude a competitor as formidable as BCBSLA, its adverse effect on Vantage and Aetna is obvious.

Thus, with Willis-Knighton's crucial assistance, Humana's plan worked: Because the WKPN has refused to contract with BCBSLA, Vantage, and nearly all other Medicare Advantage insurance providers as a result of the Gentlemen's Agreement,[7] Humana's shares of Medicare Advantage enrollees in Caddo and Bossier Parishes exceed 80%. Ex. 3, Silberman Liability Report Ex. 12.[8]

---

[7] Mr. Cochran testified that the WKPN had signed what he called an "all-products" contract with United Healthcare within the last year—well after this lawsuit was filed and Vantage put the Gentlemen's Agreement into issue. Ex. 92, 10/16/17 Cochran Dep. 217:2-218:12, 288:25-289:6. Otherwise, the WKPN's only Medicare Advantage contract was with Coventry, which never marketed a Medicare Advantage plan to senior citizens in Caddo and Bossier Parishes, and was such a negligible factor that Mr. Cochran evidently forgot for a time that the WKPN had a contract with it. *Id.* at 216:8-23; 217:2-23; 235:14-21; 271:16-272:7. When Mr. Cochran sheepishly brought the Coventry contract to Humana's attention, Humana readily carved it out of the exclusivity requirement. *Id.* at 271:16-272:7, 281:9-284:24.

[8] A monopolist like Willis-Knighton cannot escape liability by vaguely claiming that others have exclusive agreements and pointing to inapposite provisions like those in Vantage's contract with Christus. The critical difference, of course, between the Gentlemen's Agreement and other exclusive arrangements is the dominant market shares that both Willis-Knighton and Humana possess in Caddo and Bossier parishes. Because the exclusive agreement at issue here is between an insurer with over 80% of Medicare Advantage members in the area (Ex. 3, Silberman Liability Report Ex. 12) and a "dominant" health system that accounts for at least 66.7% of

11

### C. The Amended Complaint sufficiently pleads facts supporting the exclusive agreement

Willis-Knighton's principal response to the avalanche of evidence demonstrating its unlawful exclusive agreement with Humana has been to assert that Vantage failed to adequately state this claim in the Amended Complaint. WK MSJ 35-36; WK Reply 13-14. It complains, in particular, that Vantage failed to "put [it] on *fair* notice of the claims and the bases for them," undermining its ability to "adequately mount a defense." WK Reply 14. That rejoinder (which notably dodges the substance of Vantage's very powerful claim) is entirely unpersuasive, as a matter of both fact and law.

Take first the facts. Willis-Knighton was on notice from the start that Vantage believed that Willis-Knighton had refused to deal with it, including with respect to Medicare Advantage services. *See, e.g.*, Am. Compl. ¶¶ 22, 29, 33, 182(b) & 232; *see also generally* Opp. 44-45. It turns out that Vantage's belief was well-founded: Because Willis-Knighton had engaged in an exclusive deal with Humana, it *had* categorically refused to deal with Vantage (and all other insurers, including Aetna) for Medicare Advantage products. Vantage cannot be faulted for not knowing the underlying explanation for the refusal to deal which was concealed by a conspiracy—nor is the absence of the explanation from the complaint a bar to Vantage's pursuit of the claim.[9]

---

admissions and serves "8 out of 10 patients" in the area—*see* Opp. 9 (gathering evidence that Willis-Knighton's market share is as high as 76%); Ex. 101 at Humana-00001293; *see also* Ex. 13, Elrod Dep. 21:5-22:1 (in his deposition, Mr. Elrod confirmed that Willis-Knighton has a "dominant market share" for hospital services)—the Gentlemen's Agreement has had a significant exclusionary and anticompetitive impact. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals"); *United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (holding that "a monopolist's use of exclusive contracts" may give rise to violations of §§ 1 and 2 of the Sherman Act).

[9] There is nothing inconsistent about this position and the separate observation that Vantage has suffered antitrust injury as a non-purchaser. *See* Opp. 3, 32-36. Certainly, Vantage's status as

Moreover, Willis-Knighton has known for the better part of a year that Vantage was pursuing this theory; indeed, Willis-Knighton pursued discovery on the subject in depositions prior to the initial summary judgment briefing (*e.g.* Ex. 63, Vantage 30(b)(6) Dep. 27:16-29:14), and asserted in its own opening memorandum that it was entitled to summary judgment on the Humana exclusivity theory. *See* WK MSJ 35-38. And now the parties have completed an additional month of two-way discovery on the issue. *See* Docs. 378, 402. Against this backdrop, Willis-Knighton cannot seriously say (WK Reply 14) that it has been "ambushed" with a new theory of liability.

Nor does Willis-Knighton fare any better on the law. As we explained in the original opposition, even if (contrary to fact) Vantage had not adequately pleaded a claim based on Willis-Knighton's exclusive deal with Humana, Willis-Knighton should not be permitted to avoid liability for a clear violation of the antitrust laws. The proper course, instead, would be to construe Vantage's briefing as a motion to conform the pleadings to the evidence and to grant such relief. *See Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1036 n.11 (5th Cir. 1982) ("[T]he pleadings may be deemed amended to conform to the proof on a motion for summary judgment.") (citing *Putnam v. Williams*, 652 F.2d 497, 499 (5th Cir. 1981)). We made this point in the initial opposition (at 45 n.15), but Willis-Knighton offers no response.

## CONCLUSION

Willis-Knighton's motion for summary judgment should be denied.

---

a non-purchaser does not foreclose it from proceeding on a theory that Willis-Knighton had an exclusive deal with Humana.

Dated: November 13, 2017

 _s/ Scott L. Zimmer_

Scott L. Zimmer, No. 26151
KEAN MILLER LLP
333 Texas Street, Suite 450
Shreveport, LA 71101
Phone: 318-562-2655
Facsimile: 318-562-2751
scott.zimmer@keanmiller.com

James R. Chastain, Jr., No. 19518 (T.A.)
KEAN MILLER LLP
P.O. Box 3513 (70821)
11 City Plaza
400 Convention Street, Suite 700
Baton Rouge, LA 70802
Phone: 225-387-0999
Facsimile: 225-388-9133
sonny.chastain@keanmiller.com

Respectfully submitted,

 _s/ Christopher J. Kelly_

Christopher J. Kelly (*pro hac vice*)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2025
Facsimile: (650) 331-5025
cjkelly@mayerbrown.com

Robert E. Bloch (*pro hac vice*)
Scott P. Perlman (*pro hac vice*)
Reginald R. Goeke (*pro hac vice*)
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
rbloch@mayerbrown.com
sperlman@mayerbrown.com
rgoeke@mayerbrown.com

Daniel K. Storino (*pro hac vice*)
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
dstorino@mayerbrown.com

*Attorneys for Vantage Health Plan, Inc.*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, L.L.C. d/b/a UNIVERSITY HEALTH SHREVEPORT AND VANTAGE HEALTH PLAN, INC.<br><br>Plaintiffs,<br><br>v.<br><br>WILLIS-KNIGHTON MEDICAL CENTER, d/b/a WILLIS-KNIGHTON HEALTH SYSTEM<br><br>Defendant. | No. 5:15-cv-02057<br><br>Judge Elizabeth E. Foote<br><br>Mag. Judge Mark L. Hornsby |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 13, 2017, I filed the foregoing Plaintiff Vantage Health Plan Inc.'s Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment with the Clerk of this Court using the CM/ECF electronic filing system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

                                        s/ *Christopher J. Kelly*