# EXHIBIT 92
# Filed Pursuant to Court's Order of September 15, Oct. 13, 2017 and April 12, 2022

1                UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF LOUISIANA

3                   SHREVEPORT DIVISION

4

5    BRFHH SHREVEPORT, L.L.C. :   CASE NO.
     d/b/a UNIVERSITY         :   5:15-cv-02057-EEF-MLH
6    HEALTH SHREVEPORT AND    :
     VANTAGE HEALTH PLAN, INC.:
7                             :
             Plaintiffs,      :
8                             :
     VERSUS                   :
9                             :   JUDGE ELIZABETH E. FOOTE
     WILLIS-KNIGHTON          :
10   MEDICAL CENTER, d/b/a    :
     WILLIS-KNIGHTON HEALTH   :
11   SYSTEM                   :
                              :
12             Defendant  :   MAG. JUDGE MARK L. HORNSBY

13

14

15              - ATTORNEYS' EYES ONLY -

16

17

18

19        VIDEO DEPOSITION OF THOMAS H. COCHRAN
                   October 16, 2017
20                     Volume II

21

22

23   Reported by:
     Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
24   Registered Diplomate Reporter
     Notary Public

25

214

1          Q.  About getting the termination notice?

2          A.  Right.

3          Q.  Did you talk with Mr. Gavin at all about what

4     he ought to say to Mr. Fernandez in that call?

5          A.  We had, you know, in any negotiation, we had

6     discussions about our -- what we're going to ask for,

7     if that's what you're asking me.

8          Q.  Well, what, then, did you talk about in terms

9     of what you should ask for?

10          MR. COLLIER:  Objection.  Form.

11          Q.  (By Mr. Kelly)  And, again, this is with

12     Mr. Gavin.

13          A.  So -- I'm sorry.  Your question is?

14          Q.  Sure.  What did you and Mr. Gavin talk about

15     in terms you should asking for from Humana in the 2015

16     amendment before he spoke with Mr. Fernandez?

17          A.  I -- usually we try to get a ▉ percent

18     increase, and usually we try not to go over a two-year

19     agreement.

20          And I -- I couldn't tell you what the

21     specifics were, it was so long ago, but that was --

22     that was just typical contract discussions.

23          Q.  Did you and Mr. Gavin talk at all about the

24     idea of asking for an increase in the shared savings

25     percentage?

215

1        A.   Yes.   Mr. Gavin was adamant that we needed to

2    get ■ percent, I believe was the amount.

3        Q.   What did he say about that?

4        A.   He just said we need to get ■ percent of

5    the, you know, that they're getting paid, and they're

6    getting paid their money right off the top.   And so,

7    you know, we need to collect ours and so that we

8    can -- because we don't make a lot of money off of --

9    actually, I don't even know if we make any money off

10   Medicare subscribers.

11       Q.   And by "Medicare" you mean Medicare Advantage

12   subscribers?

13       A.   No -- well, by Medicare.   They're really

14   synonymous.   The rate of pay is the same; the QAD is

15   the same.

16       Q.   Got it.   Did you and Mr. Gavin talk at all

17   about what the Network could offer Humana in order to

18   get the ■ percent level?

19       A.   We -- we do, but we -- but we talk about with

20   every payor that we offer a very robust network of

21   physicians, specifically primary care physicians.

22       Q.   Did you talk at all about -- about the fact

23   that you were contracting exclusively with -- with

24   Humana for Medicare Advantage?

25       A.   You know, we -- we did -- I'm not -- we did

216

1   discuss contracting exclusively, but we -- we didn't
2   really contract exclusively.  We just -- I don't think
3   we really -- at that time, we're talking about what
4   year?
5        Q.  This is 2015; so --
6        A.  There wasn't a lot of play in this market
7   with regard to Medicare Advantage plans.
8        Q.  Did you have a contract with -- with anybody
9   for Medicare Advantage besides Humana at that time?
10       A.  Well, we didn't think we did.  We thought,
11  honestly, that we just -- just had the Humana
12  contract, and then there was -- the dynamics going on
13  at that time were -- Aetna was purchasing Coventry,
14  and we were renegotiating those contracts as this was
15  going on, and Coventry deemed that book -- their book
16  of business, if you will, to Aetna, and so we thought,
17  no problem.
18           And then they, for lack of a better term,
19  undeemed it -- some of it back, and I think -- well, I
20  don't think, I now know, it had a Medicare Advantage
21  plan in it, though it wasn't an actively marketed
22  plan.  But that was -- that was their plan is to start
23  marketing it.
24           And so I would say while I don't think we had
25  an exclusive arrangement, it worked out that way; but,

217

1    in essence, we didn't.

2        Q.  Was there anybody besides Coventry that the

3    Network had a contract with for Medicare Advantage at

4    that time?

5             MR. COLLIER:  2014?

6             MR. KELLY:  This is 2015.

7             MR. COLLIER:  Okay.

8             MR. KELLY:  April 2015.

9             MR. COLLIER:  I just wanted the record to be

10   clear.

11            MR. KELLY:  Thanks.

12            MR. COLLIER:  Sure.

13       A.  You know, our contract with UnitedHealthcare

14   was an all -- all-product line.  So -- I think all

15   product except for maybe some type of auto -- I don't

16   ever contract -- some of these companies have like an

17   auto liability-type plan.  Y'all attorneys might be

18   more familiar with it than me.  But it's where, you

19   know, somebody gets in a wreck -- we don't do that.

20   So it was all product except for that.  And I think

21   United had -- had a Medicare Advantage plan, I think.

22   I know they had the ability to have one, whether they

23   did or not, I don't know.

24       Q.  (By Mr. Kelly)  When -- when did

25   Willis-Knighton or the Network first contract with

218

1   UnitedHealthCare for Medicare Advantage?

2       A.  Well, we've -- that's what I'm saying.  It's

3   always -- I think it's -- we have a contract, it's

4   kind of like a general contract.

5       Q.  Uh-huh.

6       A.  And they can -- we just contract with the

7   insurance company, and then the insurance company

8   brings their products to the -- to the market per se.

9   And we get one rate across the board except for the --

10  you know, except for -- we either get a commercial

11  rate or we get a Medicare or a Medicaid rate.  Those

12  are our three rates.  Or workers' comp in one case.

13      Q.  Now, before Mr. Gavin spoke with -- with

14  Mr. Fernandez -- and this, again, is in late March or

15  early April of 2015 -- did you and he talk about

16  whether Mr. Gavin should tell Mr. Fernandez that eight

17  out of ten patients in Shreveport go to a

18  Willis-Knighton doctor?

19      A.  Say that again, please?

20      Q.  Sure.  Did you and Mr. Gavin talk -- before

21  he talked with Mr. Fernandez, did you and Mr. Gavin

22  talk about whether he should tell Mr. Fernandez that

23  eight out of ten patients in Shreveport go to see a

24  Willis-Knighton doctor?

25      A.  I don't recall telling Mr. Gavin that eight

235

1    took you up to ■ percent, and all of a sudden the

2    Network started retaining the shared savings instead

3    of passing it along to the physicians, Humana would

4    have a gripe.  Wouldn't they?

5           MR. COLLIER:  Objection.  Form.

6       A.  Can we use another example?

7       Q.  (By Mr. Kelly)  Sure.

8       A.  Because as I said earlier, I don't recall

9    what 1 and 2 were about --

10      Q.  Okay.

11      A.  -- that you said we'd get to in a minute,

12   but -- so maybe we could use your example with one of

13   these others?

14      Q.  Sure.  Well, what about number 6:

15   Exclusivity of Humana.  I mean, at that time you

16   thought that Humana was the only plan that you had a

17   contract with for Medicare Advantage; right?

18      A.  Yes.

19      Q.  Coventry hadn't come back to you yet and

20   said -- and reminded you that they --

21      A.  Correct.

22      Q.  -- thought they had that contract.  So you

23   tell them this as a justification for redistributing

24   the percentage.  They agree, and they increase it.

25   And then the next day, you sign contracts with -- with

271

1          Did you talk with him about the alternative
2    language that he suggested in his email to you on
3    July 1st?
4          A.   I would think so.
5          Q.   Did you tell him that that language didn't
6    work?
7          A.   Probably.
8          Q.   Did you tell him why?
9          A.   I probably reiterated that.  We told him back
10   here why.
11         Q.   Did you say anything to him in the call
12   about -- about the Network's contract with Coventry
13   for Medicare Advantage being a problem?
14             MR. COLLIER:  Objection.  Form.
15         A.   Please ask again?
16         Q.   (By Mr. Kelly)  Sure.  In this call that you
17   had with Mr. Blaylock, did you mention
18   Willis-Knighton's -- excuse me.  The Network's
19   contract with Coventry for Medicare Advantage?
20         A.   I don't know if I did in this one or not.  I
21   have -- I did have those conversations with him.
22         Q.   And when you had that conversation with him
23   about Coventry, was -- did you tell him that that
24   contract was the reason why you couldn't have
25   exclusivity language in the 2015 amendment?

272

1          MR. COLLIER:  Objection.  Form.

2      A.  I don't know when I told him about that, but

3  I know I went to great pains to make sure -- I mean, I

4  didn't know that we -- I didn't realize that we had

5  that -- that Coventry had that product and that we had

6  that in our contract, and I didn't want to lie to the

7  man.

8          And somebody said -- I don't remember who --

9  somebody said maybe, you know, just don't tell them.

10  And I said, well, Aetna is going to be buying -- you

11  know, they're trying to purchase Coventry, and they'll

12  find out.  And that's not how I want to be thought of

13  in this business.  And ultimately that's when we came

14  up with the gentlemen's agreement; so.

15      Q.  (By Mr. Kelly)  Who told you not to tell

16  Mr. Blaylock about the Coventry agreement?

17      A.  I think it was just a discussion point, maybe

18  with Jared and Mr. Gavin.  It wasn't a -- I don't

19  think it was a "don't tell them."  It was just a

20  here's -- here's -- you know, here's an option.  Just

21  that kind of deal.  But it wasn't an option.

22      Q.  Right.  And ultimately you did tell them

23  about Coventry.

24      A.  Absolutely.  Absolutely.

25      Q.  Did -- what did Mr. Blaylock have to say in

281

1     Q.   I think you'll see that the emails follow in
2  the same -- the same chain that we've been looking at.
3  And I'm boring you, I know.  I'm sorry.
4     A.   No.  No.
5     Q.   It happens.  Does it look like this is --
6  like 1054 is a further email from Mr. Blaylock to you
7  in this chain on July 7th?
8     A.   Yes.
9     Q.   And just below Mr. Blaylock's email, towards
10  the bottom of the first page, there's an email from
11  you to Mr. Blaylock dated July 6th of 2015?
12     A.   Yes.
13     Q.   And -- and there you mention, the second
14  paragraph, that there doesn't seem to be a reference
15  to a carve-out for Coventry?  I beg your pardon.  It
16  doesn't specifically mention Coventry.  Does it?  You
17  say, "I do not see where there was a concession to
18  existing or 'grandfathered' in Medicare Advantage
19  contracts like we discussed last week."
20          Do you see that there?
21          MR. COLLIER:  Objection.  Form.
22     A.   I do.
23     Q.   (By Mr. Kelly)  Were you talking about the
24  Coventry contract right there?
25          MR. COLLIER:  Objection.  Form.

282

1      A.  I don't know.  But I was definitely talking

2   about -- what it says.  I do not see where there was a

3   concession to existing or grandfathered in Medicare

4   Advantage contracts like we discussed last week; so.

5      Q.  (By Mr. Kelly)  And, in response,

6   Mr. Blaylock says, "I have added language that allows

7   for the exclusion of your Aetna/Coventry contract from

8   calculation of number of health plans in determination

9   of shared savings allocation percentage."

10          Do you see that there?

11      A.  I do.

12      Q.  And if we flip to 1055, the draft agreement

13   that is attached --

14      A.  Okay.

15      Q.  -- to it.  Yeah.  1055.  If you look at the

16   second page, you'll see that in addition to the added

17   paragraph for LSU, there's now a paragraph (e) that

18   says, "Humana agrees that any contracts with

19   Aetna/Coventry for Medicare Advantage lines of

20   business prior to the effective date of this agreement

21   will be grandfathered in and not considered in the

22   determination of the number of health plans contracted

23   in determining the shared savings allocation

24   percentage as defined above."

25          Do you see that there?

283

1    A.  I did.

2    Q.  Did you -- did you send this draft on to --

3         MR. COLLIER:  Hold on a second.  Are you

4    looking at another document?  Do you need to look at

5    something to finish answering or are you done with

6    your answer?

7         THE WITNESS:  I was trying to find -- I was

8    trying to find -- I thought I had -- somewhere in all

9    this paperwork, I thought I had seen the final

10   agreement, because I don't know if this is it or not.

11   Q.  (By Mr. Kelly)  1040 -- yeah.  I'm not

12   asking -- I'm not even suggesting that that's the

13   final agreement, for sure.  The very first exhibit we

14   looked at today, which I think you reminded me was

15   1040, is the final agreement.  We started with that.

16        So it's probably -- it's shuffled in there

17   somewhere.  I'm pretty sure.  There you go.

18   A.  That's the final agreement.

19   Q.  Right.  So let me show you --

20        MR. COLLIER:  Well --

21        MR. KELLY:  Yeah.

22        MR. COLLIER:  -- hold on.  I'm not certain --

23   I want to be very respectful of your time, so I just

24   want to ask -- was your answer done, or when he tells

25   you he understands that what he asked about was a

284

1    draft and not the final agreement, is that what you

2    were trying to tell him?

3         A.  I'm not even sure what the question was.

4         Q.  (By Mr. Kelly)  Oh, I think -- actually the

5    question was pretty clear.  I was just asking if you

6    saw there on the second page there was an additional

7    edit from Mr. Blaylock adding the LSU carve-out.

8         A.  Yes.  I see that edit, yes, sir.

9         Q.  You see that --

10             MR. COLLIER:  In Exhibit 1049.

11             MR. KELLY:  I'm sorry.  And you know what?

12   And in my hurry --

13             MR. COLLIER:  1055.

14             MR. KELLY:  --  I just blew it.  I meant

15   whether you saw the additional paragraph --

16             MR. COLLIER:  Or 1055.  Sorry.

17             THE WITNESS:  1055.

18             MR. KELLY:  Now we're stepping on each

19   other's time.  Boy, wait until you see what I do.

20        Q.  (By Mr. Kelly)  What I meant to ask was

21   whether, in fact, you saw that there was an additional

22   paragraph, this time around, with the carve-out for

23   Coventry.

24        A.  Yes.  I see that.

25        Q.  Okay.  Great.  Now I want to show you

288

 1        A.  Definitely.

 2        Q.  Let me ask that question again.  I didn't ask

 3  it right.

 4             As we sit here today, has Willis-Knighton

 5  Physician Network entered into contracts with other

 6  Medicare payors other than Humana?

 7        A.  Yes.  If I'm understanding the question

 8  right.  Have we contracted with other Medicare --

 9        Q.  Advantage payors.

10        A.  Absolutely.

11        Q.  And who would they be?

12        A.  We've got Aetna/Coventry, we've got Humana,

13  we've got UnitedHealthcare.  I don't think CIGNA has

14  that product here.  There's one more, I believe.  I

15  just don't remember the name of it right now.

16        Q.  Okay.  And despite contracting with other

17  Medicare Advantage payors, including Aetna/Coventry

18  and UnitedHealthcare and the one whose name you can't

19  remember now, what is the agreed shared savings

20  percentage between Willis-Knighton and Humana?

21        A.  ███ percent.

22             MR. COLLIER:  Pass the witness.

23  EXAMINATION

24  BY MR. KELLY:

25        Q.  Do you remember when the Network entered into

289

1  a contract with UnitedHealthcare that covered Medicare
2  Advantage?
3      A.  Probably -- I think we're in year one of a
4  three-year agreement.
5      Q.  So it's within the last year.
6      A.  I think so.
7      Q.  Okay.  And has -- has Willis-Knighton signed
8  a contract with Aetna itself to cover Medicare
9  Advantage?
10     A.  We -- that's on a two-year agreement.  And
11  that contract doesn't come up for renewal until June,
12  I think, of 2018.
13     Q.  So it hasn't signed a contract with Aetna
14  itself for Medicare Advantage.  Has it?
15         MR. COLLIER:  Objection.  Form.
16     A.  I want to say that -- kind of like we didn't
17  know it was in Coventry, I couldn't swear to you if
18  it's -- under oath, whether it's -- they have that
19  ability or not.  But I can tell you -- I can swear
20  under oath that that was a two-year agreement, and
21  that it doesn't come up for renewal until, I think
22  it's June, and I know it's of 2018.
23     Q.  (By Mr. Kelly)  Now, Aetna tried to get you
24  to agree that it could take advantage of the Coventry
25  Medicare Advantage contract in the fall of 2015.

290

1   Didn't it?

2       A.   What do you mean by "take advantage of"?

3       Q.   They tried to deem --

4       A.   They did deem it.

5       Q.   They did.

6       A.   Yes, sir.  And then they undeemed it.

7       Q.   And you resisted it -- didn't you? -- when

8   they tried to deem it?

9           MR. COLLIER:  Objection.  Form.

10      A.   Yeah.  I resisted it, because I feel like I

11  had violated my, you know, contract.

12      Q.   (By Mr. Kelly)  What did -- what did you

13  violate?

14      A.   Well, I felt like they had -- repeat your

15  question one more time?

16      Q.   You said you felt like you had violated your

17  contract, and I asked what contract did you violate?

18      A.   Well, we had a gentlemen's agreement.  I

19  violated my word.  Maybe that would be a better way to

20  say that.  And I don't want to do that.  I didn't want

21  to do that.  And so I corrected it.

22      Q.   The gentlemen's agreement with Humana?

23      A.   (Nods head, yes.)

24      Q.   Let me show you what's been marked as

25  Exhibit 1059.

291

1            (Cochran Deposition Exhibit No. 1059 was
2        marked for identification.)
3        Q.  You'll see that the exhibit consists of two
4    emails:  One between -- from you to Jackie Longman on
5    Friday, October 16th, 2015, and then a reply from
6    Ms. Longman to you and Mr. Gavin with a copy to
7    Mr. Beville on October 28th of 2015.
8        A.  Right.
9        Q.  Did you receive those emails?
10       A.  I do.
11       Q.  Do you remember those emails?
12       A.  I do.
13       Q.  Let me ask you about your email to
14   Ms. Longman.  Did you write this email?
15       A.  I did.
16       Q.  Did you run it by anyone before sending it to
17   Ms. Longman?
18            MR. COLLIER:  Objection.  Form.
19       A.  I mean, I don't usually -- I don't usually
20   run my emails by anybody.  I mean, we might have
21   discussions ahead of time and then I, you know, write
22   what I write and hopefully either get it right or take
23   my lumps.
24       Q.  (By Mr. Kelly)  Well, I'm wondering did you
25   show this email to Mr. Beville before you sent it to

292

1  Ms. Longman?

2      A.  I don't think I did.

3      Q.  Or Mr. -- or did you show it to Mr. Gavin?

4      A.  Again, I don't -- I don't think I did.  I

5  typically don't -- I mean, you'd never get anything

6  done if you said, here, proofread this.

7      Q.  In the first paragraph, you say, "As we have

8  discussed, the Willis-Knighton Physician Network is

9  not currently in a position to contract with another

10 Medicare Advantage plan.  To do so would jeopardize

11 our contractual relationship with another payor.  I'm

12 certain you can understand that and would expect us to

13 honor it if the shoe was on the other foot, so to

14 speak."

15         Do you see that there?

16     A.  I do.

17     Q.  The other Medicare Advantage plan that you're

18 referring to is Humana; is that right?

19         MR. COLLIER:  Objection.  Form.

20     Q.  (By Mr. Kelly)  I'm sorry.  The other payor?

21         MR. COLLIER:  Objection.  Form.

22     Q.  (By Mr. Kelly)  Let me be clearer.  I can do

23 a better job.

24         MR. KELLY:  Thank you, Marc.

25     Q.  (By Mr. Kelly)  In the second sentence of

293

1  that paragraph when you say "To do so would jeopardize

2  our contractual relationship with another payor," is

3  the "another payor" that you're referring to there

4  Humana?

5      A.  I would probably -- I would say yes.

6      Q.  And the contractual relationship you're

7  talking about is the gentlemen's agreement?

8          MR. COLLIER:  Objection.  Form.

9      A.  I don't know about that.  No, I don't think

10  that would be -- I don't think that would be the case.

11  Because a gentlemen's agreement is not a

12  contractual --

13      Q.  (By Mr. Kelly)  Okay.  Well, let's take a

14  look at Exhibit 1040, the signed 2015 amendment, if we

15  could.  And what I want to know is is do you see

16  anything in there that -- that entering into a

17  contract with Aetna for Medicare Advantage, anything

18  in there that an Aetna contract for Medicare Advantage

19  would violate?

20          MR. COLLIER:  Objection.  Form.

21      A.  Are you asking me if I see anything in this

22  Exhibit 1040 that would violate --

23      Q.  (By Mr. Kelly)  That would be violated by

24  your entering into a Medicare Advantage contract with

25  Aetna.

294

1    A.  Okay.  So you're --

2         MR. COLLIER:  I'm going to object to the

3    form.  Calls for a legal conclusion.  But you can

4    answer to the extent of your knowledge.

5    A.  So you're asking me, just so I'm clear, if

6    there's any -- if I contracted with Aetna, is there --

7    would it violate anything in this agreement.  This

8    Exhibit 1040; is that right?

9    Q.  (By Mr. Kelly)  Yeah.  But I think I'm going

10   to withdraw the question, since I'm running out of

11   time.

12        Let me instead ask you to take a look at

13   Exhibit 1058, in the little bit of time we have left.

14        (Cochran Deposition Exhibit No. 1058 was

15        marked for identification.)

16   Q.  And all I'd like to ask you is whether you

17   recognize it and who wrote the material that you see

18   in the lower half of page -- with the heading Meeting

19   Objectives, Contractual Discussions.

20        (Document(s) reviewed by the witness.)

21   A.  Okay.

22   Q.  Who wrote that material?

23   A.  Me.

24   Q.  Did you run it by anybody else?

25        MR. PUGH:  Clock is up.